**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NHC LLC, a Florida limited liability company, | |
| Plaintiff, | |
| v. | No. |
| CENTAUR CONSTRUCTION COMPANY INC., an Illinois corporation, SPIRO TSAPARAS, and PETER ALEXOPOULOS, | |
| Defendants. | |

**COMPLAINT**

Plaintiff NHC LLC ("NHC"), by its attorneys, Vedder Price P.C., for its Complaint against Defendants Centaur Construction Company Inc. ("Centaur"), Spiro Tsaparas ("Spiro") and Peter Alexopoulos ("Peter" and together with Centaur and Spiro, "Defendants"), in relation to the design and construction of the Nobu Hotel in downtown Chicago (the "Project") states as follows:

**NATURE OF THE ACTION**

1. This is an action for breach of contract and fraud arising from Defendants' embezzlement of Project funds and submission of fraudulent requests for payment to NHC under the Project contract. On several occasions, Centaur requested and received from NHC progress payments for work that Defendants falsely represented to NHC had been performed in constructing the Nobu Hotel, when in fact such work had not been fully completed and one or more subcontractors were still owed significant amounts of money for work they performed without the knowledge and permission of NHC.

2.      NHC has made aggregate total payments to Centaur in the amount of $47,757,000 as of June 17, 2019, as well as $500,000 to certain suppliers/subcontractors.  Despite NHC having paid the $48,257,000 guaranteed maximum contract price for the construction of the Nobu Hotel under the contract, Centaur has not substantially completed the construction of the hotel and numerous subcontractors who have performed work on the Project remain owed payment by Centaur.  In addition, Spiro recently informed a representative of NHC that he had diverted approximately $8 million in payments obtained from NHC to use for personal purposes or on other projects.

3.      NHC has incurred millions of dollars in monetary damages caused by Defendants' breaches of contract and fraud.  In addition to the embezzled funds, NHC is facing damages in the form of impeding liens from subcontractors that should have already been paid by Centaur and delay damages in completing the Project.  NHC seeks compensatory and punitive damages, as well as reasonable attorneys' fees, costs, prejudgment interest, and such other relief as the Court deems just and proper.

## THE PARTIES

4.      NHC is a Florida limited liability company with its principal place of business in Miami Beach, Florida.  At all relevant times, NHC has been registered with the Illinois Secretary of State to do business in Illinois.  No members of NHC reside in or are citizens of Illinois.

5.      Centaur is an Illinois corporation with its principal place of business in Chicago, Illinois.

6.      Spiro is an individual residing in Chicago, Illinois and is the Chief Executive Officer of Centaur.

7.      Peter is an individual residing in Niles, Illinois and is the President of Centaur.

2

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over this case based on 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

9.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because all Defendants reside in this judicial district (and in the State of Illinois) and because a substantial part of the events or omissions giving rise to the claim occurred in Chicago, Illinois.

## FACTUAL BACKGROUND

10.     On or about April 16, 2018, NHC and Centaur entered into a written agreement (the "Agreement") for Centaur to provide design and construction services in connection with the design and construction of the Project—the NOBU Hotel Chicago, a proposed 12-story hotel to be built and located at 846-54 W. Randolph Street, Chicago, Illinois.  A true and correct copy of the Agreement is attached hereto as Exhibit 1.  The Agreement further defines the relevant Contract between NHC and Centaur as consisting of the Agreement and the Design-Build Documents as defined therein (collectively, the "Contract").

11.     As set forth in Section 1.4.15 of the Agreement, Centaur and NHC agreed that the contract price of the services provided by Centaur would be subject to a "guaranteed maximum price" of $48,257,000.00.  Specifically, Section 1.4.15 of the Agreement provides that:

> The Contract Sum is the amount to be paid to [Centaur] for performance of the Work related to the Project. In consideration of the performance of this Contract, [NHC] shall pay to [Centaur] a Contract Sum up to a guaranteed maximum price ("GMP") of Forty-Eight Million Two Hundred Fifty Seven Thousand and No/100 ($48,257,000.00) as provided herein and subject to additions and deductions as provided in the Contract Documents. It being understood and agreed that if the sum of the cost of the Work exceeds the GMP, all such costs and expenses shall be solely borne [Centaur].

