**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NHC, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19 C 6332 |
| | ) | |
| CENTAUR CONSTRUCTION CO., | ) | |
| SPIRO TSAPARAS, and | ) | |
| PETER ALEXOPOULOS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

NHC, LLC engaged Centaur Construction Co. to develop and build the Nobu Hotel in Chicago's West Loop in late 2017. Nearly two years later, NHC terminated its contract with Centaur after the project was over budget and behind schedule. NHC sued Centaur, as well as Spiro Tsaparas (Centaur's CEO) and Peter Alexopoulos (Centaur's President), for breach of contract and fraud. Both sides have moved for summary judgment. The Court addresses those motions in this decision.

## Background

The following facts are undisputed except where otherwise noted. NHC purchased the Chicago Nobu Hotel project from another developer in December 2017. Centaur was already the general contractor for the project at that point, but upon taking over the project, NHC increased Centaur's role to that of design builder. The Nobu Hotel was the largest project that Centaur had ever undertaken. These parties entered

into a written master agreement (the contract at issue) in April 2018, but the record shows that work started prior to that agreement.

Rodrigo Chapur led the project for NHC. In an e-mail Tsaparas sent to Chapur on February 19, 2018, Tsaparas asked NHC to wire Centaur $4,555,000. This amount was broken down into seven line items (e.g. Masonry - $300,000). The first line item specified $2.5 million for Centaur, which (in the same e-mail) Tsaparas explained would "be held in [his] company and [would] be used for positive cash-flow immediately to support the company in this effort." Pl.'s Resp. to Defs.' LR 56.1(D) Stat. of Facts, Ex. 15 (dkt. no. 138-15). The e-mail further specified that the "[n]ext payment request will be on May 1st for work performed in April and payment will be due June 1st. That will be the case for the duration of the project." *Id.*; *see also* Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶ 16 (dkt. no. 144).

On February 22, 2018, Chapur asked Tsaparas to send him a projected cashflow for the project based on a $48,687,000 budget. Tsaparas responded to this request with a table listing sixteen dates and amounts, the sum of which fell within the budget. The first entry listed February 23, 2018, for $4,555,000, which matched the February 19 e-mail. The next 15 dates listed the first of each month from June 2018 through August 2019, and the corresponding amounts ranged from $1,900,000 to $4,000,000. These amounts consisted of whole numbers in the hundred-thousands (e.g. $2,700,000, $3,300,000, etc.). The figures in this e-mail are critical to the parties' dispute: NHC says it understood them to be simply projections and thus non-binding; the defendants say they understood the figures to reflect how much they would bill NHC throughout the duration of the project notwithstanding any future agreements.

On April 16, 2018, NHC and Centaur entered into a written contract. Among other provisions, the contract specified that Centaur was to follow industry standards, seek approval for subcontractors, pay subcontractors within seven days, provide accurate monthly reports of completion progress, and submit payment applications for completed work. *See* Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶¶ 19–36 (dkt. no. 144). The contract also provided that Centaur would substantially complete construction of the project within 400 days after construction began and that the project would be subject to a guaranteed maximum price (GMP) of $48,257,000. *Id.* ¶¶ 24, 29. The contract further included a provision stating that the "contract sum" was to be identified in a "Design-Build Amendment," but no such amendment was ever executed. Pl.'s Resp. to Defs.' LR 56.1(D) Stat. of Facts ¶¶ 26–28 (dkt. no. 136). Lastly of note, the contract included an integration clause and a non-waiver provision. Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶¶ 24, 36 (dkt. no. 144).

The parties agree that throughout the hotel's construction, Centaur submitted payment applications that did not reflect work actually performed prior to the date of the application. Centaur says it understood the payment applications to be "'file stuffers' intended only to satisfy a formality of needing an invoice prior to releasing payment." Pl.'s Resp. to Defs.' LR 56.1(D) Stat. of Facts ¶ 41 (dkt. no. 136). Accordingly, Centaur contends, it pegged each payment application amount to the February 2018 cashflow projection and did not bill based on work it had actually performed. NHC denies this understanding and contends that it expected Centaur to send payment applications that were based on actual construction progress, in other words work actually performed. The payment application requested amounts do not perfectly align with the February

2018 table, but they are close.  *Compare id.* ¶ 39, *with* Defs.' Resp. to Pl.'s L.R. 56.1

Stat. of Add'l Facts ¶¶ 40, 47 (dkt. no. 144).  Additionally, Alexopoulos signed each of

the payment applications, which were also notarized.

