**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NHC, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19 C 6332** |
| | ) | |
| **CENTAUR CONSTRUCTION CO.,** | ) | |
| **SPIRO TSAPARAS, and** | ) | |
| **PETER ALEXOPOULOS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

NHC, LLC sued Centaur Construction Co., Spiro Tsaparas, and Peter

Alexopoulos, alleging fraud and breach of a contract to build the Nobu Hotel in

Chicago's West Loop. The Court granted summary judgment in favor of NHC on liability

with regard to the breach of contract claim against Centaur and Tsaparas. NHC's

claims went to trial in August 2022 regarding liability and damages on the fraud claim

and damages on the breach of contract claim. The jury found in NHC's favor against all

three defendants on the fraud claim. The jury awarded NHC compensatory damages,

and it also assessed punitive damages against each of the defendants.

Both parties have filed motions regarding the judgment. The defendants have

moved under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law on

all claims. In the alternative, the defendants have moved under Rule 59(a) and (e) for a

new trial or to alter the damages award on the fraud claim. NHC, for its part, has moved

under Rule 59(e) to amend the judgment to include pre-judgment interest.  For the reasons below, the Court (1) denies the defendants' motion for judgment as a matter of law; (2) denies the defendants' motion for a new trial and/or to alter the judgment; and (3) grants NHC's motion to alter the judgment to include pre-judgment interest.

### Background

The Court assumes familiarity with this case's factual and procedural background, which this Court has discussed in prior written opinions.  *See, e.g.*, *NHC, LLC v. Centaur Constr. Co.*, No. 19 C 6332, 2022 WL 823878 (N.D. Ill. Mar. 18, 2022) ("*Summary Judgment Decision*"); *NHC, LLC v. Centaur Constr. Co.*, No. 19 C 6332, 2020 WL 4052657 (N.D. Ill. July 19, 2020) ("*Motion to Dismiss Decision*").  The following background is relevant to the post-trial motions and largely is taken from the Court's summary judgment decision, *see Summary Judgment Decision*, 2022 WL 823878, at *1–2, and the trial record.

### A.    The contract

NHC acquired the Chicago Nobu Hotel project from another developer in December 2017, and it entered into a written contract with Centaur regarding the project in April 2018.  The contract specified that, among other obligations, Centaur was to "pay subcontractors within seven days, provide accurate monthly reports of completion progress, and submit payment applications for completed work." *Summary Judgment Decision*, 2022 WL 823878, at *1.  It also stated that "the project would be subject to a guaranteed maximum price (GMP) of $48,257,000" and that "the 'contract sum' was to be identified in a 'Design Build Amendment.'"  *Id.*

Section 13.2.2 of the contract governed termination of the contract by NHC (as

the Owner) for cause after the parties executed a Design Build Agreement, and it included a subsection stating as follows:

> §13.2.2.4  If the unpaid balance of the Contract Sum exceeds costs of finishing the Work and other damages incurred by the Owner and not expressly waived, such excess shall be retained by the Owner.  If such costs and damages exceed the unpaid balance, the Design-Builder shall pay the difference to the owner.  The obligation for such payments shall survive termination of the Contract.

Third Am. Compl., Ex. 1, Standard Form of Agreement Between Owner and Design-Builder ("Master Agreement"), at 36.  In contrast, Section 13.1 governs "Termination or Suspension Prior to Execution of the Design-Build Amendment" and does not address costs and damages if NHC were to terminate the contract for cause before executing a Design Build Amendment.  *Id.* at 35.  The parties never executed a Design Build Amendment.

## B.  Trial testimony

Because the Court granted summary judgment in favor of NHC on liability regarding the breach of contract claim, the trial concerned only liability on the fraud claim and damages on both claims.  At trial, NHC's project lead Rodrigo Chapur testified that the $48.25 million guaranteed maximum price was the agreed-upon price rather than an estimate or projection.  He also stated that NHC would not have contracted with Centaur if it believed Centaur could not complete the project for that price, and his father Roberto Chapur testified that Centaur never indicated to NHC that the price could exceed $48.25 million.[1]  Tsaparas similarly confirmed that the Chapurs expressed an unwillingness to spend more than the guaranteed maximum price.  In addition,

---

[1] To avoid confusion, the Court will refer to Rodrigo and Roberto Chapur by their first names.

