```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3
     NHC LLC, a Florida limited        )
 4   liability company,                )
                                       )
 5                   Plaintiff,        )
                                       )  No. 19 C 6332
 6            vs.                      )  Chicago, Illinois
                                       )  July 15, 2024
 7   CENTAUR CONSTRUCTION COMPANY      )  9:30 a.m.
     INC., an Illinois corporation,    )
 8   SPIRO TSAPARAS and                )
     PETER ALEXOPOULOS,                )
 9                                     )
                     Defendants.       )
10

11              TRANSCRIPT OF PROCEEDINGS - MOTION

12         BEFORE THE HONORABLE MATTHEW F. KENNELLY

13   APPEARANCES:

14   For the Plaintiff:        VEDDER PRICE P.C.
                               222 North LaSalle Street
15                             Suite 2600
                               Chicago, Illinois 60601
16                             BY:  MR. ZACHARY J. WATTERS

17                             DAVIS MC GRATH LLC
                               125 South Wacker Drive
18                             Suite 300
                               Chicago, Illinois 60606
19                             BY:  MS. GINI S. MARZIANI

20   For the Defendant:        AMUNDSEN DAVIS, LLC
                               150 North Michigan Avenue
21                             Suite 3300
                               Chicago, Illinois 60601
22                             BY:  MS. KIMBERLY A. HERRING
                                    MR. CONSTANTINE GAVRILOS
23
     Official Court Reporter:  JENNIFER COSTALES, CRR, RMR, CRC
24                             219 S. Dearborn St., Room 1928
                               Chicago, Illinois 60604
25                             (312) 435-5895
                               jenny.uscra@yahoo.com
```

1       (Proceedings in open court)

2       THE COURTROOM DEPUTY:  Case 19 C 6332, NHC versus

3  Centaur Construction.

4       THE COURT:  Hi.

5       MS. MARZIANI:  Good morning, Your Honor.  Gini

6  Marziani on behalf of the plaintiff.

7       MR. WATTERS:  Good morning, Your Honor.  Zac Watters

8  also on behalf of the plaintiff.

9       MR. GAVRILOS:  Good morning, Your Honor.  Constantine

10  Gavrilos on behalf of defendants and third-party respondents.

11       MS. HERRING:  Kim Herring on behalf of the same.

12       THE COURT:  Okay.  So what I think is all up on the

13  agenda today, and it's what they used to call in Illinois a

14  bedsheet ballot because it's as long as a bedsheet.  So we've

15  got, there is a handful of issues from this joint status

16  report that was filed on June 17th, a couple or three.

17       There is some lingering issues from the order that I

18  entered on Friday, I think five points that I wanted to raise

19  with you from that order relating to the five different

20  subjects that are in there.

21       Then there is a couple of recent motions that I

22  haven't dealt with yet, that's docket number 435, motion to

23  extend liens, some of which have already extended, but not all

24  of them, and 436, motion to extend time to complete discovery.

25       And then it's relatively obvious to me that my

1    brilliant plan for limiting the amount of times I was going to

2    see you and how much stuff got filed was a complete miserable

3    failure.  So we're going to just chuck that and go back to the

4    drawing board.  So we'll do that last.

5            It worked in the two other times that I've done that

6    in 25 years.  But, you know, if I am batting two out of three,

7    that's probably pretty good.

8            All right.  So on the status report, starting off

9    with that, that's docket number 428, I'm just going to --

10   there are five topics, yeah, five or six topics, really five,

11   I would say five in the plaintiff's section which are

12   responded to in the defendants' section.

13           So the first is Spiro Tsaparas and Peter Alexopoulos

14   Missing Documents.  I am told in the response in the

15   defendants' part of that that we turned over copies of the

16   sale of the yacht.  We produced photos of the vehicles and the

17   firearms.  And then there is one item that Mr. Tsaparas lost

18   while traveling and he filed something with TSA on that.

19           So my take on that is that the issue raised in

20   plaintiff's section called "Spiro Tsaparas and Peter

21   Alexopoulos Missing Documents" is basically there is nothing

22   more for me to do.

23           Do you think there is anything more for me to do?

24           MR. WATTERS:  Your Honor, if I may?  I think the

25   answer is no, but if I can get give little bit more context.

1      THE COURT:  You had me going there for a second.

2      MR. WATTERS:  I've discussed this with counsel.  We

3  received a forwarded email that purported to send us the

4  photographs and the TSA information.  We never actually

5  received the underlying documents.  We thought it was an

6  Outlook glitch.  That's been a few weeks.  We were told we

7  were going to get copies.  We never did.

8      Having said that though, Your Honor, in light of the

9  Court's ruling on the motion for turnover, I don't know that

10  the photos are terribly relevant.

11      THE COURT:  It doesn't matter at this point, okay.

12  Fair enough.

13      Do you want to add anything more on that?

14      MR. GAVRILOS:  I don't think anything needs to be

15  added.

16      THE COURT:  Okay.

17      MR. GAVRILOS:  Other than we did send it again.  I

18  didn't hear any follow-up.  But I guess if they're not

19  receiving it, we don't need it.

20      THE COURT:  In item 2, "Corri McFadden Missing

21  Documents," I think the plaintiff's section says they got

22  produced and you're reviewing them.

23      So do you think that you got what you asked for, what

24  I ordered?  It's the unredacted copies of the bank records and

25  the so-called Notes document.  Bottom of page 1, top of page 2

1    of the status.

2              MR. WATTERS:  Yes.

3              MS. MARZIANI:  We still don't have the unredacted

4    copy of the William Alexopoulos Trust.

5              THE COURT:  No.  That's the next issue.

6              MS. MARZIANI:  Okay.

7              MR. WATTERS:  Yeah, with regard to Ms. McFadden, Your

8    Honor, to the best of my knowledge we have what we need.

9              THE COURT:  Okay.

10             MR. WATTERS:  We'll of course raise it again with

11   Ms. McFadden and her counsel if there is an issue.

12             THE COURT:  Okay.  Next has to do with the thing that

13   Ms. Marziani just mentioned, the trust document.

14             So if I'm understanding it right, the issue is there

15   is two William Alexopouloses, and you are not sure which is in

16   the thing.

17             MS. MARZIANI:  There may be more than two, but there

18   is certainly two.

19             THE COURT:  At least two.  Okay, all right.  And I'm

20   sure I've got all this stuff somewhere, but is this a

21   reference in the body of the trust or is it the grantor or is

22   it whatever they call the person who establishes the trust?

23             MS. MARZIANI:  It's referenced in the body of the

24   trust.  It's not that long.

25             THE COURT:  It's not a long document.

1    MS. MARZIANI:  Well, it's 71 pages.  But there is not

2  that many pages worth.

3    THE COURT:  And the reason you don't know which

4  Mr. Alexopoulos it is, what is it that you think is blacked

5  out or whited out or blacked out that prevents you from

6  figuring out which Alexopoulos it is?

7    MS. MARZIANI:  The date of birth.

8    THE COURT:  The date of birth, okay.

9    MS. MARZIANI:  And you had specifically ordered that

10  in that situation you should provide, I think it was --

11    THE COURT:  The year.

12    MS. MARZIANI:  -- the year.  And we don't, we don't

13  have it.

14    THE COURT:  Okay.  Can you do that?

15    MR. GAVRILOS:  Yeah, we can do that.  I was under the

16  impression that was done when we turned over the re-redacted

17  with black redactions instead of white.  But I have the years.

18  I can just give that to counsels in 5 seconds.

19    THE COURT:  Do that.

20    MS. MARZIANI:  Your Honor, may we go back to one

21  other point on the photographs?

22    THE COURT:  Where the guy is standing to your left,

23  who is on your side, said it's okay now?

24    MS. MARZIANI:  I know.

25    THE COURT:  Okay.  I just wanted to get that in

1    there.

2              MS. MARZIANI:  Thank you.

3              Perhaps if they just gave us hard copies, I'll walk

4    over to their office and pick them up, of the photographs.  It

5    just seems as though we should have those.

6              THE COURT:  Okay.

7              MS. MARZIANI:  Especially if they were emailed to us

8    twice.  And if that's a problem, like I said, I can walk over

9    and pick them up.

10             THE COURT:  Do you know what the nature of the

11   attachment is, because sometimes there is --

12             MR. GAVRILOS:  Less than 20 photographs.

13             THE COURT:  No.  But is it a JPEG or is it --

14             MR. GAVRILOS:  The first time I believe it was JPEG.

15   The second time I believe it was by a secure link upload

16   called Egress that our firm uses from time to time.

17             THE COURT:  Okay.

18             MR. GAVRILOS:  Sometimes it automatically converts to

19   that if the threshold of the file size warrants it.  It did

20   not in this case.  But we send one of those anyway.  If she

21   wants hard copies, I can't imagine that being an issue.

22             THE COURT:  Good, fine, do that.

23             Centaur Construction Company Missing Documents.  So

24   hang on one second.  I've just got to refresh my memory.

25             So the end of the plaintiff's section says, more or

1     less, there is deficiencies, we're going to file a motion.

2     The end of the defendants' section says, We've produced

3     everything there is.

4          And I haven't gotten a motion, so I'm just going to

5     keep my mouth shut on that one.  So, you know, if you want to

6     file something, file something.