(Ex. 1 § 1.4.15.)

12. Section 2.2.1 of the Agreement further provides that:

No progress payments made hereunder shall be conclusive evidence of the performance of the Work or Contract Documents either in whole or in part, and no such payment shall be construed to be acceptance of defective work or improper materials.

(Ex. 1 § 2.2.1.)

13. With respect to progress payments to Centaur under the Contract, the Agreement sets forth a process by which Centaur is required to submit applications for progress payment based on work Centaur has actually completed on the Project. Specifically, Section 9.3.1 of the Agreement provides that:

At least ten (10) business days before the date established for each progress payment, [Centaur] shall submit to [NHC] an itemized Application for Payment for completed portions of the Work. The application shall be notarized, if required, and supported by data substantiating [Centaur's] right to payment as [NHC] may require, such as copies of requisitions from the Architect, Consultants, Contractors, and material suppliers, and shall reflect retainage if provided for in the Design-Build Documents. Such Application for Payment shall be certified as correct by [Centaur] and shall be accompanied by a lien waiver from [Centaur] for all Work performed directly by [Centaur] for which payment is being requested and lien waivers from all Contractors, Subcontractors, Consultants, sub-subcontractors and material suppliers for all Work performed through the date of the prior Application for Payment; provided, however, that each Contractor, Subcontractor, Consultant, sub-subcontractor and material supplier shall provide a full and final lien waiver with its final payment request and any additional requirements made by [NHC's] title insurance company. In addition, such Application for Payment shall contain a certification by [Centaur] identifying all Contractors, Subcontractors, sub-subcontractors and material suppliers providing materials or performing the Work, that [Centaur] has no knowledge of any notices of intent to file claim for lien or claims for lien as of the date of such Application for Payment, that all due and payable bills with respect to the Work have been paid to date or shall be paid from the proceeds of such Application for Payment and that there is no known basis for the filing of any notices of intent to file claim for lien or claims for lien on the Work. . . .

(Ex. 1 § 9.3.1.)

14. Section 9.3.1.2 of the Agreement further provides that:

Applications for payment shall not include requests for payment for portions of the Work for which [Centaur] does not intend to pay the Architect, Consultant,

Contractor, Subcontractor, material supplier, or other persons or entities providing services or work for [Centaur], unless such Work has been performed by others whom [Centaur] intends to pay.

(Ex. 1 § 9.3.1.2.)

15. Section 9.3.3 of the Agreement further provides in relevant part that:

[Centaur] further warrants that, upon submittal of an Application for Payment, all Work for which an Application for Payment have [sic] been previously issued and payments received from [NHC] shall, be free and clear of liens, claims, security interests or encumbrances in favor of [Centaur], Architect, Consultants, Contractors, material suppliers, or other persons or entities entitled to make a claim by reason of having provided labor, materials and equipment relating to the Work.

(Ex. 1 § 9.3.3.)

16. In or around May 2018, Centaur began construction of the Project. Centaur requested on various occasions that NHC submit progress payments to Centaur for design and construction work that Defendants represented had been performed by Centaur pursuant to the Contract. The payments are as follows:

| Payment Date | Payment Amount |
|---|---|
| 1/26/2018 | $ 2,533,449.53 |
| 1/26/2018 | 96,789.58 |
| 2/23/2018 | 1,000,000.00 |
| 3/6/2018 | 1,500,000.00 |
| 3/16/2018 | 1,000,000.00 |
| 4/3/2018 | 1,055,000.00 |
| 6/1/2018 | 2,900,000.00 |
| 7/2/2018 | 3,300,000.00 |
| 8/1/2018 | 3,500,000.00 |
| 9/4/2018 | 3,600,000.00 |
| 9/6/2018 | 1,000,000.00 |
| 10/2/2018 | 2,500,000.00 |
| 10/4/2018 | 1,500,000.00 |
| 11/5/2018 | 2,900,000.00 |
| 12/6/2018 | 2,800,000.00 |
| 1/7/2019 | 2,700,000.00 |
| 2/6/2019 | 2,100,000.00 |
| 3/7/2019 | 1,900,000.00 |
| 4/2/2019 | 1,000,000.00 |
| 4/15/2019 | 1,700,000.00 |
| 5/7/2019 | 1,400,000.00 |
| 5/23/2019 | 1,500,000.00 |
| 6/5/2019 | 2,500,000.00 |
| 6/17/2019 | 1,771,760.89 |
| **Total** | **$47,757,000.00** |