From the execution of the contract through April 2019, Tsaparas consistently

represented to Chapur that the project was within budget and on schedule.  Then in

early May 2019, Tsaparas informed Chapur that the project was $2 to $3 million over

budget.  Later that month, Tsaparas sent Chapur a spreadsheet indicating that NHC

had paid $41,985,000 to date and that the total project cost would be at least $54.5

million.  Centaur continued to submit payment applications to NHC through June 2019,

though the parties contest whether and to what extent issues arose during that time

over Centaur's payment of subcontractors.  In August 2019, NHC hired a second

construction company, Shawmut Construction and Design, to prepare a report

assessing the state of the project and auditing the project's finances.

NHC served a notice of claim on Centaur on September 5, 2019, for alleged

breaches of contract.  NHC filed the present suit on September 23, 2019.  In its third

amended complaint, NHC has sued all three defendants for fraud and sues Centaur and

Tsaparas for breach of contract, the latter under a piercing-the-corporate-veil theory.

Both parties have now moved for partial summary judgment.

## Discussion

To obtain summary judgment, a party must demonstrate that "there is no genuine

dispute as to any material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  There is a genuine issue of material fact if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  *Hanover*

*Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When parties file cross-motions for summary
judgment, courts "construe all inferences in favor of the party against whom the motion
under consideration is made."  *Cremation Soc'y of Ill., Inc. v. Int'l Bhd. of Teamsters
Local 727*, 869 F.3d 610, 616 (7th Cir. 2017) (citation omitted).

**A.    Fraud**

A fraud claim under Illinois law requires the plaintiff to establish a false statement
of material fact; the defendant's knowledge of the statement's falsity; the defendant's
intent to induce the plaintiff to act based on the statement; the plaintiff's reliance on the
statement's truth; and damages resulting from the reliance. *See, e.g.*, *Connick v. Suzuki
Motor Co.*, 174 Ill. 2d 482, 496, 675 N.E.2d 584, 591 (1996).

Only the defendants have moved for summary judgment on the fraud claim.
They raise four arguments in their motion: 1) there is no justifiable reliance; 2) there is
no fraudulent intent; 3) allegations of promissory fraud are not actionable; and 4) there
is no evidence of gross fraud, which is necessary for punitive damages.

**1.    Justifiable reliance**

Among other allegedly false representations, NHC has premised its fraud claim
on the payment applications that the defendants sent.  According to NHC, these
payment applications induced it to pay Centaur the GMP despite the fact that the work
actually completed was worth substantially less than what the applications represented.

In their motion for summary judgment, the defendants argue that NHC could not
have justifiably relied on the payment applications because it knew that they were

inaccurate—i.e., that they were, to use the defendants' term, "file stuffers."[1]  The defendants cite the February 22, 2018, cashflow e-mail as explaining the corresponding amounts in the payment applications and thus as showing that NHC must have known the subsequent payment application amounts were based on preliminary projections rather than the work performed.

NHC contends that it understood otherwise.  To support this position, NHC points to the e-mail that Tsaparas sent Chapur on February 19, 2018, in which Tsaparas explained that the "[n]ext payment request will be on May 1st for work performed in April and payment will be due June 1st.  That will be the case for the duration of the project." Pl.'s Memo. of L. in Opp. To Defs. Mot for Partial Summ. J. at 6 (dkt. no. 135).  NHC further relies on the payment applications themselves.  Each was notarized, signed by Alexopoulos, and stated, "[t]he undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents[] . . . and that current payment shown herein is now due."  *Id.* at 7.  At bottom, NHC's position is that it understood the e-mail and the payment applications to mean what they said—that Centaur was requesting payment only for work that had actually been performed.