Tsaparas testified that although it was possible to build a twelve-story hotel for $49 million at the time of the contract, he believed that "under any circumstances" it would have been "absolutely impossible" to "build a hotel of the quality of the Nobu Hotel Chicago for $49 million."  Defs.' Rule 59 Mot. for a New Trial, Ex. 1 ("Trial Tr."), Vol. 3-B, at 15:21–16:4.

The parties' witnesses also testified about the payment applications Centaur regularly submitted to NHC over the course of the project.  It is undisputed that these payment applications did not accurately reflect "work actually performed prior to the date of the application" and that NHC paid Centaur the amounts indicated on each application.  *Summary Judgment Decision*, 2022 WL 823878, at *2.  Centaur contends that it "pegged each payment application amount to the February 2018 cashflow projection and did not bill based on work it had actually performed."  *Id.*  Rodrigo testified, however, that he received an email from Tsaparas that stated "[n]ext payment request will be on May 1st for work performed in April and payment will be due June 1st. That will be the case for the duration of the project."  Trial Tr., Vol. 1-B, at 69:3–5. Rodrigo stated that based on this email and similar oral statements by Tsaparas, he understood that the amounts in the applications were based on work performed and amounts used for project expenses like paying subcontractors.

Alexopoulos testified that he signed the notarized payment applications, including a final application stating that "all amounts had been paid by the contractor for work" and that no subcontractor was owed any money.  *Id.*, Vol. 3-A, at 128:15–129:16. Alexopoulos stated that he knew those statements were factually inaccurate but said he "was led to believe that the information that [he] was to be providing to [NHC] is at

[NHC]'s request." *Id.* at 129:19–30. NHC's accountant Manuel Nunez testified that in a December 2018 meeting, Tsaparas told him and Rodrigo that the expense reports were inaccurate because they did not reflect all of Centaur's spending on the project.

In early May 2019, Tsaparas informed Rodrigo that the project was over budget even though he had previously indicated otherwise. Rodrigo met with Tsaparas to discuss the project in August of that year. Rodrigo testified that during the meeting, Tsaparas explained that he had diverted "around 6 to 8 million dollars" from the funds NHC had sent Centaur "to other different things on projects and other items that he couldn't explain." Trial Tr., Vol. 1-B, at 110:1–6. Tsaparas claimed in that meeting that he did not know where he had transferred the money, but NHC's forensic accounting expert Dayna Anderson opined at trial that Centaur used more than $10 million of NHC's payments to pay expenses unrelated to the project. This included transferring $1.5 million and $400,000 to Tsaparas's and Alexopoulous's personal bank accounts, respectively.

As a result of Centaur's failure to pay, the subcontractors refused to perform further work on the project and filed liens against the property. Rodrigo testified that NHC incurred $9.4 million in paying the amounts covered by the liens and that NHC "had no more options than to terminate Centaur and hire a different company." *Id.*, Vol. 1-B, at 107:18–20. Similarly, Roberto stated that NHC "couldn't send [Centaur] any more money[] because contractors wouldn't get it and [he] needed somebody to tell the truth." *Id.*, Vol. 2-B, at 6:9–12. NHC hired Shawmut Construction and Design in August 2019, and it paid Shawmut $11.5 million to complete the project.

Rodrigo also testified that NHC incurred around $100,000 in legal fees relating to

an ongoing lawsuit by a subcontractor, and it paid another $50,000 in legal fees to settle claims with other subcontractors that did not involve a lawsuit.[2] He stated that the $50,000 "also includes the amount [NHC] spent on attorneys negotiating a new contract with Shawmut as [NHC]'s general contractor" because he believed those costs were "damages that if [Tsaparas] or Centaur would have performed the job [NHC] wouldn't have to pay it." *Id.*, Vol. 1-B, at 96:1–8. Rodrigo was not asked on direct or cross-examination about how much of the $50,000 was due to negotiating a new contract with Shawmut.

Lastly, the jury heard testimony that the defendants offered on their financial condition. Alexopoulos testified that he understood both Centaur's and his personal financial condition in August 2022 to be "nonexistent and dire." *Id.*, Vol. 3-A, at 114:16–22. Similarly, one of NHC's exhibits indicated that Centaur's only bank account contained less than two thousand dollars. As for Tsaparas's financial condition, Mark Hunt, a real estate developer who worked on the Nobu Hotel Chicago project, stated that he was working with Tsaparas on more than 20 construction projects at the time of trial.