7          MR. WATTERS:  Yes, Your Honor.

8          THE COURT:  Category 5, EDrop-Off Chicago LLC Missing

9     Documents.  And the plaintiff's section of the status report

10    says that as of June 17th, EDrop-Off has notified that they've

11    produced all responsive documents that they have.

12         The defendants' section notes this little naming

13    issue, whether it's EDrop-Off Express or EDrop-Off Chicago.

14    But nobody has asked, raised an issue for me to decide there,

15    so I'm just going to kind of get past that one.

16         Then the sixth category is the law firm citation.

17    And the last things says you were going to keep talking about

18    that.  So what's the current status of that?

19         MR. WATTERS:  Your Honor, we had a meet and confer

20    with counsel per the Court's direction.  And what counsel

21    suggested was that in lieu of a document production, a

22    declaration by the firm's general counsel be provided.  We

23    said we'd consider it, review it.  We've received no such

24    declaration.

25         THE COURT:  When are you planning to turn that over?

1      MR. GAVRILOS:  As soon as the records all come

2  together.  As Your Honor might imagine, there has been a

3  couple of entities who have chipped in, and we are putting all

4  of that together.

5      THE COURT:  Okay, okay.

6      MR. GAVRILOS:  And because of the declarations of

7  completeness that accompany this, I think it's reasonable --

8      THE COURT:  If I were to put a deadline on it, which

9  I'd like to do just to have it done, tell me what a reasonable

10  date would be.

11      MR. GAVRILOS:  Two weeks from today.

12      THE COURT:  There you go.  Two weeks from today,

13  whatever the affidavit is that's coming from Amundsen Davis,

14  Amundsen Davis.  I got it right the second time.

15      MR. GAVRILOS:  Your Honor, can I just make a quick

16  request?  Because there is a chance here that this

17  affidavit -- and to be clear, the information in the

18  declaration or affidavit is going to be exactly the same --

19  there is a chance that instead of it coming from Amundsen

20  Davis's general counsel, it actually comes from Spiro Tsaparas

21  instead --

22      THE COURT:  Whoever it comes from --

23      MR. GAVRILOS:  -- is the Court okay with whoever

24  signs on the affidavit as long as the information --

25      THE COURT:  Yeah, I mean, at some point somebody may

1   or may not raise an issue regarding the sufficiency of it.

2   But I just want to get to that step.  So whatever affidavit is

3   going to be submitted in response to the citation to Amundsen

4   Davis is to be turned over, you don't have to file it with me,

5   be turned over by two weeks from today, which would be the

6   29th of this month.

7            MR. WATTERS:  Your Honor, just for purposes of the

8   record, counsel had indicated that that affidavit may come

9   from their client.  It's not a hundred percent clear to me how

10  their client is able to bind the firm.  But we'll certainly

11  consider it and raise any issues with the Court.  I just

12  wanted to make sure that we're clear that we're reserving our

13  rights.

14           THE COURT:  Okay.  Understood.

15           Okay.  So I think, I mean, there was some other stuff

16  in the status report about expiration date, but that's all

17  covered by other things.  So I think I'm kind of done with the

18  status report now.

19           So the next set of issues has to do with follow-up

20  from the order that I entered last Friday, one second, which I

21  had here a minute ago.  Here it is.

22           Okay.  And I had I think one or two questions on each

23  of the little sections.  I have my own answer to the first two

24  questions, but I just wanted to just cover it.

25           So on the first two sections regarding

1    Mr. Tsaparas -- and by the way, I just noticed this morning as

2    I was re-reading this that there were a couple places where it

3    said "Ms." not "Mr."  I'm going to fix that.  You know,

4    unfortunately spell check doesn't catch all of those things.

5    All of the references are supposed to be Mr. Tsaparas,

6    obviously.

7            Anyhow, the order speaks for itself.  My assumption

8    was that I don't have to enter some sort of separate order

9    relating to that because there is no particular form that a

10   court order has to take.  And I've directed Mr. Tsaparas what

11   he has to do in here.

12           So if somebody thinks that I need to enter some

13   separate kind of order, tell me now.

14           MR. GAVRILOS:  Yes, Your Honor, the defendants would

15   ask for one clarification.  But I'll let the plaintiffs go

16   first if they have anything else.

17           THE COURT:  Do you need to anything?

18           MR. WATTERS:  Not from our perspective, Your Honor.

19   But of course we'll respond to whatever counsel raises.

20           THE COURT:  Yeah, okay.

21           MR. GAVRILOS:  So, Your Honor, Mr. Tsaparas would ask

22   for clarification on one specific issue.  And I guess the

23   windup to that is, this order as I understand, it confirms the

24   15 percent garnishment of Mr. Tsaparas's wages.  It then

25   confirms the additional 25,000 monthly payment.

1    THE COURT:  You are reading that correctly.

2    MR. GAVRILOS:  And the clarification we would ask is

3 what, if anything, is Mr. Tsaparas allowed to use his money

4 on?  You know, for instance, is he allowed to pay for a

5 babysitter?  Is he allowed to pay his attorneys' fees?  Is he

6 allowed to pay for groceries?

7    This order would suggest that he's not necessarily

8 allowed to use his money for anything whatsoever, which would

9 pose some practical problems in the immediate future.

10    THE COURT:  Okay.  Do you want to say something?

11    MR. WATTERS:  Yes, Your Honor.  I think the language

12 of the statutes is clear.  No, he cannot start dissipating

13 assets for whatever reason he wants, whether it's for a

14 babysitter, hotel trips, airline flights, all the things that

15 were mentioned in the motion for turnover.

16    What I think makes sense practically speaking is if

17 Mr. Tsaparas or any of the other judgment creditors want to

18 seek permission for certain expenses, they can do that in

19 writing before the Court and we'll respond to it.

20    But to try to hammer out what types of payments he's

21 allowed to make right here right now just doesn't seem very

22 practical or useful.

23    MR. GAVRILOS:  Your Honor, we did do that, you know,

24 by way of the monthly expense memorandum.  And I don't think

25 the outcome of what expenses on the memorandum were

1    permissible were quite identified.  Moreover --

2         THE COURT:  I wasn't asked to do that.  But I'll get

3    to that in a second.

4         Are you going to have this same issue with regard to

5    the turnover?

6         MR. GAVRILOS:  With Peter Alexopoulos, we are, Your

7    Honor.

8         THE COURT:  It's the same issue, yeah, okay.

9         MR. GAVRILOS:  And I guess, you know, not in a sense

10   to be, you know, semantic or nitpicky, but just the simple

11   fact that it seems like any time they do anything with their

12   money whatsoever they're at risk of being held in contempt.

13        And while I think the defendants have made their

14   position known with respect to how the citation statute deals

15   with that particular issue, the result of this order might

16   suggest that any time they use their money at all, they could

17   be held in contempt.

18        And we'll reserve, you know, the rest of that for

19   when we move through this order.

20        THE COURT:  Okay.  Well, so, I mean, I had a request,

21   and this is true with respect to both of the two individual

22   judgment debtors, Mr. Tsaparas and Mr. Alexopoulos, I had a

23   request before me from the plaintiff saying they've violated

24   their obligations.  That warrants this additional form of

25   relief, namely, these monthly payments.  I concluded that was

1    warranted.

2          I had granted on Mr. Tsaparas, because the

3    proceedings had gone back quite a bit further, I had a decent

4    amount of additional information from him regarding what his

5    income and outgo was on a monthly basis.  You no doubt noted

6    that I think the request was $40,000 a month.  I did not order

7    that.  I ordered $25,000 a month.

8          And respectfully, I was not asked in the several

9    submissions that were made to say, Okay, you can spend this

10   and you can't spend that.  I was asked -- and I wasn't called

11   upon to do that.  And I'm not going to wing that.  I'm just

12   not going to wing that.  That would be lunacy on my part.

13         I mean, if I can just speak from a 30,000-foot level

14   and not, you know, not taking away from amending, revising,

15   correcting anything that's in the order, you know, part of

16   what's going on here is that when somebody violates a court

17   order, there are consequences to it.

18         And I've concluded that this is what the consequences

19   should be.  And it's kind of like, and I don't want to draw

20   this analogy too much, but it's kind of like, you know, when

21   somebody, which as you guys know, federal judges do both civil

22   and criminal cases, it's a pretty common occurrence for

23   somebody who has committed a crime and is found guilty or pled

24   guilty to committing a crime, and they've got to get

25   sentenced, they come in and they say, Well, this is going to

1   hurt my wife, it's going to hurt my kids, it's going to hurt

2   me.  Like, yeah, and to part of that the answer is you should

3   have thought about that before you broke the law.

4        So I'm not telling Mr. Tsaparas where he gets the

5   money.  I'm not -- he can go out and borrow it from a rich

6   relative or he can borrow it from a bank.  He can get it out

7   from under his mattress if there is anything under his

8   mattress.  He can pay it from his, you know, ongoing income if

9   he wishes to do that.

10       Part of the reason that I -- part but not all of the

11  reason why I had the thing in there for both of these

12  gentlemen about filing these monthly expenditures and income

13  and asset reports is to get a sense of what it's doing.

14       I mean, to my way of thinking, if this had been done

15  according to Hoyle from the get-go, on Mr. Tsaparas's side

16  what would have happened is there would have been a discussion

17  when the citation got served saying, okay, here is what I've

18  got.  Here is what is coming in.  Let's sit down and try to

19  work out some sort of, some sort of this is what goes on my

20  side of the line, this is what goes on your side of the line.