17.     Unbeknownst to NHC, Defendants' representations that Centaur had performed all work for which it requested payment from NHC were false.  On at least several occasions, Centaur in fact did not perform all of the work for which it had requested payment from NHC.  In addition, Centaur further hired numerous subcontractors to perform work on the Project and agreed to change orders with subcontractors amounting to millions of dollars without informing NHC.

18.     At the times Defendants falsely represented to NHC that Centaur had performed all work for which it had requested payment from NHC, Defendants knew that their representations to NHC were false.

6

19.     Defendants made their false representations to NHC for the purpose of inducing NHC to provide progress payments to Centaur so that Spiro could utilize all or portions of such payments for personal use or to fund other Centaur projects and/or expenses.  Such progress payments would have been due to Centaur under the Contract only if Centaur had in fact performed the work for which the progress payments were sought, as well as complied with the other requirements in the Contract.

20.     NHC reasonably relied on Defendants' false representations in making progress payments to Centaur because NHC reasonably believed that Centaur had completed the work entitling Centaur to such progress payments.

21.     Due to Defendants' false statements, NHC made total payments of $48,257,000, the guaranteed maximum price under the Contract.  Subsequent to making these payments to Centaur, NHC learned that:  (i) Centaur had not completed all of the work for which it sought these payments, (ii) numerous subcontractors hired by Centaur were collectively owed millions of dollars for work performed on the Project without NHC's knowledge or permission, (iii) such subcontractors remain unpaid by Centaur and (iv) instead of using NHC's payments to perform work on the Project (or fully compensate the subcontractors who performed work on the Project), Defendants utilized millions of dollars from NHC's payments for personal use or to fund other Centaur projects and/or expenses.

22.     As an example of one of Defendants' false representations, on May 2, 2019, Spiro met with Rodrigo Chapuro, a representative of NHC, in Los Cabos, Mexico, during which Sprio stated to Mr. Chapuro that Centaur was three-quarters of a million dollars over budget and that Centaur would cover this extra cost.  During this meeting, Spiro also informed Mr. Chapuro that the schedule of the completion of the Project would be affected by "maybe a month or two at the

max." Spiro knew that these statements were false at the time he made them. Despite knowing that the Project was substantially more than $750,000 over budget and that the completion of the Project would be delayed more than two months, Spiro made these false statements to induce NHC to continue making progress payments to Centaur under the Contract. NHC in fact relied on these false statements by making additional progress payments to Centaur under the reasonable belief that additional funds were owed to Centaur under the Contract.

23.     As another example of false representations made by Defendants, on May 19, 2019, Spiro, on behalf of Centaur, sent an invoice by e-mail to Rodrigo Chapur stating that Centaur had earned a total of $46,881,761.24 for construction of the Project, and that based on this amount earned, an additional $4,896,522.13 was due by NHC to Centaur under the Contract by May 19, 2019. A copy of this May 19, 2019 invoice is attached hereto as Exhibit 2. At the time Spiro sent this invoice to Mr. Chapur, as a representative of NHC, Spiro and Centaur knew that Centaur had not completed construction of the Project entitling Centaur to anywhere near $46,881,761.24 in total payments under the Contract. Centaur and Spiro sent this May 19, 2019 invoice to Rodrigo Chapur in order to induce NHC to make additional progress payments to Centaur under the Contract. NHC reasonably relied on this May 19, 2019 invoice by making additional progress payments to Centaur.