The defendants have not carried their burden to establish the absence of a genuine factual dispute.  Especially when viewed in the light most favorable to NHC, a reasonable jury could find that NHC was justified in relying on Tsaparas's e-mail and the

---

[1] The defendants also assert summarily that the testimony of Roberto Chapur (Rodrigo Chapur's father)—in which he said that he could have completed the Nobu Hotel project without any issues—indicates that NHC's reliance was misplaced.  The defendants have not explained the connection between this testimony and reliance, and the Court does not see one either.  This contention lacks merit.

payment applications as truthful and accurate and as meaning what they said, particularly because they were signed by Alexopoulos. Furthermore, the fact that the payment applications largely aligned with the cashflow projection does not, without more, establish that NHC understood the applications to amount to meaningless papering of the file. Among other things, it is entirely possible that the projections could have ended up being accurate, such that the payment applications matched them *and* reflected the work performed. The evidence that NHC points to is sufficient to preclude entry of summary judgment for the defendants on this point. *See Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 722 (7th Cir. 2015) (explaining that summary judgment is improper where a fact "affecting the outcome of the case" is in dispute).

The Court concludes that there is a genuine factual dispute on the issue of justifiable reliance.

### 2. Fraudulent intent

The defendants argue that the evidence establishes that they did not harbor any fraudulent intent in sending the payment applications. In the same vein as their reliance argument, the defendants assert that they believed the applications never represented the work performed because, again, they viewed them as "file stuffers." Beyond reiterating their reliance argument, the defendants assert that Alexopoulos "had a limited role on the Project" and that Tsaparas never told Chapur "anything that he did not believe to be 100 percent true." Defs.' Memo. of L. in Supp. of Mot. for Partial Summ. J. at 10–11 (dkt. no. 129).

For the same reasons as discussed above, this issue involves factual disputes

that can only be resolved at a trial. The February 18 e-mail and subsequent payment applications could give rise to an inference of fraudulent intent. *See also Lane v. Fabert*, 178 Ill. App. 3d 698, 706, 533 N.E.2d 546, 551 (1989) ("Summary judgment is particularly inappropriate when the intent of the parties is at issue."). The additional points regarding the individual defendants do not change the calculus either. The contention that Alexopoulos had a limited role does not eliminate the possibility that he had the requisite intent, and more importantly, NHC's counterpoint that he signed off on each payment application raises a genuine factual dispute. The defendants' contention that Tsaparas only spoke truthfully also falters when the evidence is viewed in the light most favorable to NHC, given the fact that he has admitted the payment applications did not, in fact, reflect the work performed. *See* Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶ 45 (dkt. no. 144).

The defendants raise one final point in their supplemental brief and argue that the report of NHC's expert witness, Dayna Anderson, supports their position. In short, the report indicated that Centaur's financial records for the project were "incomplete" and "unreliable." Defs.' Suppl. LR 56.1(a)(1) Memo. of L. in Supp. of Mot. for Partial Summ. J. at 5 (dkt. no. 150). The defendants see this as evidence demonstrating that they could not have possibly intended to defraud NHC.

This point does not provide a basis for entry of summary judgment. For one, Anderson specifically disclaimed any opinion regarding the defendants' intent. And again, viewing the evidence in the light most favorable to NHC, a jury could infer from the payment applications that the defendants intended to defraud NHC irrespective of their poor recordkeeping. Put differently, the proposition that the defendants kept

incomplete and unreliable records does not foreclose the possibility that they intentionally submitted inaccurate payment applications.

The Court concludes that there is a genuine factual dispute on the issue of fraudulent intent.

### 3. Promissory fraud

Promissory fraud, which involves false statements of future intent, is generally not actionable under Illinois law unless the statements are "part of a scheme to defraud." *Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007); *see also Swervo Ent. Grp., LLC v. Mensch*, No. 16 C 4692, 2017 WL 1355880, at *5 (N.D. Ill. Apr. 13, 2017) ("[A] temporal element delineates the two causes of action: representations regarding future conduct generally fall under the doctrine of promissory fraud, whereas statements regarding present or past facts give rise to a claim for fraud in the inducement."). The defendants argue that certain statements in NHC's complaint are not actionable as traditional fraud because they relate to financial projections, future promises, and statements of future intent. *See* Defs.' Memo. of L. in Supp. of Mot. for Partial Summ. J. at 12–13 (dkt. no. 129). Acknowledging the scheme to defraud exception to promissory fraud, the defendants contend that NHC failed to allege such a scheme in its complaint, meaning it has failed to show that these statements "comport with the 'deliberately high' standard for promissory fraud." *Id.* at 13. Thus in the defendants' view, summary judgment is appropriate with respect to this aspect of the fraud claim.