During closing argument, counsel for NHC asked the jury to award $9,487,290 in compensatory damages for payments it made directly to Centaur's subcontractors and $11,725,545 in compensatory damages for the additional cost to complete the project. NHC also asked for punitive damages and argued that typically the amounts for punitive

---

[2] In a ruling on Centaur's motion in limine 10, the Court permitted NHC to "offer evidence regarding any attorney's fees and expenses it incurred vis-à-vis others as a result of the defendants' claimed fraud." *NHC, LLC v. Centaur Constr. Co.*, No. 19 C 6332, 2022 U.S. Dist. LEXIS 140045, at *2 (N.D. Ill. Aug. 7, 2022).

and compensatory damages are the same.

## C.    Jury instructions and verdict form

Two aspects of the jury instructions and verdict form are relevant to the parties' motions.  The jury instructions permitted the jury to award "attorney's fees paid by NHC in lawsuits brought or threatened against NHC by subcontractors on the Nobu Hotel Chicago project."  Jury Instructions at 14.  The section of the verdict form regarding liability is reproduced below:

VERDICT FORM – Case No. 19 C 6332

JUDGE MATTHEW F. KENNELLY
UNITED STATES DISTRICT COURT

First claim – breach of contract (against defendants Centaur and Tsaparas):

There has been a finding of liability in favor of NHC and against defendants Centaur and Tsaparas.

Second claim – fraud (against defendants Centaur, Tsaparas, and Alexopoulos):

We, the jury, find as follows on NHC's second claim:

| As to defendant Centaur | : | ✓ in favor of NHC |
| | | _____ in favor of Centaur |
| As to defendant Tsaparas: | | ✓ in favor of NHC |
| | | _____ in favor of Tsaparas |
| As to defendant Alexopoulos: | | ✓ in favor of NHC |
| | | _____ in favor of Alexopoulos |

Defs.' Rule 50(b) Renewed Mot. for J. as a Matter of Law as to Count II at 6.  The section of the verdict form regarding compensatory damages is as follows:

7

Compensatory damages

We, the jury, award Centaur compensatory damages as follows:

$ *9,487,290.20* for payments to subcontractors that were not paid by Centaur

$ *10,800,000.00* for payments made to Shawmut Design & Construction to complete construction of the Nobu Hotel Chicago project

$ *150,000.00* for attorney's fees paid by NHC in lawsuits brought or threatened against NHC by subcontractors on the Nobu Hotel Chicago project **(this element of damages is available only if you have found in favor of NHC against one or more defendants on NHC's second claim (fraud))**

Pl.'s Resp. to Defs.' Rule 50(b) Renewed Mot. as to Count II at 11.

Counsel for defendants contended that the verdict form should include separate lines for damages for breach of contract and for fraud, but the Court rejected that argument. The Court concluded that the form made it clear which damages were for breach of contract and which were for fraud because it (1) allowed the jury to indicate whether it would find each defendant liable for fraud, and (2) the blank for attorney's fees instructed the jury to write in a number only if it found one or more of the defendants liable for fraud.

Counsel for defendants also argued that because the first two categories of damages—payments to subcontractors and payment to Shawmut—were recoverable damages for both breach of contract and fraud, it would not be possible to determine which defendants were liable for which damages under breach of contract as compared to fraud. The Court also rejected this argument, concluding that although "there might be some theoretically, hypothetical, plausible possibility that a defendant could be found liable for fraud but not responsible for each and every element of damages," neither party had offered "a satisfactory way to set that out on the verdict form" without apportioning damages among the defendants for fraud. Trial Tr., Vol. 4-A, at 52:22–

53:14.  The Court concluded that such apportionment was inappropriate under Illinois law and thus overruled the defendants' arguments regarding the verdict form.

As indicated above, the jury found for NHC on the fraud count against all three defendants.  It awarded $20,437,920,20 in compensatory damages, with $9,487,290.20 for payments to subcontractors not paid by Centaur, $10,800,000 for payments NHC made to Shawmut to complete the project, and $150,000 for attorney's fees paid by NHC in lawsuits brought or threatened by subcontractors on the project.  The jury also awarded punitive damages of $630,666 against Centaur, $1,500,000 against Tsaparas, and $400,000 against Alexopoulos.