21       That didn't happen.  People did what they were going

22  to do.  People did what they did.  And now there is a

23  consequence to it.  So I know that's not a direct answer to

24  your question, but --

25       MR. GAVRILOS:  Can I make it a little bit more

1    broadly then, Your Honor?

2    THE COURT:  The briefing schedule, in the briefing

3    that was done, both of these guys, I wasn't asked to do what

4    you are asking me to do right now, and I'm not going to do it

5    today.

6    MR. GAVRILOS:  Okay.  Can I ask it a little more

7    broadly then?  Instead of what specifically they might be able

8    to spend their money on, my question then is, is the Court of

9    the opinion that they can spend their money on anything

10   whatsoever?

11   THE COURT:  You know, what you are -- how many

12   filings are there in this case for crying out loud,

13   post-judgment filings?  There is like several hundred of them,

14   okay.  So I'm not going to operate that way.  Nobody has had a

15   problem filing stuff in this case and on either side.  Nobody

16   has had a problem filing stuff in this case.  And that's not a

17   question that is before me, okay.

18   The question that was before me was, there were

19   citations to discover assets, there were expenditures that

20   were made, this goes back several, you know, rulings and

21   hearings, did those expenditures run afoul of the citation,

22   the restraining provisions of the citation?  I concluded they

23   did.  Then we've been dealing with the consequences of that,

24   and that's the question before me.

25   I am not going to today and maybe not ever, but

1   certainly not today, sit down and say, Okay, he can spend

2   $4.78 for a Starbucks, but he can't spend, you know, $6.50 for

3   an Intelligentsia.  Or he can spend, you know he can get a

4   babysitter, but he can only pay him 15 bucks an hour as

5   opposed to 18 bucks an hour.  I'm not going to do that.

6          You know, that's my answer.  And I'm just going to

7   hold my tongue at that at this point.  We're going to move on

8   to the next thing.

9          So the question on the table is do I need to enter

10  any kind of a separate order that embodies what's in the order

11  already?  On that the question is for defendants.

12         I mean, there is a paragraph in the order on page 3,

13  it's actually, yeah, it's the paragraph in the order on page 3

14  which basically is what Mr. Tsaparas has been ordered to do.

15  There is a similar one on page 8 regarding Mr. Alexopoulos.

16  It's a paragraph in the middle of the page on page 8.

17         To my way of thinking, I don't need to do anything

18  other than that.  If anybody thinks I need to, tell me now.

19         MR. GAVRILOS:  Well, assuming we're treating Peter as

20  a separate issue in a section under, you know, this status

21  report, so just to keep it together --

22         THE COURT:  I got to have a yes or no.

23         MS. HERRING:  We have some issues to raise as it

24  relates to Mr. Alexopoulos.

25         THE COURT:  Okay.

1       MS. HERRING:  So with Mr. Tsaparas, we're okay.

2       THE COURT:  Okay.  The issue is do I need to have --

3  okay.  What is the line from the old -- serenity now.  It's a

4  Seinfeld line.  If you look up "serenity now," you'll get a

5  YouTube cut.

6       The single thing that I am asking for an answer to is

7  do I need to put in a separate piece of paper that is entered

8  on the docket as a separate docket item the order that is

9  already on for Mr. Tsaparas, page 3, and for Mr. Alexopoulos,

10  page 8, of the entry of the order that I entered last Friday,

11  the 12th of July?  Yes or no.

12       You guys said no.

13       You say yes or no?

14       MR. GAVRILOS:  So Tsaparas, no.  Alexopoulos, yes.

15       THE COURT:  Okay.  Why on Alexopoulos?

16       MR. GAVRILOS:  For Mr. Alexopoulos, Your Honor, I

17  guess it's just -- and to be clear for the record, you know,

18  the order with respect to Peter Alexopoulos was that his

19  monthly payment is $10,000 per month.

20       I guess my question as it pertains to

21  Mr. Alexopoulos, given that the financial information that we

22  produced up until this point indicates that $10,000 is --

23       THE COURT:  You are going to tell me he doesn't have

24  it?

25       MR. GAVRILOS:  What happens when he inevitably is

1     unable to make these payments, because it's about 25 percent

2     of his yearly income.

3           THE COURT: Okay. That one I kind of figured I was

4     going to hear today.

5           So short answer is I can't tell you. I mean, whether

6     that, you know, whether somebody is going to come and say he's

7     not doing it, that's a further contempt, you should now do

8     something more severe, potentially people would have that

9     option. And if that happens then, you know, the arguments

10     would probably be along the lines of we don't have -- they

11     banned debtors prisoner in Anglo-American jurisprudence a few

12     centuries ago. We shouldn't do that now. I'm being slightly

13     facetious there, but you get my point.

14           Or that, you know, for more severe sanctions for

15     contempt, there has to be some level of wilfulness, intent,

16     maliciousness, whatever you want to call it, and not having

17     money doesn't count as that. But I think that's respectfully

18     another issue for another day if and when that doesn't happen.

19           I don't know, the guy could hit on the Pick 6

20     tomorrow as far as I know. Is it Pick 6 or is it Pick 5?

21     Whatever it is, he could hit on it tomorrow, or he could go

22     out to the riverboat and, you know, start hitting 21s, you

23     know, 15 times in a row or whatever.

24           I think that's an issue for another day. I mean, the

25     legal framework that it would fall within is, okay, is

1   somebody going to ask me to impose a further sanction for

2   contempt or whether it's contempt on top of contempt or

3   whatever you want to call it, and if they do, then, you know,

4   people will make arguments that I shouldn't do it, and then I

5   have to decide what if anything more I should do.

6           Again, part of the reason -- and I know what I was

7   told regarding what Mr. Alexopoulos's current income.  Part of

8   the reason for these monthly what I'll call, you know,

9   financial statements is so that I -- part of the reason, but

10  not all of the reason is so that I can see what is there,

11  because those are going to be submitted under oath.  And I

12  assume, I'd like to assume that even in this day and age that

13  has some sort of a meaning to people.

14          So that's my answer.  I know it's a nonanswer.  It's

15  the best I can do for you right now.

16          MR. GAVRILOS:  Nothing further to that, Judge.

17          THE COURT:  Okay.  So I'm not going to enter a

18  separate order on those two because I think it's already

19  covered in there.

20          Item number 3, Ms. McFadden.  I think I gave you a

21  couple of extra days to get me the draft order on that.  So

22  actually we don't need to talk about that.

23          And so then the last two things on the July 12th

24  order would be --

25          MR. GAVRILOS:  Turnover of personal property.

1    THE COURT:  -- the turnover of the vehicles and the

2    guns.  I certainly agree with you, I certainly agree with you

3    that the prospect of having the plaintiff turn over the gun to

4    the defendant is probably something we would all like to

5    avoid.  I'm actually sure -- I'm actually not sure -- there

6    may be some legal issues about that.

7         And you can't bring them into the courthouse.  I

8    mean, I can't act as the intermediary on that.  I just think

9    you need to kind of figure out a way to do it.

10        I will say this, I mean, I don't know if these, you

11   know, if somebody has got like the actual James Bond gun that

12   was used or something, but probably these guns don't have a

13   whole lot of value.  And I get that you are allowed to collect

14   what you want and whatever.  But, you know, one option here

15   was to say, Ah, we don't need that stuff.

16        But I think in terms of the turnover of the guns, I

17   think you should try to work something out, and I'm hoping

18   that you can figure out a mechanism to do that that doesn't

19   involve me having to make another order.  So I'm going to give

20   you some time to do that and figure it out.

21        And I think there is firearms with respect to both of

22   them if I'm reading everything correctly.

23        MR. WATTERS:  Yes, Your Honor.

24        THE COURT:  You know, so I know what the street value

25   is because I get cases like that all the time.  The street

 1   values are pretty tiny, a hundred bucks, 150 if it's a really

 2   nice one.

 3          So then that leaves these, there is a trailer I guess

 4   and -- hang on a second.  So I've got on Mr. Tsaparas --

 5          MR. GAVRILOS:  The trailer was for Mr. Alexopoulos,

 6   Your Honor.

 7          THE COURT:  Mr. Alexopoulos, you're correct.

 8          MR. GAVRILOS:  And I can maybe provide a little bit

 9   of detail.

10          THE COURT:  Go for it.

11          MR. GAVRILOS:  You know, we had quite limited time to

12   get as many background facts on the trailer as we could.  I

13   can provide a make and model.

14          THE COURT:  When you say "trailer," that can mean a

15   bunch of different things.  What is it?

16          MR. GAVRILOS:  That's exactly where I was going with

17   this.  So the trailer in this case, it's difficult to

18   describe, but imagine, you know, like the trailers that hold

19   landscaping equipment that you often see pulled around --

20          THE COURT:  Yeah, yeah, yeah.

21          MR. GAVRILOS:  -- the white ones with like

22   essentially what looks like pressboard, you know, interior

23   walls.  This is that.  It's about half that size.

24          THE COURT:  Kind of like an old style U-Haul except

25   without a top on it or something?

1          MR. GAVRILOS:  More or less, yes.  I would say

2    slightly more rudimentary than that.  It's just used for

3    physical transport.