24.     Additionally, the May 19, 2019 e-mail from Spiro to Rodrigo Chapur attached a Contractor's Application for Payment and Contractor's Affidavit, both of which were executed by Peter as President of Centaur. The Contractor's Application for Payment and Contractor's Affidavit are attached hereto as Exhibit 3. In the Contractor's Application for Payment, Centaur falsely represented that it had "earned" and "completed" $46,881,761.24 for construction work on

the Project, out of a total contract price of $48,257,000, as of April 30, 2019 and that an additional $4,896,522.13 was due by NHC under the Contract.

25.     Similarly, the Contractor's Affidavit falsely represented that there was a "balance due" of $1,375,238.76 by NHC under the Contract and that "[t]here are no other contracts for said work outstanding, and that there is nothing due to become due to *any person* for materials, labor or other work of any kind done or to be done upon or in connection with said work other than above stated."  (Ex. 3 (emphasis added).)  This representation was patently false, as Centaur had engaged additional, undisclosed subcontractors to perform work on the Project who were not listed in this Contractor's Affidavit and who had not been paid.  Defendants made these knowingly false representations for the purpose of inducing NHC to reasonably rely on these representations to make further progress payments to Centaur, which NHC in fact did.

26.     In addition, on July 24, 2019, Spiro sent an e-mail to Rodrigo Chapur containing additional fraudulent statements.  A copy of this July 24, 2019 e-mail from Spiro Tsaparas to Rodrigo Chapur is attached hereto as Exhibit 4.  In this e-mail, Spiro made numerous knowingly false representations, including that:  (1) the "[t]otal amount above the contracted sum" to complete the Project was "$6,156,000.00," (2) the "project will not suffer any liens" from subcontractors, and (3) Spiro/Centaur would be paying the rest of the "trades" on July 25, 2019 "so the site will receive the manpower it needs to catch up."

27.     On August 23, 2019, Spiro and Rodrigo Chapuro, a representative of NHC, met in person to discuss NHC's concerns with Centaur's failure to perform under the Contract.  During this meeting, Spiro admitted to Mr. Chapuro that Centaur, at Spiro's instruction, had diverted approximately $7-8 million of NHC's payments to personal use or to fund other Centaur projects and/or expenses.

28.     As of the date of the filing of this Complaint, Centaur, despite NHC having paid the $48,257,000.00 (GMP) under the Contract, has not substantially completed construction of the Project.

29.     In addition, the Contract contains additional requirements regarding Centaur's hiring and payment of subcontractors to perform work on the Project. For example, Section 1.18 of the Agreement provides in relevant part that:

> [Centaur] shall be responsible to [NHC] for all oversight and supervision of [Centaur], and its Architects, Consultants, Contractors, and Subcontractors. [Centaur] shall also be responsible and liable to [NHC] for all deficiencies in the performance of [Centaur], its Architects, Consultants, Contractors, and Subcontractors. All Architects, Consultants, Contractors, and Subcontractors must be approved by [NHC] in advance of such party performing any Work relating to the Project. [NHC's] approval of such Architects, Consultants, Contractors, and Subcontractors shall not be unreasonably withheld. For each Architect, Consultant, Contractor, and Subcontractor that [Centaur] desires to engage with relating to the Project whose contract is estimated to be $10,000.00 or more at the time of the initial engagement, [Centaur] shall notify [NHC] in writing of such Architect, Consultant, Contractor, and Subcontractor that [Centaur] desires to retain and the proposed scope of such party's proposed services. . . .

(Ex. 1 § 1.1.8 (emphasis added).)

30.     Further, Section 9.6.2 of the Agreement further provides in relevant part that:

> [Centaur] shall pay each Architect, Consultant, Contractor, Subcontractor and other person or entity providing services, materials, or work for [Centaur] no later than the time period required by applicable law, but in no event more than seven (7) days after receipt of payment from [NHC] the amount to which the Architect, Consultant, Contractor, Subcontractor, and other person or entity providing services or work for [Centaur] is entitled, reflecting percentages actually retained from payments to [Centaur] on account of the portion of the Work performed by the Architect, Consultant, Subcontractor, Contractor, or other person or entity. . . .

(Ex. 1 § 9.3.2.)