This argument lacks merit because a court can consider promissory fraud under a typical claim of common law fraud of the type alleged by NHC. *See, e.g.*, *Swervo Ent.*

9

*Grp.*, 2017 WL 1355880, at *5 ("Where a complaint purports to bring a claim for fraud in the inducement, courts will nevertheless treat the claim as one for promissory fraud if the claim is more accurately characterized as such under state law.").  And NHC clearly included the statements that the defendants cite in its common law fraud claim.  *See* 3d Am. Compl. ¶¶ 25, 29, 54, 61 (dkt. no. 26).  Above all, however, "it is factual allegations, not legal theories, that must be pleaded in a complaint."  *Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014).  NHC did exactly that.

The defendants are not entitled to summary judgment on this point.

### 4. Punitive damages

Under Illinois law, punitive damages may be awarded "when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others."  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017) (quoting *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186, 384 N.E.2d 353, 359 (1978)).  In a fraud action, "deceit alone cannot support a punitive damage award, but such an award is appropriate where the false representations are wantonly and designedly made." *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 511 (7th Cir. 1997) (cleaned up).  The defendants argue that NHC has only alleged "garden variety" fraud, which in their view does not meet the standard for punitive damages.  Defs.' Reply Memo. in Supp. of Mot. for Partial Summ. J. at 13 (dkt. no. 142).

Like the issues of reliance and intent, this determination is appropriately left for the jury.  The evidence underlying NHC's fraud claim, when viewed in the light most favorable to NHC, could permit a jury to infer that the defendants made a series of deliberately false representations.  *Cf. Echo/Tennessee Holdings, LLC v. AvidPath Inc.*,

No. 13 C 309, 2014 WL 5420020, at *2 (N.D. Ill. Oct. 23, 2014) (awarding punitive damages when the defendants' "misconduct involve[d] a series of intentional false representations").

The Court cannot appropriately resolve this issue on summary judgment.

**B.    Breach of contract**

Both parties have moved for summary judgment on NHC's breach of contract claim.  The defendants argue that three affirmative defenses bar the claim: waiver, estoppel, and unclean hands.  NHC argues that it is entitled to summary judgment on the merits, including on its claim against Tsaparas based on a piercing-the-corporate-veil theory.

**1.    Defendants' motion**

**a.    Waiver**

Waiver is the "intentional relinquishment of a known right." *Lempera v. Karner*, 79 Ill. App. 3d 221, 223, 398 N.E.2d 224, 225 (1979) (citation omitted).  A party claiming implied waiver—which is what the defendants claim—must prove "a clear, unequivocal, and decisive act of its opponent manifesting an intention to waive its rights." *In re Nitz*, 317 Ill. App. 3d 119, 130, 739 N.E.2d 93, 103 (2000).  "Where the material facts are in dispute, or where reasonable minds might differ in the inferences to be drawn from undisputed facts, the existence of waiver or estoppel is a question of fact." *Lake Cnty. Grading Co. of Libertyville v. Advance Mech. Contractors, Inc.*, 275 Ill. App. 3d 452, 463, 654 N.E.2d 1109, 1119 (1995).  Additionally, in light of the non-waiver provision in the parties' contract, the defendants must establish waiver by clear and convincing evidence.  *See Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 277 (7th Cir. 1996).

The defendants argue that NHC impliedly waived its right to enforce three provisions in the contract: 1) approving subcontractor hires; 2) providing change orders; and 3) submitting accurate payment applications.

Summary judgment in favor of the defendants is warranted on the first provision. NHC admits that Centaur had full control over the hiring of subcontractors and did not need to ask for NHC's permission to hire them. Pl.'s Resp. to Defs.' LR 56.1(D) Stat. of Facts ¶ 38 (dkt. no. 136). Consequently, the defendants are entitled to summary judgment for any breach arising from this contractual provision.

The issues relating to waiver of compliance with the second contractual provision—concerning change orders—is a bit more complicated. The defendants claim that Chapur told Centaur not to draft written change orders, but the record does not support that assertion. Instead, the record reflects NHC's admission that it only expected to receive change orders that would have resulted in the project exceeding the GMP. *Id.* ¶ 36. Although this gives rise to a genuine factual dispute regarding whether NHC waived this contractual right, NHC does not rely on this provision in arguing for breach in its briefing for summary judgment, as will be discussed below.