### Discussion

### A.    Motions for judgment as a matter of law

Under Federal Rule of Civil Procedure 50(b), judgment as a matter of law is proper if "a reasonable jury would not have a legally sufficient evidentiary basis" to support a verdict for the nonmovant.  Fed. R. Civ. P. 50(a)(1), (b); *see Thorne v. Member Select Ins. Co.*, 882 F.3d 642, 644 (7th Cir. 2018).  On a Rule 50(b) motion, a court "construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012).  Courts are "obligated to review the record to ensure that sufficient evidence exists to support the verdict, but [courts] will not otherwise consider the weight of the evidence" or "reevaluate the credibility of witnesses." *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 515 (7th Cir. 1993).  Consequently, a jury verdict will be overturned only if the court concludes that "no rational jury could have found for the

prevailing party." *Stragapede v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017) (internal quotation marks omitted).

### 1. Breach of contract

The defendants contend that because NHC terminated the contract before the parties executed a Design Build Agreement, the jury erred in awarding damages on the breach of contract claim. This argument relies on the fact that the section of the contract governing termination after the parties execute a Design Build Agreement states "[t]he obligation for such payments shall survive termination of the Contract," whereas the section governing termination before a Design Build Agreement is executed contains no such provision. Master Agreement at 35–36. Relying on the maxim *expressio unius est exclusio alterius*, the defendants argue that this difference between the two provisions means that damages do not survive the termination of the contract when—as is the case here—the parties did not execute a Design Build Agreement. The Court finds both that the defendants forfeited this argument by failing to raise it in their motion for summary judgment prior to the Court's finding of liability and that in any event the argument is unpersuasive on the merits.

The defendants raised this argument in their Rule 50(a) motion, and the Court indicated at oral argument on the motion that it believed this issue concerned liability. Illinois law is clear that "[t]o succeed on a claim for breach of contract, a plaintiff must plead and prove the existence of a contract, the performance of its conditions by the plaintiff, a breach by the defendant, and *damages as a result of the breach*." *Kopley Grp. V., LLP v. Sheridan Edgewater Props., Ltd.*, 376 Ill. App. 3d 1006, 1014, 876 N.E.2d 218, 226 (2007) (emphasis added). Even if one reads "damages" in this

formulation to mean the fact that the plaintiff was injured rather than the amount of damages, the defendants appear to contend that the lack of a damages section in the governing provision precludes NHC from establishing that it had suffered any harm. This, however, would make the lack of "damages" a liability issue, as there would be no viable breach of contract claim if that were the case.

When asked by the Court about this issue during argument on the Rule 50 motion during trial, counsel for the defendants initially agreed with the Court's conclusion that it concerned liability. Counsel argued that this argument related to the availability of damages only after the Court ruled that any arguments regarding liability not raised at summary judgment—including this one—were forfeited. In their present motion, the defendants repeat verbatim the argument from their in-trial Rule 50(a) motion, adding only a conclusory statement near the end that this "is an issue of NHC's lack of damages, not liability" without further explanation or legal support. Defs.' Rule 50(b) Renewed Mot. for J. as a Matter of Law as to Count I at 5. This cursory reference is itself a forfeiture. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived"). In sum, the Court sees no basis to conclude that it erred in deeming this argument forfeited.

Even if the argument were not forfeited, it is unpersuasive. The defendants' position is that the absence of a section expressly stating that damages survive termination of the contract means that they are—as the Court ruled on summary judgment—liable for breach of contract but there are no damages. But "a contract must be construed in light of existing principles of law, and these principles become a part of

11

the contract unless the contract clearly provides otherwise," *Estate of Savage v. Golub*, 73 Ill. App. 3d 656, 659, 392 N.E.2d 263, 266 (1979), and "[a] person who breaches a contract can be held liable for any damages that may fairly and reasonably be considered as arising from the breach in light of the facts that the breaching party knew or should have known." *Wilson v. DiCosola*, 352 Ill. App. 3d 223, 225, 815 N.E.2d 975, 978 (2004) (internal citations omitted). In this case, the lack of a provision regarding the "amount and survivability of damages" does not "clearly provide[]" that damages do not survive the contract; it is just as easily read to mean that the common law rules regarding contract damages apply. In sum, there is no basis to grant the defendants' motion for judgment as a matter of law on the merits. *See Krause v. GE Capital Mortg. Servs.*, 314 Ill. App. 3d 376, 386, 731 N.E.2d 302, 310 (2000) (declining to apply *expressio unius* because it was a "double-edged sword" that "could equally be argued" to support both parties' positions).