4          THE COURT:  Yeah.

5          MR. GAVRILOS:  And I can give you --

6          THE COURT:  Is it something that's been used kind of

7    for landscaping type stuff?

8          MR. GAVRILOS:  It's used more in connection with this

9    sportsman resource endeavor.

10          THE COURT:  Okay.

11          MR. GAVRILOS:  To transport some of his tools of the

12    trade there.

13          THE COURT:  Okay, all right.

14          MR. GAVRILOS:  Is Your Honor's position on the

15    trailer the same as it was with respect to the firearms,

16    figure it out?

17          THE COURT:  People can decide not to take whatever

18    they decide not to take.  But I think you should just kind of

19    figure out how to get this stuff.

20          MR. WATTERS:  Your Honor, I think the Court's earlier

21    instruction regarding the photos will help move this along.

22    So we will pick up the photos, gather some --

23          THE COURT:  Once they see what it looks like, that

24    will make it easier, I think.

25          MR. GAVRILOS:  Sure.

1          THE COURT:  Okay.  So then on --

2          MR. WATTERS:  Your Honor, at the top of page 10 of

3     the Court's order on Friday --

4          THE COURT:  There it is.

5          MR. WATTERS:  -- there is the issue with the Chevy

6     Suburban.

7          THE COURT:  Yeah, so that's the one where as I said

8     the ball is in NHC's court.  And the question is whether the

9     remainder of the wild card exception, the $2400 remaining from

10    the wild card exception covers the value of it.  Do you know?

11         MR. WATTERS:  Well, Your Honor, we went ahead and ran

12    a Kelley's Blue Book report using the VIN.

13         THE COURT:  Right.

14         MR. WATTERS:  So without the mileage or condition,

15    we're making some educated guesses here.  But given the VIN,

16    and assuming 100,000 miles and it being in good condition, the

17    value is somewhere between 21,926.  So quite a bit more than

18    the 2400.

19         THE COURT:  And is this the one that has a loan on it

20    or not?

21         MR. WATTERS:  This one, our understanding at least as

22    of last year was that it does have a loan on it.

23         THE COURT:  Does have a loan.

24         MR. GAVRILOS:  And, Your Honor, it's our

25    understanding that is loan around $30,000.

1          THE COURT:  That would be the norm for most vehicles.

2  They end up being worth way less than you think.  The day

3  after you buy them, they are worth like $10,000 less than you

4  paid for them.

5          MR. WATTERS:  Your Honor, if I may make a suggestion?

6          THE COURT:  Yeah.

7          MR. WATTERS:  Along with the photos, if we could get

8  documentation on the current status of the loan, I believe,

9  and Ms. Marziani can correct me, I think the last

10  documentation we had was over a year ago, correct, for the

11  loan balance?

12          MS. MARZIANI:  Right.

13          MR. WATTERS:  I mean, no one is looking to waste time

14  and resources.

15          THE COURT:  Yeah.

16          MR. WATTERS:  So if the value of the loan greatly

17  exceeds the value of the vehicle, we can make a reasonable --

18          THE COURT:  Judgment about what to do?

19          MR. WATTERS:  Yes.  So if we could get that

20  information as well, Your Honor.

21          THE COURT:  That seems to make sense to me.

22          Does that work for you?

23          MR. GAVRILOS:  It makes sense to me as well, Your

24  Honor.

25          THE COURT:  Okay, good.

1        So let's see, well, this actually goes back to things

2   you were talking about a second ago.  And since we're on

3   Mr. Alexopoulos, let's stick with Mr. Alexopoulos.

4        So I'm looking at page 10 of the order.

5   Mr. Alexopoulos made an assertion November 23 that he asserts

6   the balance of his wild card exemption as to any and all

7   remaining items of personal property to the fullest extent

8   permitted.

9        So really what that boils down to is, without knowing

10  what the value of the trailer and the firearms is, it's really

11  kind of hard to tell what that is.  I can't adjudicate it.  To

12  the extent I have to adjudicate anything, I can't do it.  So

13  do you have some input on that?

14       MR. GAVRILOS:  No, Your Honor.  And that was

15  essentially our position at the time.  Remember, that

16  exemption was claimed back in November of '23, at which point

17  there was no motion to actually turn over the vehicle.  And so

18  it was unclear what the balance of the loan obligations that

19  would have potentially offset the value, you know, would be at

20  the time turnover was actually sought.

21       THE COURT:  So you are basically telling me that

22  that's going to flow from what comes out of the Suburban

23  issue?

24       MR. GAVRILOS:  Essentially.

25       THE COURT:  Yeah.  That makes sense.  That sounds

1    right to me.

2          MR. WATTERS:  I think we just need to gather

3    additional information about the assets, Your Honor.

4          THE COURT:  Okay.

5          MR. GAVRILOS:  And that's agreed.

6          THE COURT:  That makes sense.  Okay, do that.

7          So now we're back over to -- it was actually earlier

8    in the order.  Oh, it's the last section of the order.  It has

9    to do with --

10         MR. WATTERS:  Your Honor, if I may?

11         THE COURT:  Yeah.

12         MR. WATTERS:  Before we jump to what I think is sub

13   point 6 in the order on page 11 --

14         THE COURT:  Did I skip something?

15         MR. WATTERS:  Well, we've got multiple vehicles that

16   there is no exemption claimed for on Mr. Tsaparas.

17         THE COURT:  Right, yes, exactly.  That's

18   Mr. Tsaparas.  That's what I was looking for.

19         MR. WATTERS:  Correct.

20         THE COURT:  I skipped over that.

21         MR. WATTERS:  It's bottom of 10, top of 11, Your

22   Honor.

23         THE COURT:  I was looking right at it.  There it is.

24   Okay.  And we talked about a couple of these the last time.

25   We talked about, I recall talking about the Ducati and the

1    Lancia and trying to figure out what they were.

2            MS. MARZIANI:  That was April 23rd.

3            THE COURT:  Okay.  It was a couple months ago.  Fair

4    enough.

5            Okay.  So what I concluded on that was that Mr. --

6    and there is a typo that I'm now just noticing at the top of

7    page 11, which says, "With respect to Mr. Alexopoulos's

8    statutory exemptions," it should say "Mr. Tsaparas."

9            MS. MARZIANI:  Yes.

10           THE COURT:  So I'll fix that one too.

11           MS. HERRING:  Yes.

12           THE COURT:  He asserted the motor vehicle exemption

13   on the different vehicle, a BMW.  He asserted his wild card

14   exemption on other stuff.  So basically all we're talking

15   about at this point is how the vehicle -- just table the

16   firearms for a second because you are still talking about

17   those -- how the vehicles get delivered and disposed of.  And

18   this is the Ducati, the Lancia, and the Denali, D-E-N-A-L-I.

19           So do you have a thought or proposal on that, Mr.

20   Gavrilos?

21           MR. GAVRILOS:  I believe, and I forget which hearing

22   we discussed these vehicles, I think the conclusion that we

23   came to was that the vehicles, aside from the one that

24   Mr. Tsaparas is claiming, are essentially scrap metal.  So our

25   response would be similar, you know, to what we've been saying

1   all along with respect to the vehicles.  If that's something

2   that NHC wishes to compel turnover of, I don't know that we

3   would object to that because we did not in our original claim

4   for exemptions.  And so --

5            THE COURT:  The Denali is scrap metal?

6            MR. GAVRILOS:  Well, the Denali I think was under the

7   Alexopoulos property.

8            MS. MARZIANI:  No.

9            MS. HERRING:  None of -- no.

10           MR. GAVRILOS:  Okay.  And then yes, it's our

11  understanding that none of those cars work, that, in fact,

12  they may not even have an engine.

13           THE COURT:  What do you need to know on those?

14           MS. MARZIANI:  Your Honor, may I?  Mr. Tsaparas

15  testified that he drives the Ducati all the time, except in

16  inclement weather.

17           THE COURT:  Okay.

18           MS. MARZIANI:  And that he had paid off the loan, so

19  there is no loan on it.

20           THE COURT:  Okay.

21           MS. MARZIANI:  It's a 2017 Ducati.  I don't know

22  anything about motorcycles, but --

23           THE COURT:  Oh, that's the motorcycle, that's right.

24           MS. MARZIANI:  Yeah.  The Lancia, Mr. Tsaparas at his

25  citation examination testified that it's not running.  But we

1    asked for pictures of it because we talked about how it was, I

2    don't know, it's a special car to him.

3          THE COURT:  It's not clear what it is, yeah.

4          MS. MARZIANI:  We didn't know what it was.  So I

5    think the Lancia falls into that category of we need pictures.

6    We don't know what that is.

7          The 2015 Yukon Denali, Mr. Tsaparas at his citation

8    examination testified that he drives it all the time, that

9    Mr. Alexopoulos drove it from Niles, Illinois to Aspen, and

10    that's a vehicle that Mr. Tsaparas drives all the time.

11          So the only one of those three vehicles, the only one

12    that isn't operable based on Mr. --

13          THE COURT:  Is the Lancia?

14          MS. MARZIANI:  Right.  And we just -- there is no

15    claim for exemptions.  I would think that the way to handle

16    it, but we could talk about it amongst ourselves, would be

17    that Mr. Tsaparas delivers the vehicles to a professional and

18    we sell the vehicles if we're able to sell them.