31.     Section 5.14.3 of the Agreement provides in relevant part that:

> The Design-Builder shall reimburse the Owner for costs the Owner incurs that are payable to a separate contractor because of the Design-Builder's delays, improperly timed activities or defective construction.

(Ex. 1 § 15.14.3.)

32.     Despite being required to do so by the Contract, Centaur did not obtain advance approval from NHC for all subcontractors who performed work on the Project. Additionally, despite having been directly paid $47,757,000.00 by NHC, Centaur did not pay all subcontractors who performed work on the Project within seven (7) days of receiving payment from NHC. To the contrary, numerous subcontractors hired by Centaur to perform work on the Project remain unpaid by Centaur as of the filing of this Complaint. Even worse, several of these subcontractors have served notices of mechanics liens on NHC relating to their unpaid work on the Project.

33.     With respect to changes in the work of the Project, Section 6.1.1 provides in relevant part that:

> Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by written Change Order signed by both parties or a Change Directive executed by [NHC], subject to the limitations stated in this Article 6 and elsewhere in the Design-Build Documents. . . .

(Ex. 1 § 6.1.1.)

34.     Additionally, Section 6.2 defines changes orders by stating that:

> A Change Order is a written instrument signed by [NHC] and [Centaur] stating their agreement upon all of the following:
>
>     .1 The change in the Work;
>
>     .2 The amount of the adjustment, if any, in the Contract Sum or, if prior to execution of the Design-Build Amendment, the adjustment in [Centaur's] compensation; and
>
>     .3 The extent of the adjustment, if any, in the Contract Time.

(Ex. 1 § 6.2.)

35.     At no time during Centaur's work on the Project did Centaur and NHC execute any written change orders that would increase the maximum guaranteed price of the Project under the Contract or allow Centaur additional time to substantially complete construction of the Project.

Centaur also did not provide NHC with notice of any change orders entered into between Centaur and any subcontractor(s) hired by Centaur to perform work on the Project.

36.     Under Section 1.1.7 of the Agreement, Centaur was required to substantially complete construction of the Project within 400 days after the Commencement of Construction Date. The construction of the Project commenced in or around May 2018. As of the filing of this Complaint, well more than 400 days after the Commencement of Construction Date, Centaur has not substantially completed construction of the Project.

37.     Section 8.1.1 of the Agreement provides that:

Time limits stated in the Design-Build Documents are of the essence of the Contract. By executing the Design-Build Amendment [Centaur] confirms that the Contract Time is a reasonable period for performing the Work and that it contains adequate time contingencies for usual delays for projects of similar size, scope and location.

(Ex. 1 § 8.1.1.)

38.     Being a commercial property, including a hotel and restaurant, timely completion of the Project is essential to the Project's success and the profitability of the property.

39.     NHC has been forced to engage another general contractor—Shawmut Construction ("Shawmut") to complete the Project. However, Defendants have yet to provide Shawmut with the complete Project files and information that Shawmut needs to commence its work completing the Project. In addition, there are Project materials that Shawmut needs on site to complete the Project that are unaccounted for and Defendants have failed to identify the materials' location or return the materials to site.

40.     The Project was scheduled to be completed in July 2019. The Project, because of Defendants' actions, will not be completed until, at the earliest, January 2020.

41.     To the extent that Centaur was entitled to any progress payments from NHC under the Contract for actual work performed on the Project, NHC has fully satisfied its obligation to

make any such progress payment by making payments totaling the guaranteed maximum price of $48,257,000.00 under the Contract. In addition, NHC has performed all other obligations required of it under the Contract.

42.     On information and belief, Spiro kept Centaur insufficiently capitalized and commingled Centaur's funds with his own funds and/or used Centaur funds for his own personal purposes.

43.     In addition, by fraudulently obtaining payments under the Contract from NHC to use for personal use or to fund other Centaur projects and/or expenses, Spiro diverted corporate assets of Centaur to the detriment of NHC and the subcontractors to whom Centaur owed payment for services performed on the Project.