The defendants premise their argument for waiver of the third contractual provision—the obligation to submit accurate payment applications—on their contention that the payment applications were merely file stuffers. Although summary judgment is not warranted on this issue as it relates to fraud, here, in contrast, no reasonable jury could find that NHC acted clearly, unequivocally, and decisively in waiving its contractual rights.

The defendants primarily rely on the February 2018 e-mails as support for their

waiver argument, but these e-mails predate the master agreement by two months. Furthermore, the final contract included an integration clause that "supersede[d] prior negotiations, representations or agreements, either written or oral." Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶ 24 (dkt. no. 144). Taking these two facts together, the e-mails cannot serve as the basis for waiver with respect to a claim for breach of this contractual term. The defendants also point to a statement by Chapur to Tsaparas that the two were businessmen and would figure it out in the end. Id. ¶ 33. But this runs into the same problem as the e-mail—it predated the execution of the contract, meaning it also cannot serve as the basis for a defense of waiver of the contractual term.

The defendants thus are not entitled to summary judgment on their contention that NHC waived its contractual right to receive accurate payment applications.

### b.     Estoppel

The defendants contend, summarily, that in the alternative to their defense of waiver, NHC should be equitably estopped from enforcing the contract as related to the three provisions just discussed. One big problem here is that the defendants do not bother to discuss the elements of equitable estoppel, let alone how the facts apply to those elements, such as by identifying a knowing misrepresentation by NHC upon which to premise the defense. Nor do the defendants cite any caselaw to support their argument. The Court considers this undeveloped argument forfeited. See Puffer v. Allstate Ins. Co., 675 F.3d 709, 718 (7th Cir.2012).

### c.     Unclean hands

The doctrine of unclean hands "applies if the party seeking equitable relief is guilty of misconduct, fraud or bad faith toward the party against whom relief is sought if

that misconduct is connected with the transaction at issue." *Coexist Found., Inc. v. Fehrenbacher*, 865 F.3d 901, 908 (7th Cir. 2017) (quoting *Long v. Kemper Life Ins. Co.*, 196 Ill. App. 3d 216, 219, 553 N.E.2d 439, 441 (1990)). The defendants assert this as a defense to the claim that Tsaparas, via veil-piercing, should be held liable for breach of contract. According to the defendants, NHC should be barred from recovering against Tsaparas because it provided Centaur funding despite knowing the construction company's level of capitalization. They contend that NHC's agreement to fund Centaur per the February 19 e-mail—specifically, the $2.5 million line item that was to be "used for positive cash-flow immediately"—constitutes misconduct pertaining to the same subject matter as NHC's piercing-the-corporate-veil theory.

This argument lacks merit. No reasonable juror could find that providing $2.5 million for operational cashflow amounted to authorizing the misconduct upon which NHC has primarily premised its veil piercing theory—Centaur's transfer of funds to its principals for their personal use. *See* Pl.'s Memo. of L. in Opp. To Defs. Mot for Partial Summ. J. at 29 (dkt. no. 135). Additionally, knowledge of and assistance with Centaur's capitalization early on in the parties' professional engagement, especially when based on a straightforward funding request in a single e-mail, does not implicate any misconduct on the part of NHC—or, at least, a reasonable jury could find otherwise.

The defendants are not entitled to summary judgment on the defense of unclean hands.

### 2. Plaintiff's motion

#### a. Merits

As indicated, NHC has moved for summary judgment on its breach of contract

claim, against both Centaur and Tsaparas. Under Illinois law, a plaintiff alleging breach of contract must show: 1) a valid and enforceable contract exists; 2) the plaintiff substantially performed its obligations; 3) the defendant breached the contract; and 4) damages resulted from the breach. *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018). The parties do not dispute the existence of a valid contract or that NHC substantially performed pursuant to that contract. NHC also asserts that it was damaged by the alleged breach, and the defendants do not dispute this. The amount of any damages would be an issue for trial. Consequently, the issue for present purposes is whether NHC has established that Centaur breached the contract.