### 2. Fraud

The defendants raise various arguments in support of their motion for judgment as a matter of law on NHC's fraud claim. None are persuasive.

#### a. Promissory fraud

The defendants first contend that NHC's fraud claim is not actionable under Illinois law because it is based on future promises. The Court disagrees; sufficient evidence supports the jury's verdict in favor of NHC. The defendants argue that even though the payment applications Centaur submitted to NHC did not reflect the work performed on the project, those applications were not misrepresentations because all parties were aware that they were inaccurate. The defendants support this argument by

12

pointing to (1) Alexopoulos's testimony that he was aware there was no correlation between the amounts on the payment applications and the work performed, and (2) NHC's accountant Nunez's testimony that Tsaparas informed him and Rodrigo in December 2018 that the expense reports did not reflect all of Centaur's spending on the project. Yet Rodrigo testified that he believed the amounts on the payment applications reflected the work performed, and he explained that this belief was based on oral statements by Tsaparas and an email stating that the "[n]ext payment request will be on May 1st *for work performed in April*." Trial Tr., Vol. 1-B, at 69:3–5 (emphasis added). The jury was free to consider Rodrigo's, Alexopoulos's, and Nunez's testimony "and resolve any inconsistencies in their testimony however it [saw] fit"; a Rule 50(b) motion does not call upon a court to "consider the weight of evidence" or "reevaluate the credibility of witnesses." *United States v. Hodges*, 315 F.3d 794, 799 (7th Cir. 2003); *McNabola*, 10 F.3d at 515. There is no basis to believe that there was insufficient evidence to support the jury's conclusion on this ground.

The jury also properly awarded NHC $10.8 million for the payments NHC made to Shawmut to complete the project. The defendants argue that any payments to Shawmut were based not on actionable fraud but rather on Centaur's failure to fulfill its promises to complete the project on time and within budget. Not so. Rodrigo and Roberto both testified otherwise. Rodrigo stated that he believed he had no choice but to hire another contractor after Centaur's failure to pay subcontractors resulted in liens on the project, and Roberto stated that NHC needed a partner who would be truthful and pay its subcontractors. In light of these statements, it was not unreasonable for the jury to conclude that NHC's decision to terminate Centaur was based on Centaur's past

behavior—failing to pay the subcontractors, redirecting funds, and misrepresenting the status of the project—rather than its inability to fulfill future promises. As a result, the Court concludes that NHC's fraud claims are actionable under Illinois law.

### b. Restating breach of contract claim

There is also no merit to the defendants' contention that NHC's fraud claim merely restates the breach of contract claim. A plaintiff must "identify [a] fraudulent act distinct from the alleged breach of contract." *Greenberger v. GEICO*, 631 F.3d 392, 401 (7th Cir. 2011). It was reasonable for the jury to conclude that NHC did so in this case. For example, whereas failing to pay the subcontractors is a basis for the alleged breach of contract, misleading NHC to believe that the funds actually were going to the subcontractors—while transferring approximately $2 million to Tsaparas's and Alexopoulos's personal bank accounts—was a "fraudulent act" that was "distinct from the alleged breach." *Id.* In addition, before the parties entered into the contract, the defendants led NHC to believe it was possible to complete the project for $49 million. This was despite Tsaparas believing that it was "absolutely impossible" to build "a hotel of the quality of the Nobu Hotel Chicago" for that price. Trial Tr., Vol. 3-B, at 15:21–16:4. Although the defendants contend that such statements about the price were promises of future performance, a reasonable jury could understand such statements as misrepresenting what was possible at the time of the contract. Rodrigo's testimony regarding these acts provided the jury with sufficient evidence to permit it to find that the defendants committed fraud beyond, and in addition to, breaching their contract with NHC. *See, e.g.*, *Boyd Grp. (U.S.) Inc. v. D'Orazio*, No. 14 C 7751, 2015 WL 3463625, at *9 (N.D. Ill. May 29, 2015) (declining to dismiss a fraud claim as duplicative of breach

14

of contract where the defendant's "alleged misrepresentations concerned present or past facts"). The Court therefore denies the motion for judgment as a matter of law on this ground.