19          MR. WATTERS:  Just to clarify, Your Honor --

20          THE COURT:  You say "a professional," like to

21    somebody who sells cars?

22          MR. WATTERS:  Right, a private sale, Your Honor, as

23    opposed to the sheriff.

24          MS. MARZIANI:  Like CarMax, yeah.

25          THE COURT:  Yeah.

1          MS. MARZIANI:  We would not want the sheriff or the

2     marshal selling it.  That would not make sense.

3          THE COURT:  That would be extraordinarily unwise --

4          MR. WATTERS:  Yeah.

5          THE COURT:  -- to have the marshal sell it.  You'd

6     get less for it anyway.

7          Mr. Gavrilos, what are your thoughts?

8          MR. GAVRILOS:  Yeah, Your Honor, that's my apologies,

9     I think I confused the Lancia with the Ducati.

10          THE COURT:  Ducati is a motorcycle.

11          MR. GAVRILOS:  Sure.  Yeah, Your Honor, the exemption

12     claim I think was for the BMW.

13          THE COURT:  Yeah.

14          MR. GAVRILOS:  I don't know that the Denali was -- is

15     that something that was even on Spiro's initial asset

16     disclosure form?  I mean, we're going back a little bit on

17     that particular issue.

18          THE COURT:  All I know is it was in the motion that I

19     dealt with.

20          MR. GAVRILOS:  I don't know, in other words, Your

21     Honor, if that's something that can be turned over from Spiro.

22     But if we're talking about the automobiles, it's certainly

23     something that we can add to our to-do list discussion as to

24     how to best dispose of that.

25          THE COURT:  So the turnover of it has been ordered,

1   okay.  So that's a done deal.

2          So it's okay for you to discuss all of this, but just

3   what I don't want to get and what I will not take is a whole

4   boatload of more motions relating to this stuff.  I mean, this

5   is a discussion.  There has been orders entered on all of

6   these things.  I'm talking about the collection of the stuff

7   we've been talking about so far.

8          And there is a discussion about, you know, details of

9   how things get transferred and in some situations details

10  about what things are or what they, you know, what they're

11  worth.  But that's a status report, joint, and pretty soon, so

12  two weeks.  So I want a status report two weeks from today,

13  which would be the 29th.

14         So in terms of remaining issues then, we've got a

15  motion to extend time to complete discovery.  Actually that

16  one I just completely blanked on until this morning.  So I've

17  got to pull it up and look at it.

18         MR. WATTERS:  Your Honor, I apologize, if I may?

19  There was one other issue with regard to the motion for rule

20  to show cause as to Mr. Tsaparas that was addressed in the

21  Court's Friday --

22         THE COURT:  Which is what?

23         MR. WATTERS:  As Your Honor may have seen, we

24  submitted consistent with the Court's instruction a proposed

25  order to the proposed order inbox.  Your Honor, practically

1    speaking, in light of the filings by Mr. Tsaparas's counsel, I

2    think a finding of contempt has essentially already been made.

3    There have been --

4          THE COURT:  Not essentially.  It has been made, more

5    than.

6          MR. WATTERS:  Fair enough, Your Honor.  So I think

7    the only remaining --

8          THE COURT:  Yeah, when I looked at this order, I said

9    there is a lot of this stuff that just doesn't need to be in

10   there.  Is that where you were headed?

11         MR. WATTERS:  Well, I think so, Your Honor.  And I

12   don't know that there needs to be further briefing on the

13   issue.  The question really is what is the remedy for the

14   contempt.

15         THE COURT:  Oh, I'm sorry.  No.  We're talking about

16   two different things.

17         MR. WATTERS:  I apologize, Your Honor.

18         THE COURT:  I'm sorry.  There has been an earlier

19   contempt filing, but this is the new motion.

20         MR. WATTERS:  This is the newer one.

21         THE COURT:  Okay.  So look, you know, at the risk of

22   being accused of being pedestrian about this, the way that a

23   contempt typically but not always gets teed up, and this is

24   the way you started to tee it up here, is a motion for rule to

25   show cause gets filed.  Oftentimes there is a response to

1   that.

2          The judge basically, and I'm oversimplifying this a

3   little bit, the judge basically decides whether there is

4   probable cause, okay. If so, the judge issues a rule to show

5   cause. Then there is a contempt hearing. And that's kind of

6   where we are heading. I've got to issue the rule to show

7   cause. Then there is going to be a contempt hearing, at which

8   the -- you know, obviously the burden -- well, not obviously.

9          Even though it's an order to show cause, the burden

10   of proving contempt is always on the party seeking contempt,

11   not on the party who would be held in contempt. But that

12   party is entitled to present evidence, as is the party seeking

13   the contempt finding, to determine what I should do about it.

14   So this involves this 70,000ish additional transfers.

15          So we're not going to skip over anything. We're

16   going to do it according to Hoyle or whatever the legal

17   equivalent of doing it according to Hoyle is.

18          So I don't think I need all of the preliminaries

19   here. It's really paragraph 2 of your draft order.

20          "Mr. Tsaparas shall show cause on or before" blank,

21   and we'll fill in the blank in a second, "why an order should

22   not be entered pursuant to" citations.

23          It would be, number one, finding him in the contempt

24   and, number two, imposing an appropriate sanction for the

25   contempt. I don't think you have to identify all of the

1    potential sanctions in the order.

2           So that's what I'm going to -- I'll just take what

3    you've got and tweak it a little bit and get something entered

4    on that.

5           MR. WATTERS:  Understood, Your Honor.

6           THE COURT:  But then the question would be how long

7    do I give you all to file a response to the show cause order?

8    So how long would you like?

9           MR. GAVRILOS:  Can we take three weeks, Your Honor?

10          THE COURT:  Sure, that's fine.  That would be the 5th

11   of August I think.  Yeah, 8/5.  So I'll just plug that in.

12          And then I'm going to give you all 10 days after that

13   to reply, which would be the 15th of August.  And then our

14   next date will be the date that we do that in addition to

15   anything else, which is really kind of the tail end of August

16   I think.

17          Okay.  So now I'm back to the motion to extend time

18   to complete discovery, which is docket number 436, which I'm

19   pulling up here.

20          Okay.  So you've got -- so this is the laundry list.

21   Is this the other William Alexopoulos, so the first --

22          MR. GAVRILOS:  I believe it's the senior, Your Honor.

23          THE COURT:  It's William Alexopoulos, the older.  So

24   it's written discovery request of William Alexopoulos, the

25   elder -- is that how we'll will refer to him?  It's subpoenas

1    on Mr. Pokorny and it's a law firm, right?

2           MR. WATTERS:  Correct.

3           THE COURT:  Mr. Pokorny and the law firm.

4           Number 3 is a subpoena to somebody named Susan

5    Krasick, who is the co-trustee of the Alexopoulos Trust,

6    K-R-A-S-I-C-K.

7           And so you were looking for -- you said that there

8    was going to potentially be some more documents on the way.

9    Have you gotten anything since you filed the motion?

10          MR. WATTERS:  We have not, Your Honor.  We believe --

11          THE COURT:  Which of those folks do you represent, if

12   any of them?

13          MR. GAVRILOS:  William Alexopoulos, the senior, and

14   Susan Krasick, I believe.

15          THE COURT:  Okay.

16          MR. GAVRILOS:  And as to the first William

17   Alexopoulos, I'll just start with him because he's I guess a

18   direct respondent in the petition, we have discovery answers

19   out waiting for signature.

20          THE COURT:  Okay.

21          MR. GAVRILOS:  You will recall William Alexopoulos is

22   the individual who is like north of 85 years old, does not

23   have a phone, computer, fax.  It has been extraordinarily

24   difficult to communicate just on a base level.  And so that's

25   essentially --

| | |
|---|---|
| 1 | THE COURT:  By the way, nobody has a fax. |
| 2 | MR. GAVRILOS:  You would assume if you didn't have a |
| 3 | phone or an email though that you might have a fax. |
| 4 | THE COURT:  No.  Actually the 85-year-old might be |
| 5 | the guy that still had the fax. |
| 6 | MR. GAVRILOS:  Exactly, Your Honor, or a typewriter |
| 7 | at least or something along those lines. |
| 8 | THE COURT:  Right. |
| 9 | MR. GAVRILOS:  Nothing.  So it's taken a little bit, |
| 10 | but we are working towards that.  We expect to get those I |
| 11 | guess I'll say soon. |
| 12 | THE COURT:  Okay.  So I'm going to put a deadline on |
| 13 | it.  So let's come back to that. |
| 14 | So who is Susan Krasick?  She's the trustee of the -- |
| 15 | is this the same trust that we -- |
| 16 | MR. GAVRILOS:  She's the daughter, Your Honor, |
| 17 | daughter slash brother. |
| 18 | THE COURT:  And what were the documents that you |
| 19 | requested of her?  Do you recall? |
| 20 | MR. WATTERS:  I may have it, Your Honor. |
| 21 | THE COURT:  It's probably attached here somewhere. |
| 22 | MR. WATTERS:  It would be Exhibit 3 to the motion, |
| 23 | Your Honor.  And I apologize I didn't print all the exhibits. |
| 24 | Trying to save some trees. |
| 25 | THE COURT:  I'm getting there.  Exhibit 3, okay. |

1       So basically it all has to do with the trust and the

2  transfer of the home, it looks like, the transfer of the home

3  to the trust.  Okay.