44.     Further, by fraudulently obtaining payments under the Contract from NHC to use for personal use or to fund other Centaur projects and/or expenses, Spiro has operated Centaur as a mere façade for himself as the dominant officer of the company.

45.     Following its discovery of Centaur's breaches of contract and failure to perform construction services for which it had been paid, NHC served a notice of claim on Centaur on September 5, 2019. A true and correct copy of NHC's September 5, 2019 Notice of Claim to Centaur is attached hereto as Exhibit 5.

46.     Under Article 14 of the Contract, Centaur was required to provide a written response to NHC's September 5, 2019 Notice of Claim with ten days. As of the date of the filing of this Complaint, however, Centaur has not responded to NHC's September 5, 2019 Notice of Claim.

47.     On September 23, 2019, NHC issued and served on Centaur an initial decision approving NHC's claim.  A true and correct copy of NHC's September 23, 2019 Initial Decision is attached hereto as Exhibit 6.

48.     Simultaneous with the filing of this Complaint, NHC has filed a request for mediation with the American Arbitration Association and has served this request for mediation on Centaur.

### COUNT I:
### COMMON LAW FRAUD
### (Against all Defendants)

49.     Plaintiff restates and re-alleges the allegations above as this Paragraph of Count I as if fully set forth herein.

50.     Centaur requested on various occasions that NHC submit progress payments to Centaur for design and construction work that Defendants represented that Centaur had performed pursuant to the Contract.  Centaur in fact did not perform all of the work for which it had requested payment from NHC and/or Centaur's subcontractors had performed the work but Centaur did not pay said subcontractors from the money obtained from Centaur's payment applications.  The cumulative payment schedule is as follows:

| Centaur Payment Application Date | Alleged Work Completed/ Earned to Date |
|---|---|
| 6/29/2018 | $ 13,385,239.11 |
| 7/30/2018 | 16,885,239.11 |
| 8/31/2018 | 21,485,239.11 |
| 9/27/2018 | 25,485,239.11 |
| 10/31/2018 | 28,385,239.11 |
| 12/5/2018 | 31,185,239.11 |
| 1/7/2019 | 33,885,239.11 |
| 2/4/2019 | 35,985,239.11 |
| 3/4/2019 | 37,885,239.11 |
| 3/31/2019 | 40,585,239.11 |
| 5/20/2019 | 43,485,239.11 |
| 6/14/2019 | 47,757,000.00 |

51.     Unbeknownst to NHC, Defendants' representations that Centaur had performed all work for which it requested payment from NHC were false.  Centaur in fact did not perform all of the work for which it had requested payment from NHC.  In addition, Centaur further hired numerous subcontractors to perform work on the Project and agreed to change orders with such subcontractors amounting to millions of dollars without informing NHC.

52.     At the times Defendants falsely represented to NHC that Centaur had performed all work for which it had requested payment from NHC, Defendants knew that their representations to NHC were false.

53.     Defendants made their false representations to NHC for the purpose of inducing NHC to provide progress payments to Centaur so that Spiro could utilize millions of dollars from NHC's payments for personal use or to fund other Centaur projects and/or expenses.  Such progress payments would have been due to Centaur under the Contract only if Centaur had in fact performed the work for which the progress payment was sought, as well as complied with the other requirements in the Contract.  To the extent that some work that was the subject of the payment

applications was completed by Centaur's subcontractors, Centaur was required to pay the subcontractors for their work rather than divert the money to other personal or business uses.

54. NHC reasonably relied on Defendants' false representations in making progress payments to Centaur because NHC reasonably believed that Centaur had completed the work entitling Centaur to such progress payments, or would complete the work with the funds NHC provided. NHC's reliance was reasonable because it could observe the completion of certain work by various subcontractors, without knowledge that Defendants did not pay those subcontractors base contract amounts and without knowledge that Centaur had agreed to change orders with certain subcontractors above base contract amounts. Again, to the extent that some work that was the subject of the payment applications was completed by Centaur's subcontractors, Centaur was required to pay the subcontractors for their work rather than divert the money to other personal or business uses.