NHC outlines a series of breaches for which it seeks summary judgment: "Centaur failed to follow industry standards, complete the project for the prescribed GMP or on schedule, seek NHC's approval for subcontractors, provide accurate monthly percentages of completion, submit accurate payment applications, or pay subcontractors." Pl.'s Memo. of L. in Opp. To Defs. Mot for Partial Summ. J. at 23 (dkt. no. 135). As previously discussed, NHC waived its contractual right to have Centaur seek approval to hire subcontractors. But as to the other alleged breaches, NHC has pointed to evidence backing most of its claims. Specifically, the project ran behind schedule; the costs exceeded the GMP; the payment applications were inaccurate; and subcontractors were not fully paid, which is a basic tenet of construction industry standards. *See* Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶¶ 55, 60, 104 (dkt. no. 144). The only aspect of the breach of contract claim that the record does not support is the contention that Centaur failed to provide accurate monthly percentages of completion. *See id.* ¶ 61.

15

Of these viable contentions, the only one to which the defendants respond on the merits is the contention that the costs exceeded the GMP. The defendants attempt to sidestep the GMP by focusing on the fact that the parties never formalized a contract sum, which was to be determined in a design-build amendment to the contract that was never executed. But as NHC explains, the lack of a finalized contract sum does not absolve Centaur of its obligation under the GMP provision. The defendants have cited no contractual language and no principle of law that would support the proposition that the absence of a contract sum somehow overrode the GMP provision or rendered it inoperative. In short, the defendants' argument turns on a non-issue.

The defendants' only other response to NHC's claim of breach is that the affirmative defenses of waiver and estoppel apply. But even viewing the evidence in the light most favorable to the defendants, no reasonable factfinder could find that NHC waived its right to enforce the contract—with the exception of the single provision discussed earlier. As the Court has discussed, the timing of the acts that the defendants cite, combined with the contract's integration clause, foreclose this as a defense. Additionally, to the extent that the defendants suggest, in a cursory way, that estoppel should apply, they have not developed this argument in any meaningful way and therefore have forfeited it.

The Court concludes that Centaur breached Sections 1.1 (industry standards), 1.4.15 (guaranteed maximum price), 1.1.7 (schedule), 9.3.1 (payment applications), and 9.6.2 (subcontractor payment) of the master agreement; no reasonable jury could find otherwise. Centaur is entitled to summary judgment on liability to this extent on its breach of contract claim against Centaur.

16

### b. Veil piercing

NHC argues that it is also entitled to summary judgment on its breach of contract claim against Tsaparas, which requires the Court to find that piercing the corporate veil is warranted. Illinois courts use a two-part test to determine whether a plaintiff has met this burden: 1) there is a unity of interest and ownership such that the separate personalities of the corporation and individual no longer exist; and 2) adherence to the fiction of a separate corporate existence would sanction fraud or promote injustice. *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 752 (7th Cir. 2012).

NHC offers sufficient evidence that the defendants used Centaur as a "dummy or sham" through numerous examples of commingling and diverting funds. *Id.* (quoting *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008)); *see also Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 503, 840 N.E.2d 767, 778 (2005) (listing, among other factors, "commingling of funds" and "diversion of assets" as relevant considerations for the unity of interest prong). For example, NHC references the fact that Tsaparas wired his romantic partner more than $750,000 directly from Centaur's account. Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ¶ 93 (dkt. no. 144). NHC also points to the fact that Centaur transferred more than $1.3 million to repay loans that had no relation to the Nobu Hotel project. *Id.* ¶ 94.

Rather than contesting the truth of these facts or disputing whether NHC has carried its burden under both parts of the veil piercing inquiry, the defendants' only response is that the defense of unclean hands bars veil piercing. For the reasons the Court has discussed, this argument lacks merit. Because that is the only issue the defendants asserted, the Court concludes that there is no genuine factual dispute on

the issue of piercing the corporate veil and grants NHC's motion for summary judgment as to liability on the claim of veil piercing.

## Conclusion

For the foregoing reasons, the Court grants summary judgment in favor of the defendants on the issue of waiver regarding the contractual requirement for approval of subcontractors. The Court grants summary judgment in favor of the plaintiff on its breach of contract claim against defendant Centaur with respect to Sections 1.1 (industry standards), 1.4.15 (guaranteed maximum price), 1.1.7 (schedule), 9.3.1 (payment applications), and 9.6.2 (subcontractor payment) of the master agreement, as well as against defendant Tsaparas based on piercing the corporate veil. Both parties' summary judgment motions are otherwise denied. The case is set for a telephonic status hearing on March 22, 2022 at 9:05 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 18, 2022