### c. Apportionment

The defendants next argue that the damages award should have been apportioned between the two claims and among the three defendants. This is not the law. Both the fraud and breach of contract claims concerned the same injury, and "damages are not assessed 'by defendant' or 'by claim' but 'for' an injury." *Duran v. Town of Cicero*, 653 F.3d 632, 640 (7th Cir. 2011) ("Where a plaintiff has suffered a single, indivisible injury (as is ordinarily the case and was true here on each of the state tort claims), the jury's task is to award a sum of money to compensate the plaintiff for that injury, not to enter a damages award against each defendant who is or will be liable on the judgment.") (applying Illinois and federal law).

In this case, NHC suffered a single injury: harm resulting from the failure to complete the Nobu Hotel Chicago on time and within budget. The fact that the costs NHC incurred because of this injury were payments to various parties—the subcontractors and Shawmut—does not make its single injury divisible, and there is no basis to apportion damages when the contract and fraud claims overlapped with regard to injury. The jury's obligation was therefore to "award a sum of money to compensate" NHC for the overlapping, indivisible injury, *Duran*, 653 F.3d at 640, and the defendants offer no legal authority indicating otherwise. Rather, their response brief cites to legal support only to argue that Alexopoulos cannot be held liable for breach of contract. But because the jury found Alexopoulos liable for fraud, it is unnecessary to determine what

damages were due to breach of contract versus fraud: regardless of the claim, the injury was the same (with the exception of the request to recover legal fees, which were recoverable only on the fraud claim), and Alexopoulos was found liable for having caused that injury.

Furthermore, the defendants' only proposed alternative was not viable. They suggested changes to the verdict form that would have (1) separated breach of contract damages from fraud damages, and (2) asked the jury to apportion among the three defendants the damages specific to the fraud claim. Yet as the Court pointed out during the jury instruction conference, these changes would have confused the jury and would have led it to believe it should split up damages, which is not the law. *See Duran*, 653 F.3d at 640; *Roberts v. Alexandria Transp., Inc.*, 2021 IL 126249, ¶ 32, 183 N.E.3d 701, 707 ("Illinois adheres to the rule of joint and several liability. . . [which] provides that when two or more individuals tortiously contribute to the same indivisible injury, each individual may be held jointly and severally liable for the entire injury."). Because the Court cannot approve a verdict form submitted by a party that fails to "comport accurately with the governing legal principles," *Carlson v. Bukovic*, 621 F.3d 610, 623 (7th Cir. 2010), it could not have appropriately adopted the defendants' proposed changes. Consequently, the Court denies the defendants' motion for judgment as a matter of law as it relates to apportioning the damages awards.

### d.    Prima facie fraud

The defendants also contend that NHC did not establish a prima facie case of common law fraud because it did not show reasonable reliance or fraudulent intent. Based on the evidence presented at trial, the jury reasonably could have found

otherwise.  Based on Rodrigo and Roberto's testimony regarding the guaranteed minimum price and the payment applications, *see* section A.2.a–b, *supra*, a rational jury could conclude—as the jury in this case did—that NHC reasonably relied on the defendants' statements in entering into a contract with and making payments to Centaur.

As for fraudulent intent, the evidence includes but is not limited to (1) Rodrigo and Roberto's testimony that NHC and Centaur had agreed on the $48 million as a guaranteed maximum price, and (2) Tsaparas's admission that he never believed a hotel like the Nobu Hotel Chicago could be completed for $48 million.  In addition, NHC's forensic account expert Dayna Anderson opined that Tsaparas and Alexopoulos had transferred almost $2 million of the funds from NHC to their own accounts. Because the evidence permitted a finding that defendants never informed NHC of these transfers but instead indicated that they were paying subcontractors, it was reasonable for the jury to find that they acted with fraudulent intent.

For these reasons, the defendants are not entitled to judgment as a matter of law on this ground.

### e.  Punitive damages

The defendants also argue that the jury's punitive damages award violates both Illinois law and the Fourteenth Amendment's Due Process Clause.  Neither argument is persuasive.

"In determining whether an award is excessive in a given case, Illinois courts look to a fact-specific set of relevant circumstances, including: (1) the nature and enormity of the wrong; (2) the financial status of the defendant; and (3) the potential liability of the

defendant." *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1143, 818 N.E.2d 357, 371 (2004). The defendants contend that the punitive damages awards are excessive in light of their financial status, citing to Alexopoulous's testimony that his and Centaur's financial condition was "nonexistent and dire" and one of NHC's exhibits showing that Centaur's only bank account has under $2,000. Yet NHC pointed to third party testimony that Tsaparas is currently employed on twenty other projects, and NHC's forensic accounting expert testified regarding Tsaparas's and Alexopoulos's history of transferring funds from Centaur's accounts to their personal accounts. As a result, the Court cannot say that it was unreasonable for the jury—especially a jury that found Alexopoulos liable for fraud—not to credit his testimony regarding his financial condition.