4       So I was with you, Mr. Gavrilos.  So what is going on

5  with that?

6       MR. GAVRILOS:  Susan produced all of the trust

7  documents, which essentially represents everything responsive

8  to the subpoena that she has.  She was not -- and even if you

9  look at the allegations of the petition, I don't think she's

10  alleged to have done anything or taken any specific role.

11       THE COURT:  Well, she's the named trustee or

12  something like that?

13       MR. GAVRILOS:  That's correct.  I mean, I think

14  really what it boils down to is I think she's a paralegal at

15  the probate firm that handled this.  So essentially, you know,

16  she's the gateway.

17       THE COURT:  Well, so I mean, you know, just

18  consistent with the way we've done everything else, you know,

19  in the latter stages in this case, if the response is she's

20  produced everything that she has, she needs to provide some

21  sort of declaration of completeness then.

22       MR. WATTERS:  I'm sorry, Your Honor.

23       THE COURT:  Yeah, go ahead.

24       MR. WATTERS:  I was just going to say, just to be

25  clear, it's my understanding, and again Ms. Marziani can jump

1    in and correct me, she has produced two pieces of paper.

2              THE COURT:  Well, may be all she has.

3              MR. WATTERS:  It seems unlikely, but it's certainly

4    possible, Your Honor.  And I agree, if they are going to have

5    her sign a declaration --

6              THE COURT:  I'm some sort of a trustee of some trust

7    that my brother set up, and if I had to produce any piece of

8    paper, I would not have anything.

9              MR. WATTERS:  Fair enough, Your Honor.

10             THE COURT:  And I'm a trustee.  It probably means I'm

11   a pretty bad one.

12             But anyhow, so what we need within two weeks on that

13   one is production of any remaining records, if there are any,

14   and some sort of a declaration of completeness.  So that's the

15   29th again.

16             Okay.  So that leaves -- now I've got to go back to

17   the motion.

18             So what were you trying to get from the Pokorny law

19   firm?  Where does he fit in?  Did he represent somebody here

20   at some point in time or what?

21             MS. MARZIANI:  Your Honor, they handled, if you

22   recall --

23             THE COURT:  I don't.  That's why I'm asking.

24             MS. MARZIANI:  Right.  The trust was amended after

25   the lawsuit was filed to exclude William -- I'm sorry, Peter

1    Alexopoulos.

2            THE COURT:  Pokorny did the amendment?

3            MS. MARZIANI:  Right, not only did -- right.

4            THE COURT:  Okay.

5            MS. MARZIANI:  So he did the amendment.  The

6    paralegal happens to be the --

7            THE COURT:  Ms. Krasick works for him?

8            MS. MARZIANI:  Right.  And so it just seems --

9            THE COURT:  The documents, you are just looking for

10   the documents, and they're either in one place or the other.

11           MS. MARZIANI:  Right.  It seems somewhat odd that she

12   being --

13           THE COURT:  But you don't represent Pokorny?

14           MR. GAVRILOS:  That's correct.

15           THE COURT:  Okay.  So what I need to do, if they

16   don't represent Pokorny, what I need to do is issue some sort

17   of order to show cause on Pokorny and the law firm.

18           MR. WATTERS:  And we're happy to file the motion,

19   Your Honor, or do it orally right now.

20           THE COURT:  You don't need to.  Just give me an

21   order --

22           MR. WATTERS:  Understood, Your Honor.

23           THE COURT:  -- you know, basically saying why they

24   shouldn't be held in contempt for failure to respond to the

25   subpoena that was served on them.  So just draft an order.

1         MR. WATTERS:  We'll prepare the order, Your Honor.

2         THE COURT:  Yeah, okay.  Then the last thing is

3 motion to extend, which is 435.  So a couple of them I think

4 that I have done already.  Those were the two individual

5 judgment debtors.

6         MR. WATTERS:  Your Honor, I think I can help

7 short-circuit it if the Court would like.

8         THE COURT:  Yeah.

9         MR. WATTERS:  So at 435, I think the Court's ruling

10 on Friday takes care of quite a bit of what was asked for with

11 regard to the judgment debtors and the associated citations to

12 the banks.

13         I think what we have outstanding that's requested in

14 the motion is the citations and the associated liens with

15 regard to Cori McFadden, EDrop-Off and William Alexopoulos,

16 the senior, both individually and as a trustee.

17         And we'd ask that just to keep it consistent, Your

18 Honor, we extend those through January 31st.

19         THE COURT:  Yeah, I'm not comfortable extending those

20 quite out as far.  And the reason, I mean, this should come

21 through from the order, the reason for the extension, at least

22 the length of the extension on the two judgment debtors has to

23 do with what I've concluded were violations of the citation.

24 I don't think that as of right now I'm not prepared to say

25 that anybody else has violated anything, at least to that

1    extent, and maybe in some cases not at all.

2          You know, I assume where we're headed on the William

3    N as in "Nancy" Alexopoulos situation is, is somebody going to

4    ask to undo the transfer of the home or something like that?

5          MR. WATTERS:  It's certainly a possibility, Your

6    Honor.  We're waiting on documents.

7          THE COURT:  Yeah.  And so I guess my question is, and

8    I think I know the answer, but I would rather have you tell

9    me, what does that have to do with whether the citation should

10   be extended?  So what are you trying to avoid happening by

11   extending the citations?

12         MS. MARZIANI:  Your Honor, besides the home and that

13   petition, William Alexopoulos pays Peter Alexopoulos monthly.

14   And we haven't -- we haven't dug into it.  It's not a lot, but

15   they pay him monthly amounts.  And it's intertwined in your

16   orders on the $10,000 a month, and I think that will all come

17   out.

18         We had suggested in our motion to extend that it be

19   extended to September 12th, sometime after the Labor Day

20   holiday.

21         THE COURT:  Okay.  So the father is giving money to

22   the son and, therefore, what at least potentially?  That's my

23   question.

24         MS. MARZIANI:  I believe that the father is violating

25   the citation, yeah.

1    THE COURT:  By giving money to the son.  Oh, I see

2  what you are saying, because he has a citation served on him.

3    MS. MARZIANI:  Yes, right.

4    THE COURT:  Okay.  You've probably just exceeded my

5  colloquial understanding of what third-party citations do and

6  don't do.

7    MS. MARZIANI:  He should be paying, it should be paid

8  to --

9    MR. GAVRILOS:  Hold on, Your Honor.  If I can just

10  quickly respond there.  I mean, just to be clear on --

11    THE COURT:  No.  I want to make sure she finishes the

12  point.

13    So the point is that, I mean, what a third-party

14  citation does, let's say my courtroom deputy clerk has a

15  judgment that she owes, and I owe her money.  The effect of

16  the third-party citation would be I pay the money to you --

17    MS. MARZIANI:  Exactly.

18    THE COURT:  -- or hold on to it at least, but I don't

19  pay it to her.

20    MS. MARZIANI:  Yes, exactly.

21    THE COURT:  Okay.  And so the idea would be that if

22  Mr. Alexopoulos, Senior -- and I know he's not a senior and a

23  junior here -- if Mr. Alexopoulos, Senior owes money to

24  Mr. Alexopoulos, Junior, then he shouldn't be paying that.  He

25  should be paying it to you.

1          MS. MARZIANI:  Yes.

2          THE COURT:  So then I'm going to ask you a follow-up

3   question.  If on the other hand what this is, and I know we're

4   not talking about a teenager here, but dad, his son is in kind

5   of dire straits, so he's giving him money to live on, does

6   that run afoul of the citation?  It wouldn't, right, because

7   he didn't owe the money, except maybe in some moral sense?

8          MS. MARZIANI:  Except that Peter Alexopoulos

9   testified at his citation examination that he does work for

10  William Alexopoulos --

11         THE COURT:  Okay.

12         MS. MARZIANI:  -- and that that's why he's getting

13  the money, and that it's on and off and --

14         THE COURT:  Okay.  So you've got an argument for why

15  it may be owed.  Okay.  I get what you are saying.

16         Now go ahead.

17         MR. GAVRILOS:  Sure.  So, you know, we can brief

18  Mr. Alexopoulos' citation examination if need be.  I know

19  we're trying to avoid that.  But it's my recollection that

20  Mr. Alexopoulos testified he does work for his parents.

21         THE COURT:  This is the judgment debtor Alexopoulos?

22         MR. GAVRILOS:  Correct, correct.  Peter Alexopoulos

23  testified that he often does work for William Alexopoulos and

24  his mother.  Sometimes they give him a couple hundred bucks a

25  month.  Peter Alexopoulos testified that it's not an

1  employment arrangement, that he would do the work even if he

2  wasn't getting paid.  And sometimes his parents give him money

3  even when he doesn't do anything.  We're talking stuff like

4  taking out the trash.

5            THE COURT:  Yeah.

6            MR. GAVRILOS:  You know, they're 85 years old.

7            And so our understanding of the citation restrictions

8  is that it restricts the disposition of money that is subject

9  to citation, i.e., the judgment debtors's money.

10           THE COURT:  Money that's owed to the judgment debtor.

11 The judgment debtor's money or money that's owed to him.

12           MR. GAVRILOS:  Correct.

13           THE COURT:  And the contention is going to be that

14 they didn't know any of this.

15           MR. GAVRILOS:  This is neither the judgment debtor's

16 money nor money that is owed to the judgment debtor.