55. Due to Defendants' false statements, NHC made total payments amounting to $48,257,000, the guaranteed maximum price under the Contract, when in fact the amount due to Centaur in progress payments for work actually completed on the Project by Centaur was substantially less than this amount. In addition, through their fraudulent statements, Defendants were able to obtain from NHC full payment of the guaranteed maximum price under the Contract without substantially performing the construction of the Nobu Hotel as required under the Contract, leaving NHC with an unfinished hotel subject to numerous mechanics liens from subcontractors.

56. NHC would not have made all of such payments if it had known of the facts described herein.

57.     NHC has suffered millions in monetary damages as a direct and proximate result of Defendants' fraud.

58.     Defendants' fraud was deliberate, willful and malicious, and of such an aggravated character as to warrant imposition of punitive damages, attorneys' fees and costs, in addition to compensatory damages.

WHEREFORE, NHC respectfully requests the Court to enter judgment in its favor and against Centaur, Spiro and Peter on Count I and award the following relief:

(a)     Compensatory damages in an amount to be determined at trial;

(b)     Punitive damages, including reasonable attorneys' fees as well as pre-judgment interest, in such amounts as this Court deems appropriate under the circumstances;

(c)     NHC's costs of suit; and

(d)     Such other relief as the Court deems just and proper.

## COUNT II:
## BREACH OF ILLINOIS DECEPTIVE BUSINESS PRACTICES ACT
### (Against all Defendants)

59.     Plaintiff restates and re-alleges the allegations above as this Paragraph of Count II as if fully set forth herein.

60.     815 ILCS 505/2 states:

505/2. Unlawful practices; construction with Federal Trade Commission Act

§ 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965 [*footnote omitted*] in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

17

61.     Defendants committed acts of material misrepresentations and/or omissions as detailed above in the factual allegations and in Count I, which are incorporated into this paragraph.

62.     As a matter of law, Defendants had a duty to disclose to NHC all facts material to the Project, including, *inter alia*, non-payment to subcontractors, subcontractor change orders, the true status of completion of work and Defendants' true use of Project funds.

63.     Defendants concealed from NHC these items that they had a duty to disclose and made further misrepresentations as addressed above.

64.     Defendants made their false representations to NHC for the purpose of inducing NHC to provide progress payments to Centaur so that Spiro could utilize millions of dollars from NHC's payments for personal use or to fund other Centaur projects and/or expenses. Such progress payments would have been due to Centaur under the Contract only if Centaur had in fact performed the work for which the progress payment was sought, as well as complied with the other requirements in the Contract.

65.     NHC reasonably relied on Defendants' false representations in making progress payments to Centaur because NHC reasonably believed that Centaur had completed the work entitling Centaur to such progress payments, or would complete the work with the funds NHC provided. NHC's reliance was reasonable because it could observe the completion of certain work by various subcontractor's, without knowledge that Defendants did not pay those subcontractors base contract amounts and without knowledge that Defendants had agreed to change orders with certain subcontractors above base contract amounts.

66.     Due to Defendants' false statements, NHC made total payments to Centaur amounting to $48,257,000, the guaranteed maximum price under the Contract, when in fact the amount due to Centaur in progress payments for work actually completed on the Project by Centaur

was substantially less than this amount. In addition, through their fraudulent statements, Defendants were able to obtain from NHC full payment of the guaranteed maximum price under the Contract without substantially performing the construction of the Project as required under the Contract, leaving NHC with an unfinished hotel subject to numerous mechanics liens from subcontractors.

67. NHC would not have made all of such payments to Centaur if it had known of the facts described herein.

68. NHC has suffered millions in monetary damages as a direct and proximate result of Defendants' violation of the Illinois Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*.

69. Defendants' fraud was deliberate, willful and malicious, and of such an aggravated character as to warrant imposition of punitive damages, attorneys' fees and costs, in addition to compensatory damages.

WHEREFORE, NHC respectfully requests the Court to enter judgment in its favor and against Centaur, Spiro and Peter on Count II and award the following relief:

(a)     Compensatory damages in an amount to be determined at trial;

(b)     Punitive damages, including reasonable attorneys' fees as well as pre-judgment interest, in such amounts as this Court deems appropriate under the circumstances;

(c)     NHC's costs of suit; and

(d)     Such other relief as the Court deems just and proper.