Illinois law also "require[s] the award to be the product of passion, partiality, or corruption in order to be excessive." *Gehrett v. Chrysler Corp.*, 379 Ill. App. 3d 162, 180, 882 N.E.2d 1102, 1119 (2008) (upholding punitive damages of $88,000 and compensatory damages of $8,500 against a car dealership that misrepresented the features of a single vehicle leased to the plaintiff). The defendants argue that the jury's award in this case was a result of passion because it was not based on a mathematical equation and because one of the amounts awarded ended in the number 666. The latter argument is bizarre, to say the least. That aside, "as there are no punitive-damages guidelines . . . it is inevitable that the specific amount of punitive damages awarded whether by a judge or by a jury will be arbitrary." *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003) (noting that punitive damages against a hotel of $1,000 per bed-bug infested room was arbitrary but not excessive). Instead,

courts have deemed punitive damages awards to be based on passion when they are too high in comparison to the compensatory damages awarded. *Deal v. Byford*, 127 Ill. 2d 192, 204, 537 N.E.2d 267, 272 (1989) ("The award is certainly not so high that it indicates passion, partiality, or corruption on the part of the jury."). In this case, the punitive damages were a fraction of the compensatory damages, not a multiple. Under the circumstances, there is no basis to conclude that the award was "the product of passion, partiality, or corruption." *Gehrett*, 379 Ill. App. 3d at 180, 882 N.E.2d at 1119.

Similarly, courts "consider three guideposts to determine whether a punitive damage award is grossly excessive such that it offends due process: (1) the degree of reprehensibility of defendant's conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004). The defendants address only the reprehensibility factor, arguing that the punitive damages were excessive because their conduct did not involve physical harm or a reckless disregard for the health and safety of others. The Seventh Circuit has held, however, that a punitive damages award of 3.3 times compensatory damages was "easily permissible" under the Due Process Clause for an Illinois common law fraud claim. *Id.* Considering that the total punitive damages award in this case was around $2.5 million, less than one-eighth of the compensatory damages awarded, there was no Due Process Clause violation here.

For these reasons, the Court denies the defendants' motion for judgment as a matter of law regarding the awards of punitive damages.

**B.**     **Motions for a new trial or to alter or amend the judgment**

The defendants have moved under Rule 59 for a new trial or to alter or amend

the judgment to exclude the attorney's fees awarded by the jury as part of

compensatory damages on the fraud claim, and NHC has moved to amend the

judgment to include pre-judgment interest.  A new trial is warranted under Rule 59(a) if

the verdict was "against the manifest weight of the evidence or if the trial was in some

way unfair to the moving party."  *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir.

2018).  In making this determination, a court "has the power to get a general sense of

the weight of the evidence, assessing the credibility of the witnesses and the

comparative strength of the facts put forth at trial."  *Whitehead v. Bond*, 680 F.3d 919,

928 (7th Cir. 2012).  The Seventh Circuit has cautioned that a court should grant a new

trial "only when the record shows that the jury's verdict resulted in a miscarriage of

justice or where the verdict, on the record, cries out to be overturned or shocks our

conscience."  *Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646

(7th Cir. 2017).  Similarly, "Rule 59(e) allows a court to alter or amend a judgment only if

the petitioner can demonstrate a manifest error of law or present newly discovered

evidence."  *Obriecht v. Raemisch*, 517 F.3d 489, 494 (7th Cir. 2008).

**1.**     **Attorney's fees**

The defendants have moved under Rule 59(e) to amend or alter the judgment to

exclude the $150,000 the jury awarded for attorney's fees.  They argue that there is no

evidence to support the award, but this is factually incorrect.  It is not disputed that the

jury instructions permitted the jury to award NHC "attorney's fees paid by NHC in

lawsuits brought or threatened against NHC by subcontractors on the Nobu hotel

project."  Jury Instructions at 14.  At trial, Rodrigo testified to incurring $100,000 as a result of a lawsuit by subcontractors and $50,000 to settle claims by other subcontractors that did not bring lawsuits.