17           THE COURT:  Okay.  I get it.  I think I understand

18 kind of what we're talking about now.

19           MS. MARZIANI:  Your Honor, may I add one --

20           THE COURT:  No.  Here is what we are going to do.

21 This has all got to be brought to a head at some point.  You

22 are going to have to fish or cut bait on this thing.  I'm not

23 going to extend this for six months.  I'm not going to extend

24 it for three months.  You know, it's fish or cut bait time.

25           And, you know, you've taken the examination of the

1   individual.  You've taken the examination of the son too.  And

2   so, you know, you've got to file something.  You've either got

3   to file something or decide that you're not going to, and it's

4   time to do that.  So I'm going to give you three weeks to do

5   that.

6           MS. MARZIANI:  That's fine, Your Honor.  We'll do

7   that.

8           THE COURT:  And so I'm going to extend the citation

9   by four weeks, because I'm giving them three weeks to do that.

10  And I'm not making any adjudication about what is happening,

11  what has been happening is good, bad or indifferent.  I just

12  want to have it in effect.

13          So three weeks, that's the 5th of August.  So you

14  have got some stuff due on the 29th of July.  We've got some

15  stuff due on the 5th of August.

16          Okay.  So that's William Alexopoulos.

17          Now we've got -- hang on one second.  I've just got

18  to look at one thing.

19          That last one is McFadden/EDrop-Off.  Actually, no.

20  The heading on the motion or the first paragraph of the motion

21  doesn't mention EDrop-Off.  It just says McFadden, US Bank and

22  Busey Bank.  But I think Busey Bank may be Mr. Alexopoulos or

23  maybe Mr. Tsaparas.

24          MS. MARZIANI:  UC Bank is Mr. Alexopoulos.

25          THE COURT:  Okay.  So my question on Ms. McFadden --

1    I'm just pausing to formulate the question here.  Okay.  So
2    I've made an order on that.  I know it's got to get papered.
3    And that's the thing that's coming in in a couple of days.
4          What else is there to deal with with regard to
5    McFadden?  I mean, once that order is entered, which is going
6    to get entered probably Thursday, or Wednesday or Thursday on
7    the order that -- as a follow-up from the July 12th order,
8    what more is there to deal with on her?
9          I mean, you are going to get a judgment that directs
10   her to turn over $751,058.07.  So what's left on McFadden?
11   Why do I need to extend on these citations?
12         MS. MARZIANI:  The reason is Ms. McFadden has been
13   making payments and taking payments from Mr. Tsaparas.  And so
14   the citation, we believe, should be extended to, liens should
15   be extended to the January date just as well as the
16   Mr. Tsaparas one.  Any money that she, any money that --
17         THE COURT:  Let me go about this in a different way.
18   You answered the question I asked.  But the question I asked
19   was not a good question.  It wasn't what I intended to ask.
20         So once I enter this judgment against Ms. McFadden
21   and in favor of NHC that directs her to turn over the 750 and
22   change, what is going to happen after that as it relates to
23   Ms. McFadden?  You are going to have a judgment that says:
24   McFadden, pay me money.
25         She is presumably not going to write you a check or

1    just hand you a bag of cash.  So what is going to happen after

2    that?

3            MS. MARZIANI:  We'll take the next steps to enforce

4    the judgment.

5            THE COURT:  Which is what?  It's a citation, right?

6            MS. MARZIANI:  Well, that would be my suggestion,

7    record the judgment and issue a citation against her

8    individually, yes.

9            THE COURT:  Which is the citation that you are asking

10   me to extend is against her individually.  Why is it

11   different?  That's my question.

12           MS. MARZIANI:  The difference is is that one is a

13   third-party citation and one is a judgment debtor citation.

14           THE COURT:  So the third party, and I'm just talking

15   this through, the third-party citation says anything that you

16   have that is the property of or is owed to the judgment

17   debtor, give me.  The individual citation says give me

18   everything basically --

19           MS. MARZIANI:  Yes.

20           THE COURT:  -- except for whatever exemptions there

21   are.

22           MS. MARZIANI:  Yes.

23           THE COURT:  That's the difference, okay.

24           MS. MARZIANI:  And one gets satisfied, you know, when

25   the judgment is -- we're talking about 700,000, 750, whatever.

1       THE COURT:  But doesn't, the second one, the broader

2   one, the individual citation, doesn't it kind of subsume the

3   other one?

4       My question is why are we going to need the extend

5   the citation, the third-party citation now that I am going to

6   be entering a judgment on it if you are going to as a result

7   of that judgment then serve a citation on her that's an

8   individual citation and, therefore, broader, covers

9   everything.

10      It may sound like a dumb question, but I'm --

11      MS. MARZIANI:  None of your questions are dumb.

12      THE COURT:  No, I'm just trying to figure this stuff

13  out is all.

14      MS. MARZIANI:  Yeah.  Well, two reasons.  One is that

15  the judgment against Ms. McFadden is significantly smaller

16  than the judgment against Mr. Tsaparas.

17      THE COURT:  Okay.

18      MS. MARZIANI:  Two, if you terminate the citation

19  against, the third-party citation against Ms. McFadden now,

20  she then is free to dissipate whatever money that she was

21  going to give Mr. Tsaparas --

22      THE COURT:  Okay.

23      MS. MARZIANI:  -- since she wouldn't be paying us.

24      THE COURT:  I get that.  I get that.

25      MS. MARZIANI:  So, you know, those two issues I think

1   are significant.  The judgment against Mr. Tsaparas is

2   significant.  She is his domestic partner.  And, you know, I

3   think it's important that it stay, especially given --

4           THE COURT:  Okay.  I get your point.

5           Let me hear from you.

6           MR. GAVRILOS:  Your Honor, I guess to your earlier

7   point, the third-party citation seems superfluous in light of

8   the looming direct citation.

9           THE COURT:  Well, at least until it gets -- maybe not

10  until a direct one gets issued.

11          MR. GAVRILOS:  And to Ms. Marziani's point, I don't

12  know that the third-party citation prohibits the contemplated

13  action here.  Again, the third-party citation is limited to

14  the judgment debtor's assets, money owed to the judgment

15  debtor, not funds that a domestic partner shares with her

16  domestic partner on a day to day.  That is not money that is

17  owed to Mr. Tsaparas that should be restricted pursuant to the

18  terms of a third-party citation.

19          THE COURT:  Well, I guess -- hang on.  My answer to

20  that kind of might be it depends.  I mean, nobody asked me to

21  adjudicate exactly what the terms of the obligation are.  But

22  let's just assume it's the equivalent of a demand note, okay.

23          And let's just assume for purposes of discussion that

24  Ms. McFadden doesn't have -- whatever assets she has is south

25  of $751,000.  It may be that everything is owed to him, and

1    it's all subject to this, it's all going to be subject to

2    this. And frankly, that's like the most likely outcome,

3    unless she's got a lot of money that nobody knows about yet.

4            So it seems to me that what makes sense here is to

5    extend the third-party citation for some finite period of

6    time, and then eventually it's going to effectively I think

7    get subsumed by whatever citation is likely to get served once

8    the judgment is entered. You know, I don't know if there is a

9    waiting period for serving citations or not, there may be,

10   there may not be.

11           So I think that seems to me to be the best way to do

12   it. So maybe I extend it for like four to five weeks or

13   something like that.

14           What's the current -- when does it currently expire?

15   Do we know? I think I had them all on one day.

16           MS. MARZIANI: I believe it's the 19th.

17           THE COURT: Of this month?

18           MS. MARZIANI: Yes.

19           THE COURT: Yeah, so it's this Friday. So what about

20   that? I mean, I get what you are saying. But, I mean, if she

21   owes $750,000 to Mr. Tsaparas, and that's what the judgment is

22   going to enter, and she doesn't have $750,000, in theory, and

23   I'm not saying this is what the adjudication will be, but in

24   theory everything she got, everything she has is owed to him

25   in one way or another.

1    And so it kind of cuts against the proposition I

2  should just let everything expire and, you know, we all go on

3  about our merry way until whatever point in time the citation

4  gets issued on this judgment.

5          MS. MARZIANI:  Your Honor, if I may speak?

6          THE COURT:  Hang on one second.  I'm still with him.

7          What am I missing?

8          MR. GAVRILOS:  Sure.  I guess maybe part of the

9  problem is the function of the fact that there is no note

10  here.  You know, there is really no parameters as to what

11  collateral, you know, may have been contemplated or if this

12  was ever even contemplated as a loan.  But the point remains

13  that --

14          THE COURT:  Well, time out.  So if Ms. McFadden wants

15  to walk in here, climb up on a witness stand, put her hand up,

16  take an oath and say that she testified falsely in the trial,

17  God bless her.  Okay.  Then I'll make a referral to the U.S.

18  Attorney's Office about somebody having committed perjury

19  before me and having just admitted it.  But she's testified

20  under oath that these were loans.

21          I get that nobody has testified that there is a note.

22  But there is no law that says there has to be.

23          MR. GAVRILOS:  Sure, Your Honor.  I guess the

24  response to that is that I think her testimony, and perhaps

25  this may be briefed further in the future if necessary, but I

1    think her testimony was the fact that they were loans to the

2    business, that they were not loans to her as an individual.