### COUNT III:
### BREACH OF CONTRACT
### (Against Centaur and Spiro)

70. Plaintiff restates and re-alleges the allegations above for this Paragraph of Count III as if fully set forth herein.

71.     NHC and Centaur entered into the Contract, which is a valid and enforceable written contract.

72.     NHC has performed all of its material obligations under the Contract, including but not limited to by making total payments in the amount of $48,257,000, the guaranteed maximum price under the Contract.

73.     Centaur has breached the Contract, including but not limited to through the following acts or omissions:

(a)     Failing to obtain approval from NHC for each subcontractor who performed work on the Project in advance of such subcontractor performing any work on the Project;

(b)     Failing to provide written notification to NHC of the name and proposed scope of services to be provided by each subcontractor on the Project whose contract was estimated to be $10,000 or more;

(c)     Failing to notify NHC of change orders entered into between Centaur and subcontractors who performed work on the Project;

(d)     Failing to substantially complete construction of the Project within the time frame for such substantial completion set forth in the Contract;

(e)     Failing to complete construction of the Project despite having been paid nearly the full amount of the contractually guaranteed maximum price of $48,257,000;

(f)     Failing to fully compensate all subcontractors who performed work on the Project despite having been paid nearly the full amount of the contractually guaranteed maximum price of $48,257,000.

(g)     Failing to submit accurate applications for payment to NHC reflecting work actually performed on the Project;

(h)     Submitting fraudulent applications for payment to NHC that falsely represented that certain work had been completed on the Project when it had not;

(i)     Submitting applications for payment to NHC when subcontractors hired by Centaur had not been paid for work completed on the Project;

(j)     Failing to pay each subcontractor in full within seven (7) days after receipt of payment from NHC of the amount to which such subcontractor was entitled; and

(k)     Causing unreasonable delay to the Project.

20

74.     The foregoing breaches and continuing breaches by Centaur have proximately caused NHC to suffer substantial monetary damages in an amount to be determined at trial.

75.     On information and belief, Spiro kept Centaur insufficiently capitalized and commingled Centaur's funds with his own funds and/or used Centaur funds for his own personal purposes.

76.     In addition, by fraudulently obtaining payments under the Contract from NHC to use for personal use or to fund other Centaur projects and/or expenses, Spiro diverted corporate assets of Centaur to the detriment of NHC and the subcontractors to whom Centaur owed payment for services performed on the Project.

77.     Further, by fraudulently obtaining payments under the Contract from NHC to use for personal use or to fund other Centaur projects and/or expenses, Spiro has operated Centaur as a mere façade for himself as the dominant officer of the company.

78.     A unity of interest and ownership between Spiro and Centaur exists such that the separate personality of Centaur as a corporation no longer exists.  In addition, due to Spiro's fraudulent statements to NHC inducing the payment of millions of dollars for work that had not actually been performed on the Project, circumstances exist such that adherence to the fiction of a separate corporate existence for Centaur would sanction a fraud, promote injustice, and promote inequitable consequences.   As such, Centaur's corporate veil should be pierced and Spiro is personally liable to NHC for Centaur's breaches of the Contract.

WHEREFORE, NHC respectfully requests that this Court enter judgment in its favor on Count III and against Centaur and Spiro, and award the following relief:

(a)     Compensatory damages in an amount to be determined at trial;

(b)     Prejudgment interest pursuant to 815 ILCS 205/2;

(c)     NHC's attorneys' fees and costs of suit; and

21

(d)    Such other and further relief as is just and proper.

## **JURY DEMAND**

79.    Plaintiff hereby demands a jury on all triable issues.

Dated:  September 23, 2019                          Respectfully submitted,

                                                    NHC LLC


                                                    By:  /s/ Nicole J. Wing
                                                          One of Its Attorneys

Nicole J. Wing, Bar No. 6291632
Joshua J. Orewiler, Bar No. 6309835
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T:  +1 312 609 7500