By arguing that there was no evidence substantiating the $150,000 in damages, the defendants appear to contend that Rodrigo's testimony was insufficient.  Yet they "ha[ve] given [the court] no ground on which to hold that [Rodrigo]'s testimony on this point is so implausible that the jury could not rationally believe it."  *Venson v. Altamirano*, 749 F.3d 641, 647 (7th Cir. 2014) (denying party's Rule 50(b) and Rule 59 motions because "the credibility of the [witnesses]' testimony . . . was for the jury, not [the court] to assess").  Even if Rodrigo did not state the exact words "NHC incurred $150,000 in attorney's fees because of the defendants' fraudulent actions," he testified that he understood the defendants were paying the subcontractors until Tsaparas informed him otherwise in August 2019.  It was reasonable for a jury to conclude based on Rodrigo's testimony that the full $150,000——including both the $100,000 NHC incurred as a result of lawsuits and the $50,000 it paid to settle other claims—resulted from the defendants' fraud.

The defendants are correct that the jury instructions did not cover attorneys' fees spent negotiating a new contract with Shawmut, the contractor that replaced Centaur on the project.  Rodrigo testified at trial that the $50,000 NHC incurred in settling claims included legal expenses that the company spent on negotiating with Shawmut. Defendants' counsel could have asked Rodrigo on cross-examination about the exact

amount of those legal expenses. Counsel chose not to do so, however,[3] and Rodrigo's exact response to the question "[d]id you incur any legal fees to settle claims with other subcontractors for liens that did not involve a lawsuit" was "[y]es, around 50,000." Trial Tr., Vol. 1-B, at 95:21–23. With only this information, the jury did not act unreasonably in awarding the full $50,000 on top of the $100,000 in attorney's fees.

The Court therefore denies the defendants' motion to amend or alter the judgment to exclude attorney's fees.

### 2.    Pre-judgment interest

NHC has moved under Rule 59(e) to amend the judgment to include pre-judgment interest. The defendants oppose the motion. "In order to recover prejudgment interest, the amount due must be liquidated or subject to an easy determination." *Santa's Best Craft, L.L.C. v. Zurich Am. Ins. Co.*, 408 Ill. App. 3d 173, 191, 941 N.E.2d 291, 308 (2010). The defendants argue that damages cannot be easily determined in this case because there was no liquidated damages clause and the case went to trial on the question of damages. The defendants' theory, if accepted, would preclude any party from recovering prejudgment interest when damages are an issue at trial. This is not the law. "Where a party is liable for obtaining funds through fraudulent misrepresentation, prejudgment interest attaches as a matter of right from the date of payment as 'money received to the use of another and retained without the owner's knowledge.'" *Sheth v. SAB Tool Supply Co.*, 2013 IL App 110156, ¶ 98, 990

---

[3] There is no merit to the defendants' argument that it could not have cross-examined Rodrigo on this point because NHC did not disclose the relevant documents until three days before trial. Those documents were not shown to the jury, the jury determined the award based on Rodrigo's testimony, and counsel for defendants had ample opportunity to ask Rodrigo about this issue on cross-examination.

N.E.2d 738, 761 (citing 815 ILCS 205/2) (reversing denial of prejudgment interest after joint bench and jury trial on fraud claim); *see also Marcus & Millichap Real Estate Inv. Servs. Inc.*, No. 07 C 5369, 2010 WL 145785, at *8 (N.D. Ill. Jan. 12, 2010), *aff'd on other grounds*, 639 F.3d 301 (7th Cir. 2011) ("[P]rejudgment interest is proper on this claim to provide [the plaintiff] with full compensation since [the defendant] has had possession of these funds, and [the plaintiff] has not, since the overpayments were made . . . [and] because the jury found that [the defendant]'s behavior was fraudulent and such behavior must be deterred.").  It is also the case here that damages were easy to determine, as the jury awarded the exact amount NHC requested relating to payments to subcontractors and based the other elements of the compensatory damages award on Tsaparas's admission in one of NHC's trial exhibits.

As a result, the Court grants NHC's motion to amend the judgment to include $1,834,834.14 in prejudgment interest.

## Conclusion

For the foregoing reasons, the Court (1) denies the defendants' renewed motions for judgment as a matter of law [dkt. nos. 213, 214]; (2) denies the defendants' motion to amend or alter the judgment [dkt. no. 212], and (2) grants plaintiff NHC's motion to amend or alter the judgment [dkt. no. 215.  The Clerk is directed to enter an amended judgment consistent with the Court's ruling.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  March 15, 2022