3    And that may have changed the dynamic of what is properly

4    recoverable if it was a loan to the business as opposed to a

5    loan to her as an individual.  And that was the gist of our

6    response in the status report as to how this should ultimately

7    conclude.

8         This is something that we raised a couple of times in

9    the previous hearings.  But I think Ms. McFadden's position

10   would be that to the extent that this was a loan, this was not

11   a loan to her personally, that it was a loan to the business.

12   And we thought that that was an issue that should have been

13   potentially further explored.

14        THE COURT:  Well, time out.  Potentially further

15   explored.  Everybody has filed like gazillions of briefs in

16   this thing.  And you guys filed a brief in response to the

17   motion for turnover order relating to Ms. McFadden.  You did.

18   You know, you've made those arguments.  You've probably made

19   them more than once as we went through.

20        I rule whenever arguments are made.  My ruling may be

21   right, it may be wrong.  If it's wrong, that's something that

22   you can take up with a higher authority at some point in time.

23        So for right now I'm extending the citation on Ms.

24   McFadden by an extra five weeks beyond when it expires now.

25   So that's to the 23rd of August.

1          But what that means, here is what that means, that
2    means I've got to get this order, the judgment order, which
3    I'll try to get entered promptly, and then you are going to do
4    whatever happens next.

5          MR. WATTERS:  Understood, Your Honor.

6          MS. MARZIANI:  Your Honor, just a point.  We can't
7    enforce the judgment for 10 days.

8          THE COURT:  I know.

9          MS. MARZIANI:  And so --

10         THE COURT:  Five weeks is more than 10 days.  There
11   is math.  That's 35 as opposed to 10.  Okay.  So that gives,
12   you, let's say the judgment doesn't get entered for three
13   days, that gives you still 22 days to play with.

14         So what else do we have to talk about today,
15   important qualifier, that we have not already discussed?

16         MR. WATTERS:  Your Honor, there is one I think
17   relatively minor issue with regard for the motion for turnover
18   as to Mr. Tsaparas and the U.S. Bank accounts.  It's motion --

19         THE COURT:  Is that the one I already ruled on?

20         MR. WATTERS:  You ruled on it with regard to
21   Mr. Tsaparas.  And we are not trying to retread on that
22   ground.

23         THE COURT:  Yeah.

24         MR. WATTERS:  One of the requested forms of relief
25   for it was the order for a turnover of $17,311 that's

1    currently being held in --

2           THE COURT:  I thought I already entered something on

3    that.

4           MS. MARZIANI:  No.  A different bank account.  That

5    was Busey Bank.

6           THE COURT:  But I granted the motion, or I didn't

7    grant the motion?

8           MS. MARZIANI:  You granted the motion with regard to

9    Busey Bank, not with regard to U.S. Bank.

10          THE COURT:  All right.  So give me a docket number.

11    What is the motion that we are talking about?

12          MR. WATTERS:  The motion that we are talking about is

13    docket number 351.

14          THE COURT:  351.  All right.  Motion for turnover

15    order for Spiro Tsaparas and U.S. Bank accounts.  Okay.

16          MS. MARZIANI:  Right.

17          MR. WATTERS:  And then specifically, Your Honor, the

18    requested relief that we're talking about is made in

19    subparagraph 6 of the "wherefore," which is on page 9.

20          THE COURT:  "Order that U.S. Bank turn over $17,311."

21    Didn't I enter a turnover?  No.  I entered a turnover on

22    Busey.

23          MS. MARZIANI:  Busey Bank.

24          MR. GAVRILOS:  No.  Your Honor, I do believe you

25    ordered a turnover.  This was in response to the turnover

1    motion that was filed against Mr. Tsaparas maybe in February.

2    I think what we had concluded was that money that was frozen

3    on the day that we entered into the agreed wage deduction back

4    in November, and it has just been sitting there this whole

5    time, you asked if we had any objections as to whether that

6    money should be turned over.  We said no.

7          So it was our understanding that that money has

8    already been subject to turnover.

9          THE COURT:  So I've just got to enter, what you are

10    saying, I've just got to enter an order.  Get me an order.

11          MR. WATTERS:  We'll submit a proposed order, Your

12    Honor.

13          THE COURT:  Fine.

14          MS. MARZIANI:  Yes.

15          THE COURT:  So you can put them all in the same

16    email.

17          MR. WATTERS:  Understood, Your Honor.

18          THE COURT:  Anything else you've got?

19          MR. WATTERS:  Your Honor, I think the only thing --

20    well, actually two things, Your Honor.  I almost misspoke

21    there.

22          I'm happy to go into as much detail or as little

23    detail as the Court would like.  With regard to the other

24    third-party citations, we've been in contact with citation

25    recipients or their counsel.  Obviously no one has showed up

1   today because we've told them that we are working with them to

2   gather answers and documents.  We're entering and continuing

3   those examination dates.

4          And then the only other issue, Your Honor, is how you

5   want to proceed with regard to the next court date and filings

6   related to the next court date.

7          THE COURT:  Yeah, I know, I know we've got to talk

8   about that.  Is there anything, before I get to that, anything

9   else that you've got?

10         MR. GAVRILOS:  We do not, Your Honor.

11         THE COURT:  Okay.  Okay.  So we have this one little

12  glitch here, which is that we're not basically allowed to hold

13  court the week of the Democratic National Convention because

14  they think it's going to be chaos down here.  I think they're

15  wrong, but whatever, that's what they think.

16         And the 23rd is that, the 23rd of August, which is

17  what I just extended this citation to, is that week.  So I

18  need to make that one more week just to cover it.  So whatever

19  I extended to the 23rd of August is going to be the 30th of

20  August.

21         And so what I want to do is, I'm going to have you

22  file a joint status report on the 15th of August.  So that's

23  two weeks before the date that we're going to have the status

24  hearing, which is the 29th.  But I think that one I'm just

25  going to do by phone.  Let me just be sure here.  Yeah, we're

1    going to do that one by phone at 8:45 in the morning on the

2    29th of August.

3            So now we're to the how do I reconfigure everything.

4    So the other times, the other two occasions over the 25 or so

5    years that I've been here where I've had things where I said,

6    Okay, I can only see you so much, I set all these dates and

7    filing restrictions and whatnot.  The purpose and actually the

8    effect in those situations was to lower the amount of stuff

9    that got filed.

10           I have no idea, of course, I don't have a control

11   group here.  My concern is that I increased the amount of

12   stuff that got filed, because a lot of stuff got filed.  And

13   then I got the motion on the defense side saying:  Time out.

14   We've got this torrent of stuff here.  We can't respond to it

15   all within the time that you have set.

16           So we've got to do this in a different way.  And I am

17   vacating the order that has you coming in every two weeks or

18   three weeks or whatever it is or month.  That's just not going

19   to work.

20           And I think what I am going to tell you is we are

21   going to go back to normal.  You file stuff when you want to

22   file it, and I set it for a hearing when I think it ought to

23   be set for a hearing, and I order a response when it gets

24   filed, and we'll just do it that way.

25           So a failed experiment has been consigned to the ash

1     heap of history at this point.  So there you go.

2            MS. MARZIANI:  Your Honor?

3            THE COURT:  Yeah.  He said only two more things and

4     he actually covered two.  Does that mean he was wrong and it

5     really three?

6            MR. WATTERS:  I'm not giving her enough time to kick

7     me under the podium, Your Honor.  I apologize.

8            MS. HERRING:  I've been trying really hard.

9            I just wanted to mention that I am going to be out of

10    the country starting on the 23rd.  I don't need to be here on

11    the 29th if you --

12           THE COURT:  It's just going to be a phone call.

13           MS. MARZIANI:  Right.  I'll just need --

14           THE COURT:  If we end up needing to do something in

15    person, it's going to end up being after that.

16           MS. MARZIANI:  Okay.  But I'll be in France.

17           THE COURT:  And so what he will tell me is that when

18    I go to set a hearing date, if I set it for a hearing when you

19    going to be in France, he'll say, "She's going to be in

20    France" and I won't set it.

21           MS. MARZIANI:  No, no.  You already set a hearing for

22    when I am going to be in France.

23           THE COURT:  Okay.

24           MS. MARZIANI:  I just wanted to say I think that

25    Mr. Watters is fully capable of handling that hearing --

1      THE COURT:  Okay.

2      MS. MARZIANI:  -- without me.  But in case there is a

3  question about something --

4      THE COURT:  Yeah, okay.

5      MS. MARZIANI:  -- way back when, you'll know why --

6      THE COURT:  Okay.

7      MS. MARZIANI:  -- he's not here to --

8      THE COURT:  Okay.  All right.  Thanks.  Bye.

9      MS. MARZIANI:  Thank you, Your Honor.

10      MR. WATTERS:  Thank you, Your Honor.

11      MR. GAVRILOS:  Thanks.

12   (Proceedings concluded)

13              C E R T I F I C A T E

14      I, Jennifer S. Costales, do hereby certify that the

15  foregoing is a complete, true, and accurate transcript of the

16  proceedings had in the above-entitled case before the

17  Honorable MATTHEW F. KENNELLY, one of the judges of said

18  Court, at Chicago, Illinois, on July 15, 2024.

19

20                          */s/ Jennifer Costales, CRR, RMR, CRC*

21                          Official Court Reporter

22                          United States District Court

23                          Northern District of Illinois

24                          Eastern Division

25