```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION

 3
    NHC LLC,                         )    Docket No. 19 C 6332
 4                                   )
                    Plaintiff,       )
 5                                   )
            vs.                      )
 6                                   )
    CENTAUR CONSTRUCTION COMPANY INC.,)   Chicago, Illinois
 7  et al.,                          )    August 7, 2024
                                     )    9:45 o'clock a.m.
 8                  Defendants.      )

 9              TRIAL TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE MATTHEW F. KENNELLY
10

11  APPEARANCES:

12
    For the Plaintiff:      VEDDER PRICE P.C.
13                          BY:  MR. ZACHARY J. WATTERS
                            222 North LaSalle Street, Suite 2600
14                          Chicago, IL 60601
                            (312) 609-7500
15

16                          DAVIS MCGRATH LLC
                            BY:  MS. GINI S. MARZIANI
17                          125 South Wacker Drive, Suite 300
                            Chicago, IL 60606
18                          (312) 332-3033

19

20

21

22

23  Court Reporter:         MS. CAROLYN R. COX, RPR, CRR, FCRR
                            Official Court Reporter
24                          219 S. Dearborn Street, Suite 2102
                            Chicago, Illinois  60604
25                          (312) 435-5639
```

```
 1   APPEARANCES CONTINUED:

 2
     For Defendant            SMITHAMUNDSEN LLC
 3   Peter Alexopoulos:       BY:  MR. CONSTANTINE GAVRILOS
                                   MS. KIMBERLY ANNE HERRING
 4                            150 North Michigan Ave, Suite 3300
                              Chicago, IL 60601
 5                            (312) 894-3329

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (The following proceedings were had in open court:)

2          THE CLERK:  Case 19 C 6332, NHC v. Centaur

3    Construction.

4          MS. MARZIANI:  Good morning, your Honor.  Gini

5    Marziani on behalf of the plaintiff.

6          MR. WATTERS:  Good morning, your Honor.  Zack Watters

7    also on behalf of the plaintiff.

8          MR. GAVRILOS:  Good morning, your Honor.  Constantine

9    Gavrilos on behalf of the defendants and third-party

10   respondents.

11         MS. HERRING:  Kim Herring on behalf of the same.

12         THE COURT:  Okay.  We're going to talk about the

13   status report filing issues and then the matters that are

14   contained in it last.

15         There's two pending motions that I'm going to deal

16   with before that.  The first is the motion, it's docket

17   number 462, by respondent McFadden for reconsideration.  The

18   motion's denied.

19         So what motions for reconsideration are supposed to

20   be for are things that -- where the Court overlooked

21   something.  "Overlooked" doesn't mean got wrong.  "Overlooked"

22   means I missed something, evidence that was filed, or I

23   overlooked an argument or I overlooked a response to an

24   argument or something like that.

25         That's not what this motion says.  The motion

1    basically asks for a do-over.  It asks for a do-over.  And
2    it's not an appropriate motion to reconsider.  It's denied.

3           I know you disagree with pretty much everything that
4    I have done in this case on the defense and respondents' side.
5    Your remedy is on the 27th floor of this building.  You know,
6    once you have an appealable order, you can enter it.

7           So that's the ruling on the motion to reconsider in
8    that case -- on that matter.  That's docket number 462.

9           By the way, there's some points in there that may be
10   brand new points that weren't made before.  That's equally an
11   improper basis for a motion to reconsider because those points
12   are considered to have been forfeited which they are in this
13   case.

14          The new motion to reconsider which got filed
15   yesterday or the day before, yesterday, docket number 474,
16   that's Mr. Alexopoulos' motion to reconsider, that's a
17   complete do-over.  That's denied for that reason.  I don't
18   even require a response on that.

19          So, look, I have to say this.  On some of these
20   arguments, I've heard the same argument three and four times
21   that I'm now hearing it again.  And to me, at this point, this
22   is a strategy in this case to basically just keep papering the
23   case and keep filing stuff over and over again so that nothing
24   ever happens.

25          We're done with it, okay?  There's no more motions to

1  reconsider.  They're going to be denied on their face unless

2  they actually are proper motions to reconsider, which neither

3  one of these came within shouting distance of being.  So that

4  motion's denied.

5          So now we're done with the motions to reconsider.

6          Now we're going to talk about the status report.

7          I don't know why it is that you guys, unlike

8  basically every lawyer in all of the 279 cases that I have

9  besides this one -- now, some people just blow dates.  It's

10  like the people in the last case and the people on the phone.

11  That happens.  I get that.

12          That's not what's happening here.  You guys can't get

13  your act together about who gets who a draft when.  Everybody

14  else in the entire civilized legal world figures this out on

15  their own.  We have a report due by the judge -- from the

16  judge -- or with the judge on such-and-such a date, one side

17  is going to get a draft X days before, the other side is going

18  to send their draft Y days before, and everybody gets it

19  figured out.

20          Doesn't seem to work out for you guys.  I don't know

21  why, and, honestly, I don't really care.  Don't really care.

22  Doesn't really matter.  All I know is I'm not -- you're not

23  doing what you're supposed to do.

24          And so you're done with warnings.  There's not going

25  to be any more warnings.  There's not going to be any more

1   orders to show cause.  If I don't get something when I'm
2   supposed to get it, there's going to be a monetary sanction
3   right then.  Today is your warning.  There's going to be
4   strict compliance with dates.  If I don't get something when I
5   tell you that you have to file on such-and-such a date, then
6   there's going to be a sanction.  And it's going to be against
7   everybody who didn't comply, which is going to be everybody
8   because if you don't file a status report, that means none of
9   you did it.

10         So no more warning shots, nothing like that.

11         And what I've learned in this case, and I learned it
12   the most recently from the last go-round because when I
13   issued -- when I didn't get the joint status report on
14   the 29th and I issued the order on the 30th ordering you show
15   cause why you shouldn't be sanctioned for not cooperating and
16   filing a joint status report, I got one the same day.  Look
17   how easy that was?  You know what, the message I got from
18   that?  All I have to do is threaten you.  The threats work.

19         So now you're being permanently threatened because
20   you're under the cloud of a threat for the rest of the case.

21         You've told me by your actions that threats work, so
22   that's what you're going to get from now on.  It's going to
23   be -- you've got a standing threat of a sanction if you don't
24   comply with an order.  It's going to be a monetary sanction,
25   and it's going to be a written order that names you; that

1    names you.

2          Now we're going to talk about the stuff that's

3    actually in the status report.

4          First thing is -- okay.  I'm looking at the status

5    report, which is docket number 472.  NHC section has items 1

6    through 6.  First is birth date year that was redacted from

7    the trust documents.  That's been provided, so that's a moot

8    point.

9          Hard copies of the photographs that were referenced

10   in the June 17th status report, I'm told by the plaintiff that

11   there's no photo of the Ducati, D-U-C-A-T-I.  I'm told by the

12   defendant on page 4, paragraph B, subparagraph 1, that

13   defendants produced photographs of the vehicles, plural, which

14   would include that one.

15         So this is an ascertainable fact.  It's an

16   ascertainable fact.  Somebody has told me a lie.  Somebody has

17   told me a lie.  One side said, I didn't get it, the other side

18   said, we gave it to them.  So we're going to find out today

19   who told me a lie, and then that person is going to be

20   punished.

21         So who told me a lie?  Anybody want to volunteer,

22   fess up?

23         MR. GAVRILOS:  Your Honor, the only thing I'll say on

24   this point, and I didn't bring the --

25         THE COURT:  So we're going to be -- we're going to be

1    talking about testimony under oath here.

2          MR. GAVRILOS:  Sure.

3          THE COURT:  Testimony under oath.  And when I

4    conclude it's a lie, it's going to be perjury, okay?

5    18 United States Code Section 1621 and 1623.

6          MR. GAVRILOS:  Sure.  And --

7          THE COURT:  Criminal statute.

8          MR. GAVRILOS:  Yep.

9          THE COURT:  There's going to be a referral to the

10   U.S. Attorney's Office.

11         So did you yourself turn over a photograph of the

12   Ducati after I entered the order?

13         MR. GAVRILOS:  Your Honor, in the physical photos

14   that we provided, and I can picture it in my mind, which is

15   why I'm reasonably confident that it was produced, the Ducati

16   was under a tarp in the photo.

17         If you guys have the photo production, we can leaf

18   through it right now, but the reason why I'm confident in

19   saying that is because I can picture the photo of the Ducati

20   in my mind.

21         MR. WATTERS:  Do you have the photos?

22         MS. MARZIANI:  Your Honor, if I might speak?

23         THE COURT:  You can answer my question.  Did you get

24   a photo of the Ducati, yes or no?

25         MS. MARZIANI:  The Ducati is a motorcycle.  We did

1    get pictures of the cars.

2            THE COURT:  Okay.  So did you hear my question?

3            MS. MARZIANI:  I did.

4            THE COURT:  You're not answering it.

5            MS. MARZIANI:  We did not get a picture of the

6    Ducati.

7            THE COURT:  Okay.  Did you get something that was

8    under a tarp?

9            MS. MARZIANI:  Yes.

10           THE COURT:  Okay.  Why would you -- if I asked you to

11   send a picture of a vehicle -- so if I say, send a picture of

12   me and I go -- and I take a picture of me like this, is that a

13   picture of me?  Of course it's not.

14           Why did you send a picture of something under a tarp?

15           MR. GAVRILOS:  Your Honor --

16           THE COURT:  Can somebody lift the freaking tarp?

17           MR. GAVRILOS:  Your Honor, if we can look through the

18   pictures, I think it might be lifted and not be completely

19   concealed.

20           My -- I guess my answer is I didn't take that photo.

21   I can only provide what was provided to us.

22           MR. WATTERS:  Your Honor, if I may?

23           THE COURT:  No.  There's a question pending, and the

24   next thing that's going to happen is an answer to that

25   question.

1    (Brief pause.)

2         MR. GAVRILOS:  Are those black-and-white photos?  The

3    ones that I gave you were color.

4         MR. WATTERS:  Your Honor, if I may?  The photos?

5         THE COURT:  Is that going to include a photo with

6    something under a tarp?

7         MR. WATTERS:  It does, but it's clearly not a

8    motorcycle.

9         MR. GAVRILOS:  Your Honor, the photos that I produced

10   were color photos.

11        THE COURT:  Did you bring them with you?  Did you --

12        MR. GAVRILOS:  I did not --

13        THE COURT:  -- bring -- this is an issue up today.

14   The order today said, The parties should be prepared to

15   address in full the matters discussed in the parties' separate

16   status report, of which this is one.  And you knew that there

17   was a dispute over this.  Did you bring it with you?

18        MR. GAVRILOS:  I did not bring the photos with me,

19   your Honor.

20        THE COURT:  Okay.  So that's going to be topic one

21   for the hearing where everybody testifies under oath.  There's

22   going to be, photo of Ducati, yes or no?

23        All right.  We're on to the next item.

24        Sworn declaration relating to the citation served on

25   Amundsen Davis as discussed during the hearing is to be

```
1    produced by July 29th.  Plaintiff says no declaration was
2    provided.  The defendant's part, I don't believe --
3               MR. GAVRILOS:  Your Honor --
4               THE COURT:  -- says that.
5               MR. GAVRILOS:  -- our part said that we were
6    producing one, and I believe we indicated that we were
7    producing it by July 30th.  We did not produce it by
8    July 30th, but we did produce it after that date.
9               THE COURT:  When?
10              MR. GAVRILOS:  Was that Monday?
11              THE COURT:  So you mean like the day before
12   yesterday?
13              MR. GAVRILOS:  I believe so.
14              THE COURT:  So that's the 5th of August.
15              MR. GAVRILOS:  Oh, no, Friday.  Friday, your Honor.
16              THE COURT:  That's the 2nd of August.
17              MR. GAVRILOS:  Correct.
18              THE COURT:  Okay.  Why wasn't it produced when -- you
19   may have heard me talking on the phone.  An order's a thing.
20   It's not a suggestion.  It's not like do this if you feel like
21   it.  It's do it, unless I've excused you from doing it.  And
22   nobody came in and said, hey, we can't do this by the 29th of
23   July, Judge, we need until the 2nd of August.
24              So why didn't it get produced on the date that you
25   were ordered, O-R-D-E-R-E-D, to produce it?
```

1    MR. GAVRILOS:  Your Honor, we did our absolute best

2  to get the signature from the client.  There was a little bit

3  of radio silence.  We learned that the client was out of town,

4  and it took several of the partners who outrank me quite a bit

5  calling him directly to get his signature.  As soon as we got

6  that signature, we produced it.

7    THE COURT:  Do you have the signature now?

8    MR. WATTERS:  Yes, your Honor.

9    THE COURT:  Item No. 4.  Regarding the turnover of

10  personal property items from Mr. Tsaparas and Mr. Alexopoulos,

11  dot, dot, dot, information regarding the current status of the

12  loan on the 2018 Suburban as well as the mileage and condition

13  of the vehicle, photograph of the trailer, previously

14  referenced photographs of the firearms.

15    So the plaintiff's part of the status report says, we

16  got photographs of the firearms, we got info regarding the

17  status of the loan, and the mileage and condition of the

18  vehicle, but not a photograph regarding the trailer.

19    And then on the defendant's side -- well, so

20  Section (b)(3) says, Reproduce the same vehicles, the firearms

21  -- the same photos of firearms and vehicles.  I don't know if

22  vehicles includes trailer or not, but there's nothing specific

23  on the trailer.

24    So did you send a photograph of the trailer?

25    MR. GAVRILOS:  Not to my knowledge, your Honor.

1       THE COURT:  Why not?

2       MR. GAVRILOS:  We have not yet received one.

3       THE COURT:  Okay.  I'm not going to try to count up

4    here the stuff that has been filed on each side in this case,

5    but suffice it to say that nobody has a problem filing stuff

6    in this case.  Nobody has a problem filing motions, motions to

7    reconsider, due respect, motions to re-reconsider, and maybe a

8    motion to re-re-reconsider, other stuff.  Nobody has a problem

9    filing stuff.

10       Did it occur to you to maybe say, oh, Judge, I can't

11   comply with your order by the date you ordered me to comply

12   with it by, I'd like an extension?  I could say the same thing

13   about this July 29th versus August 2nd thing.  Did that occur

14   to you?  I'm under a court order, the court order isn't a

15   suggestion, at least I don't think it's a suggestion, it's an

16   order.  Maybe I -- and I can't get the thing that the judge

17   has told me to do by such-and-such a date, maybe I should ask

18   for an extension.

19       Did that occur to you?

20       MR. GAVRILOS:  It did not occur to me, your Honor.

21       THE COURT:  Why the heck not?

22       MR. GAVRILOS:  Ultimately, at the end of the day, we

23   are trying to minimize the filings on this side, and --

24       THE COURT:  Seriously?  I mean, I got to tell you,

25   that doesn't pass the straight-face test.  I have two 15-page

1   motions to reconsider, okay?  Again, some of them dealing with
2   points I've dealt with multiple times.
3           Minimize the filings in this case, that's laughable.
4   It's just laughable.
5           MR. GAVRILOS:  Your Honor, with respect to the
6   turnovers of the judgment debtors' property, the judgment
7   debtors have agreed to every single turnover that has been
8   within reason.  They agreed to the turnover of their bank
9   accounts.  They agreed to the wage deduction.  All of these
10  measures that have been properly brought before the Court we
11  have agreed to.  The orders have been by agreement of the
12  parties.
13          And so there are some of these issues that we simply
14  cannot agree to because it does not comport with the statute,
15  it does not comport with the procedure.  So --
16          THE COURT:  Do you think that my order that you
17  produce -- that you do the thing we're talking about right now
18  didn't comport with the statute?
19          MR. GAVRILOS:  No -- no, your Honor.
20          THE COURT:  Because when you tell me -- when I say,
21  why didn't you ask for an extension of time on the order, and
22  then you go off into a discussion about things that don't
23  comport with the statute, that kind of comes across to me
24  like, Judge, your order was illegal, so I just kind of decided
25  I wasn't going to comply with it.

1        And what happens to people who do that is they get

2   held in contempt of court, and sometimes they go out of court

3   through the side door.  You know what's on the side door?

4   It's a jail cell.  Okay?

5        So that's how it came across to me when your response

6   to my question about did you think about asking for an

7   extension of time as you start devolving into a discussion

8   about compliance with the law and whether the -- whether we've

9   complied with the law or not.  So --

10       MR. GAVRILOS:  Your Honor --

11       THE COURT:  -- you might want to rethink your

12   approach.

13       MR. GAVRILOS:  Yeah.  I raised that to say that

14   including the motions to reconsider, the defendants and

15   third-party respondents collectively have affirmatively filed

16   six things, and five of them were denied without briefing

17   schedule in hand the following day.

18       So all of this is to say -- and it may have been an

19   error in judgment, but I felt that my resources were better

20   dedicated trying to get the photos as quickly as possible as

21   opposed to diverting them to file a motion.  Because as has

22   been evident, it takes a little bit to get these documents, to

23   get signatures.

24       THE COURT:  So as of right now, do you have a photo

25   of the trailer, yes or no?

```
1          MR. GAVRILOS:  I don't believe so, your Honor.
2          THE COURT:  Okay.  Here's the deal.  Mr. Alexopoulos
3   -- it's his trailer, right?
4          MR. GAVRILOS:  Correct.
5          THE COURT:  Okay.  He's to be in my courtroom at 9:00
6   o'clock in the morning carrying a photo, carrying a photo,
7   physically carrying a photo.  I don't care where he is right
8   now.  I don't care where he is right now.
9          MR. GAVRILOS:  At 9:00 -- it's 10:00 o'clock in the
10  morning right now.
11         THE COURT:  9:00 o'clock tomorrow morning carrying a
12  photo --
13         MR. GAVRILOS:  Okay.
14         THE COURT:  -- of the trailer.
15         And if he's not here, here's what's going to happen.
16  I'm going to place a call to the marshals service on the 24th
17  floor, I'm going to issue a warrant for his arrest for
18  contempt of court, and they're going to go out and get him.
19  And that's the way he'll come in here.
20         Now, there's one way that you can deal with that
21  ahead of time, okay?  If you -- when I say "you," I mean, you,
22  Mr. Gavrilos -- if you obtain a copy of a photograph of the
23  trailer today before 5:00 o'clock Central Standard -- Central
24  Daylight Time and walk it over to plaintiff's counsel's office
25  and then file an affidavit to me saying, I walked this
```

1    photograph which I've attached to my affidavit over to

2    plaintiff's counsel and left it off before 5:00 o'clock today,

3    then I'll vacate the order that Mr. Alexopoulos has to be in

4    here.

5           And I will just point out we are in the year 2024.

6    We're not in the year 1981, 2002, or anything like that.

7    Somebody can take the device they have in their pocket or in

8    their purse out, snap a photo, and they can text it to you,

9    and then you can print it out from any printer, and you can

10   walk it over there.  It's not a hard thing to do.  You know,

11   in 1981, it would have been, but it isn't now.

12          We're moving on to the next thing.  That's item 5.

13          With regard to the firearms that are the subject of

14   the turnover order, the parties are directed to discuss in

15   good faith arrangements for making the turnover.

16          Okay.  So the dispute seems to be NHC wants to say,

17   give them us to and we'll sell them -- we'll arrange for them

18   to be sold to a dealer in whatever state they're located in;

19   and on defense side, we want 60 days, and he wants to sell

20   them himself.

21          Am I understanding the dispute correctly?

22          MR. WATTERS:  Yes, your Honor.

23          THE COURT:  Okay.  Why does he want to sell them

24   himself?

25          MR. GAVRILOS:  Your Honor, the trailer that we were

1    talking about is part of Mr. Alexopoulos' business, sportsman
2    resource training.  He's a firearms instructor.  That's the
3    business.  So I don't know if you could find someone who would
4    be able to sell them quicker and would have more connections
5    in that market.
6              I personally have never bought or sold a firearm, but
7    I would imagine someone who's plugged into that industry would
8    have a little bit better of a time doing so.
9              THE COURT:  Why don't you want him to sell them?
10             MR. WATTERS:  To be blunt, your Honor,
11   Mr. Alexopoulos has been found liable for fraud, he's --
12             THE COURT:  You don't trust him.  That's -- just get
13   to the point.
14             MR. WATTERS:  Correct.
15             THE COURT:  Okay.  "Turn over" means turn over, okay?
16   So you're going to -- it's going to be done the plaintiff's
17   way here.
18             MR. GAVRILOS:  Your Honor, one thing that we
19   discussed was the logistics of handing firearms from one party
20   to another and how that might present some novel issues.  I
21   don't know if the Court is prepared to address those.  Again,
22   not being involved in -- with firearms, I generally don't know
23   what those considerations are.  So I would defer --
24             THE COURT:  Me neither, but, you know, just
25   anecdotally from dealing with criminal gun possession cases

1  and other things like that, I have probably more than an

2  average person's awareness.

3          So, presumably, the smartest way to do it would be to

4  have somebody who is actually a firearm's dealer come pick

5  them up from Mr. Alexopoulos and that person goes and sells

6  them, because a licensed firearm dealer can do that and they

7  would know how to execute the transfer paperwork.  You have to

8  document any kind of a firearms transfer because if you don't,

9  then it's potentially a crime.  So that's presumably why it

10  was suggested that a firearms dealer do it.

11         So the deal is is that firearms that are the subject

12  of the July 12th turnover order are to be turned over to a

13  firearms -- to a licensed firearms dealer designated by -- one

14  or more licensed firearms dealer designated by the plaintiff

15  by three weeks from today.

16              MR. GAVRILOS:  Your Honor, can we put --

17              THE COURT:  That is the 28th of August.

18              MR. GAVRILOS:  Can we put some sort of limitation on

19  like the location of the firearms dealer --

20              THE COURT:  Where's Mr. --

21              MR. GAVRILOS:  -- because Mr. Alexopoulos --

22              THE COURT:  Where are they?  Are they in this state

23  or are they in Colorado?

24              MR. GAVRILOS:  I believe they're in Illinois, your

25  Honor.

1        THE COURT:  Okay.

2        MR. GAVRILOS:  I believe he lives in Niles, Illinois.

3        THE COURT:  Okay.

4        MR. GAVRILOS:  So, I mean, Illinois is a big state.

5   I wouldn't want him to have to drive three hours.

6        MR. WATTERS:  Your Honor, I think we just need to

7   clarify.  I believe we're talking about firearms that are

8   owned not just by Mr. Alexopoulos but also by Mr. Tsaparas.

9        THE COURT:  I thought there were some from each.

10       MR. WATTERS:  There are.  And so my understanding,

11  and counsel can certainly correct me if I'm wrong, but the

12  firearms owned by Mr. Tsaparas are in Colorado.

13       THE COURT:  That sounds right to me.

14       MR. GAVRILOS:  That's correct.  I thought we were

15  just talking about the Alexopoulos firearms.

16       THE COURT:  Okay.  So I don't know -- so we know

17  Mr. Alexopoulos lives in Niles.

18       Where in Colorado does Mr. Tsaparas live, what town?

19       MR. GAVRILOS:  I believe Pitkin County, your Honor;

20  Pitkin County.

21       THE COURT:  Okay.

22       MR. GAVRILOS:  I believe it's maybe an hour and a

23  half outside of Colorado -- Denver.

24       THE COURT:  Outside of Denver.

25       MR. GAVRILOS:  Excuse me, outside of Denver.

1        THE COURT:  Everything is an hour and a half outside

2  of Denver.

3        MR. WATTERS:  Your Honor, it's my understanding he's

4  in or near the general Aspen area.

5        THE COURT:  Oh, okay.

6        Well, to me, what makes the most sense is the

7  firearms dealer goes to the guy and gets the firearms so that

8  they don't have to be shlepping them across town because,

9  again, I don't want anybody to get in trouble.  And if

10  Mr. Alexopoulos is driving guns from, you know, Niles to

11  Joliet and runs a red light, that ain't going to be good.

12        So what ought to happen is that the firearms dealer

13  ought to go to where -- go to the location at a time to be

14  arranged, but it has to happen by the 28th of August in both

15  locations.

16        Now we're on to item No. 6.

17        With regard to Mr. Tsaparas' vehicles that are the

18  subject of the July 12th turnover order, which is the Ducati,

19  the Lancia, and the Denali, the parties are to discuss in good

20  faith agreed-upon arrangements for the transfer and sale.

21        So the plaintiff says, we -- here's the proposal we

22  made.  We didn't get a response.  The defendants say -- hang

23  on one second.  There was one issue about that that was in

24  here.  Yeah.

25        No.  I'm sorry.  This is Tsaparas.

1    There we go.

2    As noted in his motion to claim exemptions,

3    Mr. Tsaparas wishes to apply his exemptions to his 2002 BMW so

4    that he too can sustain means of income and means to satisfy

5    the judgment entered against him.

6    Whatever.  That's not one of the vehicles we're

7    talking about.  I mean, that was discussed in the last opinion

8    that I issued back in July.

9    The BMW isn't at issue here.  It's the other three

10   things.  And I get that one of them is a motorcycle, I get

11   that one of them is a junker, and I get that one of them is

12   something else, but -- it says, Mr. Tsaparas is continuing to

13   search for information on the mileage and the VINs to provide

14   to the plaintiff.

15   I actually laughed out loud when I read that

16   sentence.

17   Okay.  This is what I would do if I needed mileage on

18   my car.  I would walk out to my garage, I would open the

19   garage door, I would open the door to the car, and I would

20   look at the mileage.  I would probably turn it on because you

21   have to do that these days to look at the mileage, and I would

22   look at the mileage.

23   Now, I get that one of these cars isn't workable.

24   That's not true for the Denali, is it?  He drives the Denali.

25   So why the heck doesn't he go -- just turn on the gosh darn

1    car and see what the mileage is?  And the VIN number, I mean,
2    it's right there.  VINs are in two places in a car, one of
3    which is secret that only car dealers know about, and one of
4    which is right inside the windshield.  You go up to the
5    windshield, you look in with pencil and paper in hand, and you
6    write it down.  Pretty easy to do.

7    So what am I to think, what am I to think as a judge
8    who entered an order, when I'm told that somebody is still
9    working on getting the VIN and the mileage for a working
10   vehicle?  I'm just talking about the Denali now.  That's why I
11   say I laughed out loud when I read it.

12   I can tell you what I think.  It kind of goes back to
13   a point I made before.  Stall, delay, do nothing, shuffle, you
14   know, pirouette, whatever, anything I can do to not comply
15   with what the judge said and to delay the day of reckoning.
16   That's what's happening here.

17   So do you have an explanation for me?  Because if you
18   don't, then the other thing that's going to happen at 9:00
19   o'clock tomorrow morning is that Mr. Tsaparas is going to be
20   here and he's going to be up on the witness stand because I'm
21   about to order him to show cause why he shouldn't be held in
22   contempt of court.

23   MR. GAVRILOS:  Yes, your Honor.  So --

24   THE COURT:  And the hearing on the contempt is going
25   to be tomorrow morning at 9:00 o'clock.

1      MR. GAVRILOS:  Yes, your Honor.  And we've talked

2  about a number of vehicles with Mr. Tsaparas --

3      THE COURT:  Denali.

4      MR. GAVRILOS:  -- with the Denali.  So I do believe

5  that was part of the February 8th, 2024, citation production,

6  your Honor.  There have been upwards of five or six

7  productions in total for both of the defendants, including the

8  supplements.  We have emailed VIN numbers.  I think we emailed

9  the VIN number for the Lancia to opposing counsel at some --

10      THE COURT:  Time out.  This is your part of the

11  status report, docket 472 -- docket number 472, page 7:  As to

12  the Lancia and the Ducati, Mr. Tsaparas is continuing to

13  search for information as to the mileage and VINs to provide

14  to the plaintiff.

15      MR. GAVRILOS:  Right.  That's not -- that's not the

16  Denali.

17      THE COURT:  Oh.

18      MR. GAVRILOS:  That's the Lancia and the Ducati.

19      THE COURT:  Okay.  So why hasn't he turned over the

20  Denali then?

21      MR. GAVRILOS:  We haven't objected to that, your

22  Honor.  That's kind of my point, is that the claim for

23  exemptions was for the BMW.

24      THE COURT:  I ruled on it.

25      But that's the BMW.  I'm asking about the Denali.

1      MR. GAVRILOS:  Right.

2      THE COURT:  Why hasn't he turned over the Denali?

3      MR. GAVRILOS:  When you say turn over, how do you

4  mean, your Honor?  Like drive it over?

5      THE COURT:  Whatever.  Give it to you to give to

6  them.  I mean...

7      MR. GAVRILOS:  Okay.  Again, the VIN numbers, the

8  information, the registrations, again, all of that, as far as

9  I recall, your Honor, was part --

10     THE COURT:  Let me back up a little bit here.

11     The order was -- the order was, Discuss in good faith

12  agreed-upon arrangements for transfer and sale.

13     Okay.  So the plaintiff's part of the status report

14  says, here's -- we made a proposal -- I said Denali.  Is that

15  a Suburban?

16     MR. GAVRILOS:  Mr. Alexopoulos' vehicle is the

17  Suburban.

18     THE COURT:  Okay.  There's an error in your part of

19  the status report.

20     MR. WATTERS:  My apologies, your Honor.  We grouped

21  all the vehicles together in one.

22     THE COURT:  Okay.  So you don't say anything about

23  the Denali.

24     MR. WATTERS:  Yes.  And the reason for that, your

25  Honor, is my understanding from representations counsel made

1    is the Denali has been repossessed.

2           THE COURT:  Okay.

3           MR. WATTERS:  So as a result, your Honor, with regard

4    to Mr. Tsaparas' vehicles that are the subject of the

5    July 12th, 2024, turnover order, we're looking at the Lancia

6    and the Ducati.

7           We already have the VIN number for the Ducati.  It's

8    included in our portion of the joint status report.

9           As to the information about the Lancia, the VIN and

10   the mileage, I don't have an explanation.

11          THE COURT:  Just a moment.

12          MR. WATTERS:  Yes, your Honor.

13          THE COURT:  Okay.  Maybe I need to just back up

14   further.

15          So in the amended -- the corrected order dated

16   July 15th, which is the corrections order entered I think the

17   Friday before that, which would have been the 12th, pages 10

18   and 11, motion to compel turnover as to Spiro Tsaparas, docket

19   number 439, the motion sought turnover of three vehicles, a

20   Ducati, a Lancia, and a Denali, and any firearms.

21          There's a discussion about exemptions, which I say,

22   they've already been asserted on other property, including the

23   BMW.

24          And then the last two sentences say, "The property in

25   question is, in fact, subject to turnover, and the Court

1   therefore grants NHC's motion.  The parties should come to

2   court on July 15th prepared to discuss how the vehicles and

3   firearms get delivered and disposed of."

4         So the property includes the Denali, okay?

5         And so then -- I don't know if anybody -- I don't

6   recall being told that it -- it's possible that I was told on

7   the 15th of July that it was turned over, but I don't recall

8   it.

9         So nobody mentions anything about this in this status

10   report.

11         So is the Denali off the table at this point?

12         MR. WATTERS:  Your Honor, I'm waiting for

13   documentation that counsel said they'd provide regarding the

14   repossession.

15         MR. GAVRILOS:  Your Honor, can I just briefly jump in

16   here, because my phone is about to die, and I did -- I'm

17   looking at an email February 8th, 2024:  Additionally, we've

18   been advised that the VIN to Mr. Tsaparas' Lancia is 78611795.

19   That was sent five months ago.  That was before Mr. Watters

20   was in the case.  That was sent to Ms. Marziani.

21         I don't know if they directly put a line in here

22   saying that we did not provide the VIN number in the report,

23   but if they did, that is an untrue statement.

24         THE COURT:  Okay.  Thanks.

25         The question on the table is is what he said, what

1  Mr. Watters said, about the Denali correct?  He said, I'll

2  just summarize it, that, we were waiting for confirmation that

3  the vehicle had been repossessed and we haven't gotten it yet.

4      So Denali, not Ducati, not Yukon, whatever the

5  motorcycle is, Denali, is he right?

6      MR. GAVRILOS:  He's correct.

7      THE COURT:  Okay.  So why haven't you produced

8  information that it's already gone?

9      MR. GAVRILOS:  Your Honor, we've been told from --

10  the client said it's difficult to get in touch with companies

11  who repossess your vehicles and they're not super amenable to

12  handing over documentation.

13      THE COURT:  Doesn't a repossessor have to give notice

14  that they've repossessed something?

15      MR. GAVRILOS:  They do, your Honor.

16      THE COURT:  There's an Illinois statute that requires

17  that, to my recollection.

18      MR. GAVRILOS:  It's in Colorado.  I don't know what

19  the Colorado procedure is.

20      THE COURT:  Yeah, I'm guessing there's a statute

21  pretty much everywhere.

22      MR. GAVRILOS:  I can't speak to that.

23      THE COURT:  Okay.  I'm just going to say,

24  collectively, you guys must not think you're spending enough

25  time in this courtroom because you're just kind of begging to

1    spend more time in it.

2         Okay.  Denali.  So as far as I'm concerned, the

3    Denali has just been erased from my memory.  I don't care

4    about it anymore.  If you get it -- if you have something else

5    to order me to do, then you'll file a motion.  You guys don't

6    have any trouble filing stuff either.  So I'm not going to ask

7    about it anymore.

8         Now I'm back to paragraph 6 of plaintiff's part of

9    the status report.

10        So the first vehicle is a Suburban, which I gather is

11   Mr. Alexopoulos' vehicle.  No?  Is that Mr. --

12        MR. GAVRILOS:  Yes, your Honor.  2018 Suburban.

13        THE COURT:  Okay.  So your thing has a mistake

14   because it says Mr. Tsaparas.  Is it supposed to say

15   Mr. Alexopoulos?

16        MR. WATTERS:  That's my -- that's my mistake, your

17   Honor.  We --

18        THE COURT:  Your proposal was to be, give us a power

19   of attorney to sign over the title, the registration, the

20   keys, the remotes, blah, blah, blah, and we've got an offer

21   based on 42,000 miles.

22        The defendant's part of the status report says, it's

23   not 42,000 miles.  It's 130,000 miles.  It's not worth that

24   much.  He owes 10 grand on a loan.  We should submit

25   valuations, and Mr. Alexopoulos wants to apply his statutory

1   exemptions to determine if it's subject to turnover.

2            So which exemption would that be?

3            MR. GAVRILOS:  There's two exemptions, your Honor:

4   There's a vehicle exemption, there's a wild card exemption.

5            THE COURT:  What's -- remind me what the number --

6   the amount is on the vehicle?

7            MR. GAVRILOS:  The amount -- the exemption for the

8   vehicle?  I believe it's 2500, your Honor.

9            THE COURT:  That sounds about right.

10           MR. WATTERS:  I believe it's 2400, your Honor.

11           THE COURT:  It was below 5,000 is what I --

12           MR. WATTERS:  Yes.

13           THE COURT:  Okay.  And then there's the wild card.

14  Has he used any of his wild card on anything else?

15           MR. GAVRILOS:  Neither of the judgment debtors have

16  applied any of their exemptions.

17           THE COURT:  That's false.  Mr. Tsaparas had.  If you

18  thought my order was wrong in that regard, you would have

19  filed a motion to reconsider, and I know you would have

20  because you file a motion to reconsider on just about

21  everything.

22           Page -- hang on a second -- the corrected order of

23  July 15th, pages 10 and 11, I'm summarizing, NHC seeks

24  turnover of three vehicles in Mr. Tsaparas' possession.  With

25  respect to Ms. Tsaparas' statutory exemptions, his earlier

1   filing asserted his $2400 motor vehicle exemption on a BMW,

2   not one of the vehicles sought in NHC's current motion, and

3   asserted a thousand dollars of his wild card exemption on the

4   same BMW and the remaining $3,000 on certain jewelry.  Thus,

5   the items sought by the current motion for turnover order are

6   not the subject of any exemption claims by Mr. Tsaparas.  As a

7   result, there's nothing the Court has to adjudicate at this

8   time regarding those exemptions.

9           What you just said has been ruled on.

10          Back to my question, though.  So -- and now I got to

11  remember my question.

12          MR. GAVRILOS:  So just to be clear, your Honor, if

13  you denied those exemptions with respect to that claim --

14          THE COURT:  Not "if."  I just read it to you.  And,

15  presumably, you read it when you got it, you know, three weeks

16  ago.

17          MR. GAVRILOS:  So then he still has all of his

18  exemptions available for use?

19          THE COURT:  I adjudicate exemptions that get

20  asserted, and that's discussed at page 9 in the context of

21  Mr. Alexopoulos, but it applies to everybody.  No payment

22  order may be entered unless the judgment debtors had an

23  opportunity to exert exemptions.

24          The way that doesn't work -- the way it does -- not

25  going to work, even though you think it is, is that every time

1    something happens, there's, oh, I want to do this, oh, a

2    motion to reconsider, oh, assert an exemption, and this

3    process goes on forever.  No.  I'm sorry.  He had an

4    opportunity to assert his exemption on these vehicles.  He

5    didn't.  No.

6              MR. GAVRILOS:  He did, your Honor.  Document

7    number 298 was filed on --

8              THE COURT:  Well, then why didn't you file a motion

9    to reconsider when I concluded that he had -- that he didn't?

10             MR. GAVRILOS:  I did not know that his exemptions

11   were ever ruled on.  I guess at that point, they'd been

12   pending for eight months.  They were filed pursuant to court

13   order on November 17th of 2023.

14             THE COURT:  What was the exemption?

15             MR. GAVRILOS:  For Mr. Alexopoulos?

16             THE COURT:  We're talking about Mr. Tsaparas.  What

17   was the exemption that you said was filed nine months ago?

18             MR. GAVRILOS:  He filed an exemption related to his

19   wages pursuant to 1402(b)(3).  He filed his motor vehicle

20   exemptions --

21             THE COURT:  Right.

22             MR. GAVRILOS:  -- pursuant to --

23             THE COURT:  And that was on the BMW.

24             MR. GAVRILOS:  Correct.

25             THE COURT:  Right?  Which I just talked about, right?

1          MR. GAVRILOS:  He filed -- or asserted his wild card
2    exemption --
3          THE COURT:  On the BMW and on jewelry, right?
4          MR. GAVRILOS:  Right.
5          THE COURT:  Just talked about that too.
6          So what other exemptions are there?
7          MR. GAVRILOS:  Well, if you denied those exemptions,
8    he still has them.
9          THE COURT:  I didn't.  He's asserted them, and I --
10   they've been applied.  That is pages 10 and 11, which I've now
11   actually read twice during this hearing today.  I've read it
12   twice during this hearing today.  Plus, you read it,
13   presumably, when you read the gosh darn order.  Okay?
14         So he's asserted them, they've been applied, and you
15   don't get to keep applying them to other things.
16         MR. GAVRILOS:  I misunderstood the language of that
17   order, your Honor.  I apologize.
18         THE COURT:  Okay.  So now let me go back to my
19   question, which -- because every question gets diverted off to
20   something else, I now have to go back like four pages in the
21   transcript to just find it.
22         So we were talking about the Suburban.  He doesn't
23   have any exemptions left to assert on the Suburban, does he?
24         MR. GAVRILOS:  The Suburban is Mr. Alexopoulos'
25   vehicle.

1        THE COURT:  I'm sorry.  Not the Suburban.

2        Okay.  So Mr. Alexopoulos, is he asserting his

3    vehicle exemption on a Suburban?

4        MR. GAVRILOS:  Yes, your Honor.  Mr. Alexopoulos'

5    position this whole time is that he's stacking all of his

6    exemptions so he can keep his vehicle because that is the only

7    means that he has to and from work.

8        THE COURT:  So that would be the $2400 or whatever it

9    is vehicle exemption --

10       MR. GAVRILOS:  Plus the 4,000 wild card.

11       THE COURT:  -- and then whatever is needed out of the

12   wild card exemption to get to the value --

13       MR. GAVRILOS:  Correct.

14       THE COURT:  And is the value of the vehicle

15   determined based on its book value, or do you have to

16   deduct -- your position is do you have to deduct from it

17   what's owed on it?

18       MR. GAVRILOS:  That's a good question, your Honor.  I

19   would say the latter.  I mean, there's not a whole lot of case

20   law on the mechanics of how to value a vehicle for purposes of

21   a turnover.  It would stand to reason on the defendant's side

22   that you take what it was purchased at, subtract the residual,

23   subtract the loan because that cuts against the interest,

24   apply the exemption, and if that number is greater than

25   zero --

1　　　　　THE COURT:  Probably would.  Is the loan --

2　presumably, whoever has the loan has a security interest in

3　it.

4　　　　　MR. GAVRILOS:  I would assume so, your Honor.

5　　　　　THE COURT:  Usually that's the case.  Most car

6　dealers aren't stupid enough not to do that.  Okay.

7　　　　　MR. WATTERS:  Your Honor, if I can --

8　　　　　THE COURT:  Have you gotten any kind of a

9　verification on the mileage on the thing at this point?

10　　　　　MS. MARZIANI:  No.

11　　　　　MR. WATTERS:  No verification, your Honor, but we did

12　receive the new mileage number after the status report was

13　submitted.  Thereafter, we went out and got a new offer based

14　on the mileage that counsel has represented.

15　　　　　So the math I have, your Honor, is we have an offer

16　on the vehicle for $17,000.

17　　　　　THE COURT:  And something like 10 is owed-ish.

18　　　　　MR. WATTERS:  Okay.  Well, I'm being told Kelley Blue

19　Book might say 20, but we have -- we have an offer for 17,

20　though.

21　　　　　There's 9,700 owed on the loan, and then --

22　　　　　THE COURT:  9,700.

23　　　　　MR. WATTERS:  Right.

24　　　　　And then there was a $2400 exemption under -- for the

25　vehicle exemption that was in the Court's July order.

1    That means we clear approximately $5,000.

2    THE COURT: It's about 4900 is what would it be.

3    But what I'm -- he's going to assert his wild card

4    against that, and the wild card is -- tell me again how

5    much --

6    MR. GAVRILOS: 4,000.

7    THE COURT: So that gets you down to 900 bucks.

8    MR. WATTERS: Your Honor, to the extent the Court's

9    willing to let him now exert the wild card exemption, it's a

10   lot less than we were hoping for, but at this point, we'll

11   take any amount of money I can get.

12   THE COURT: So translate that into --

13   MR. WATTERS: Sorry, your Honor.

14   THE COURT: You're asking me --

15   MR. WATTERS: My understanding from the Court's July

16   order was the only exemption that was raised and that the

17   Court ruled on was the $2400 exemption, and the question

18   was --

19   THE COURT: Mr. Gavrilos told me that this has been

20   asserted like nine months ago.

21   MR. WATTERS: I can't speak to that, but I assume it

22   was, your Honor.

23   THE COURT: I assume he's right, okay?

24   MR. WATTERS: Your Honor, ultimately, even if we

25   clear only 500 or $900, I'd like --

1      THE COURT:  You still want to do it.

2      MR. WATTERS:  -- I'd like to sell it.

3      THE COURT:  Okay.

4      MR. GAVRILOS:  And, your Honor, that's based on an

5  offer that they got -- it -- there's clearly a dispute here.

6  I know the Court believes that the defendants and third-party

7  respondents call for a hearing at the drop of a hat.  We don't

8  believe that that's the case, but --

9      THE COURT:  No, no, it's not call for a hearing at

10  the drop of a hat.  It's filing motions to reconsider at the

11  drop of a hat.  Those are two different issues.

12      MR. GAVRILOS:  This issue, your Honor,

13  Mr. Alexopoulos just simply needs to keep his car.

14      THE COURT:  So I get what you're saying, and so are

15  you saying that you're not persuaded -- you think there's a

16  dispute about whether once all the exemptions get applied,

17  whether there's actually any value left.

18      MR. GAVRILOS:  Correct, your Honor.

19      THE COURT:  And so what you're asking me to do is

20  make a determination on what the value would be or what the

21  value is.

22      MR. GAVRILOS:  No, your Honor.  I'm -- I would

23  suggest that pursuant to 277(h), that there would be a

24  hearing.  If they're not willing to concede --

25      THE COURT:  That's what happens -- so that's a yes.

1    I mean, you want me to make a determination on the value after
2    having a hearing.
3              MR. GAVRILOS:  Essentially, your Honor.
4              THE COURT:  Okay.
5              MR. GAVRILOS:  If it's going to come down to a
6    hearing over 500 bucks, I mean, it doesn't seem --
7              THE COURT:  Does the law -- does the Sixth Amendment
8    apply to this?  I mean, does it have to be live testimony
9    under oath with the right to confront witnesses and whatnot,
10   or can the hearing be done on paper?
11             MR. GAVRILOS:  In light of the fact, your Honor, that
12   the general case law says that these proceedings should be
13   swift, cheap, and informal, I would say that you have
14   discretion to do it by paper if you'd like.
15             THE COURT:  Okay.  So let me just kind of lay this
16   out here.
17             So if all of your numbers are right, you're going to
18   clear 900 bucks.  So here's what you're going to have to do to
19   clear the 900 bucks.  I'm going to use the term "clear"
20   advisedly because it's going to turn out that you're not going
21   to actually clear anything.
22             You're going to have to file paperwork with me to
23   persuade me what the value of the vehicle is, and that's going
24   to have to include some sort of an affidavit from somebody
25   that says, this is the offer that we have on this vehicle;

1  it's going to have to include something about, you know,
2  what's owed on it; it's going to have to include, you know, a
3  filing of some sort.

4          I don't know what your hourly rate is.  My guess is
5  of the 900, we're going to probably use about 775 or so, and
6  so we're talking about 125.  I'd throw in 5 bucks to get to
7  the 125, but you got to decide whether it's worth it or not.
8  You don't have to decide it right now, but you got to decide
9  it pretty soon.

10         MR. WATTERS:  I understand.

11         THE COURT:  Because if the message hasn't come
12  through, this is no more fun for me than it is for you guys,
13  okay?  It's no more fun for me than it is for you to be -- to
14  have these hearings about every four weeks where I'm dealing
15  with what a rational person might call in some instances the
16  least minutia.  I mean, I'll do it.  That's what I get paid
17  the big bucks for.

18         So you're going to have to decide whether you want to
19  do that.  Because I think Mr. Gavrilos is right, that's the
20  next step.  It seems to me there's at least a factual question
21  on whether there's enough once all the exemptions are
22  asserted, which he has now asserted and I have adjudicated
23  that he's applying them to the Suburban, okay?  Done, that's
24  done, so we're not going to be coming back and dealing with
25  that again.  It's whether it's worth it or not.  So you have

1    to make a decision.

2         MR. WATTERS:  Understood, your Honor.  Could I make a

3    quick request, though?

4         THE COURT:  What's the request?

5         MR. WATTERS:  Your Honor, we've had a representation

6    from counsel in writing by email as to the mileage of the car.

7    If I --

8         THE COURT:  Somebody take a picture of it?

9         MR. WATTERS:  If I could get --

10        THE COURT:  Just take a picture of it.  Tell somebody

11   to just go in there and snap a picture of the odometer once

12   the car is turned on so -- and back far enough so they can

13   tell it's actually a Suburban and not, you know, the next-door

14   neighbor's high school kid's car.

15        MR. WATTERS:  Your Honor, I'm sorry.  If I may, I

16   hate to ask, but given everything that's happened so far, can

17   we get a date certain for that to be produced?

18        THE COURT:  Yeah, I'm going to start charging by the

19   hour in this case, by the way.  That's a half of a joke.

20        Sure.  What's the deadline that I gave on the --

21   there was something I just gave a deadline on.

22        MR. WATTERS:  Your Honor --

23        THE COURT:  He ought to be able -- Mr. Alexopoulos,

24   he's the guy who lives in Niles, right?

25        MR. GAVRILOS:  Correct.

1        THE COURT:  And the Suburban is in Niles, as far as
2   you know?
3        MR. GAVRILOS:  No, because at this point, this is a
4   car that he shares with his wife.  It's the only care they
5   have.  I don't know if he has it with him.
6        THE COURT:  Oh, no, I mean -- I'm talking -- it's not
7   like in California or something like that.  It's here.
8        MR. GAVRILOS:  I would be very surprised if it was in
9   California.
10        THE COURT:  Okay.  Get a photograph of the odometer
11   within a week, a week from today.  That's the 14th.
12        Okay.  Now we're over to -- I think those are all the
13   items on the plaintiff's part of the status report, and now
14   we're over on the defense side, most of which, I think, have
15   already been covered.  Exemptions, that's been covered.
16   Suburban, we talked about.
17        MR. GAVRILOS:  Your Honor, can I just revisit one
18   point on the status report?
19        THE COURT:  Not just yet.
20        The trailer, we talked about.  The firearms, we
21   talked about.  Amundsen Davis, we talked about.
22        Okay.  Now you can raise the point.
23        MR. GAVRILOS:  Yeah.  I don't quite know how to put
24   this diplomatically, but we just had a discussion about
25   something that I put in the status report, and I was

1    personally directed to provide an affidavit.  You told me that

2    I'd testify under oath, and there was a suggestion that I

3    would be escorted out the door and into jail.

4         I just --

5         THE COURT:  No.  Actually, you misread that.  I said

6    when people get held in contempt, that's what sometimes

7    happens.

8         MR. GAVRILOS:  I just pointed out that something on

9    their side of the status report that we spent a great deal of

10   time talking about was demonstrably false --

11        THE COURT:  What was said --

12        MR. GAVRILOS:  -- and that was that they do have the

13   VIN information for the Lancia.  It's in the report.  It's not

14   true.  I told you the email that we sent it to them.

15        So I'm just wondering is there going to be any sort

16   of similar recourse along those lines?

17        THE COURT:  Where?  In the status report?

18        Sure.  I'll tell you what.  If I send you out the

19   side door, I'll send them out the side door too.

20        So where in the status report am I supposed to be

21   looking for this, Mr. Gavrilos?  You just told me --

22        MR. GAVRILOS:  I believe it was page 3.

23        THE COURT:  Page 3.

24        And what part of it?

25        MR. GAVRILOS:  On the vehicles, your Honor, talking

1    about the Tsaparas vehicle saying, no information has been
2    provided.
3            And then they told you in open court that they did
4    not have the VIN number for the Lancia.
5            THE COURT:  Now, wait a second.
6            MR. GAVRILOS:  And as I told you, Judge, the email
7    that went to them was on February 8th.
8            THE COURT:  You just talked to me about something
9    being false in the status report --
10           MR. GAVRILOS:  Right.  And also in open court just
11   now.
12           THE COURT:  You talked to me about something being
13   false in the status report.  I'm going to take these things
14   one at a time.  Do you have a copy of the status report?
15           MR. GAVRILOS:  I have a --
16           THE COURT:  Here, here is a copy of the status
17   report.  Tell me what it was.  There's page 3.  Tell me what
18   it was that was false so I know what to ask.
19           MR. GAVRILOS:  NHC will obtain an offer in advance of
20   the sale if Mr. Tsaparas provides the VIN.
21           THE COURT:  Okay.
22           MR. GAVRILOS:  That was on February 8th, 2024.
23           THE COURT:  This is on the Lancia.
24           MR. GAVRILOS:  Correct.
25           THE COURT:  Remind me, is the Lancia the -- that's

1  not the motorcycle.  That's the --

2         MR. GAVRILOS:  Correct.

3         THE COURT:  -- that's the car that I referred to as a

4  junker, basically.

5         MR. GAVRILOS:  Correct.

6         THE COURT:  Yeah.  Okay.  So you're telling me you

7  had the VIN?

8         MR. GAVRILOS:  I'm telling you they had the VIN.

9         THE COURT:  Okay.  Do you have the VIN?

10        MR. GAVRILOS:  It was sent on February 8th, 2024.  I

11  can show you the email.

12        THE COURT:  Show it to me.

13        Is it in the attachment?

14        MR. GAVRILOS:  No, it's in the subject of the email.

15        MS. HERRING:  It's in the body of the email.

16        MR. GAVRILOS:  The body of the email.

17        THE COURT:  Got it.  This is dated February 8th of

18  2024.

19        Okay.  So what's going on here, folks?

20        MR. WATTERS:  Your Honor, that email predates my

21  involvement, obviously --

22        THE COURT:  I'm going to stop you right there.

23        MR. WATTERS:  Yes, your Honor.

24        THE COURT:  Hang on one second.

25        Yeah, Ms. Marziani's name is on this status report

1    too.  It doesn't predate her involvement.

2         MR. WATTERS:  It doesn't, your Honor, and the only

3    thing I would say --

4         THE COURT:  So, Ms. Marziani, did you look at this

5    status report before you put your name on it?

6         MS. MARZIANI:  Absolutely, your Honor.

7         THE COURT:  And when you got to the part where it

8    says, "Will obtain an offer if Mr. Tsaparas provides VIN" --

9    now, it doesn't come right out and say he never provided the

10   VIN, it doesn't say that in so many words, but that's the

11   pretty clear implication of it and what I'm supposed to take

12   away from it.  So did -- how did you overlook that?

13        MS. MARZIANI:  Your Honor, I don't recall that email

14   in February.  Your Honor ordered this information in April,

15   ordered the pictures in April.  If they had provided the

16   information to me in an email, perhaps they could have pointed

17   it out then.

18        I -- without checking my emails on my computer, I

19   don't know if I have that VIN number.

20        THE COURT:  Okay.  That's not a good screw-up.  It's

21   a pretty bad screw-up.  And I'll just make this observation,

22   is that if you guys actually filed joint status reports and

23   actually talked about them in advance before you did them like

24   most lawyers do, this would have come out in the wash because

25   Mr. Gavrilos would say, hey, we sent it to you in February,

1    and you wouldn't have put the damn thing in there.  Pardon me
2    for the "damn."

3         But, I mean, you guys sent the draft of the status
4    report if I'm seeing -- if I'm reading the response to the
5    order to show cause correctly.  The status report was due on
6    the 29th, okay?  29th, which was a Monday of July.  You sent
7    the status -- you sent a draft of the status report at 5:04
8    p.m. on Friday the 26th.

9         Now, look, I work -- people think this is a cushy
10   job.  I work pretty much eight hours a day Saturday and
11   Sunday, and I know that that's true of lawyers too, but it's
12   not supposed to be that way.  It's not reasonable, it's not
13   reasonable on a status report that's due on Monday, to give
14   your draft to the other side at 5:00 o'clock -- 5:04 on the
15   Friday before.  It's just not reasonable.  It basically
16   requires the other person to work the weekend, which you chose
17   not to do because you dumped it on them probably as you knew
18   they were going out the door.

19        MS. MARZIANI:  May I respond?

20        THE COURT:  You can respond any way you want.  It's a
21   fact.  You dumped it on them at 5:04 p.m.  This is what your
22   filing says.

23        MS. MARZIANI:  The proposal for the sale was sent to
24   them on Thursday.

25        THE COURT:  Oh.

1        MS. MARZIANI:  And --

2        THE COURT:  Oh, so it was a whole day before.  It was

3   at 4:17 p.m. on July 25th, according to your response?

4        MS. MARZIANI:  Yes.

5        THE COURT:  Do you detect a note of sarcasm?  That

6   means your sarcasm detector is working.

7        MS. MARZIANI:  Your Honor, I apologize for the

8   timing, but we were waiting for --

9        THE COURT:  So, look, everybody's waiting on

10  everybody else.  Everybody's waiting on everybody else.

11       Here's the deal.  You guys need -- you know, you're

12  having to file these status reports.  I'm going to say the

13  obvious here.  When you get something that says a status

14  report's due on X, you should -- before you walk out the door,

15  you should -- before you walk out the door after you've gotten

16  the order, you should say, okay, let's agree on who's going to

17  get whose draft to whom when.  And maybe you send simultaneous

18  things and everybody works on it, or maybe one side goes

19  first.  That's what people do.  I used to practice law.

20  That's what I did.  That's what people -- like I say, people

21  do in the 279 of the 280 cases I got or whatever it is.  You

22  guys don't seem to.

23       MR. GAVRILOS:  Your Honor, we actually have an order

24  on this point where the first iteration from the plaintiff's

25  side --

1    THE COURT:  We talked about this before?

2    MR. GAVRILOS:  Many times.  The first draft is

3    supposed to be three days before it's due.  Our response --

4    THE COURT:  And I'm predicting the response, it was

5    because it was Friday and it was due Monday.

6    MR. GAVRILOS:  I don't know what the response is

7    going to be.

8    THE COURT:  And I didn't say business days, and so,

9    therefore, it's technical compliance.

10    So, look, I get your point, okay?  We've talked about

11    it before.  You should have gotten this sooner.  Just -- I

12    mean, are you having fun yet?  Because I'm not, and I'm

13    guessing you're not either.

14    And the whole reason why we're even here today -- I

15    mean, I could have issued the order denying the two motions to

16    reconsider from my couch at home.  I could have made an entry

17    on the docket doing that.

18    You're here because of this mess about the status

19    reports, which is a recurring problem in this case.  You know,

20    which is a problem in, you know -- if I have 280 cases, I

21    don't know if it's plus or minus, at any given time, this goes

22    back 25 years, I have three cases that's a problem.  Three

23    cases out of 280.  You are number one.

24    But the other 277 people figure it out somehow.  They

25    somehow figure it out.  And you guys -- I get that there's a

1   lot of emotion and rancor and all sorts of stuff involved in
2   this case, you know, maybe including the lawyers, although it
3   shouldn't, maybe including the lawyers, but at least including
4   the clients.  But for crying out loud, you just got to find a
5   way.  And you should agree on it, whether it's one side gives
6   their version -- gives a draft first and the other side
7   responds and you have specific days you're going to do that by
8   given the due date, or whether both sides send their sections
9   and then you sit down to try to combine them.  I mean, it's
10  not rocket science.

11          I mean, none of us is going to get this hour back,
12  right?  We're never going to get this hour back.  And I'm one
13  of those people.  I'm not going to get the hour back.  I
14  just -- and it's probably about the 18th time I've said it in
15  this case, I've just kind of reached the end of my rope.  And
16  that's why I whistled you in here.  And even when I got the
17  compliant -- more or less compliant status report the same
18  day, I'm not backing off on that because I just -- this is not
19  working the way it's supposed to.

20          So you got to figure it out.  I mean, really, when
21  people come -- when I did the thing, and I honestly had
22  forgotten doing it, but I said, you know, the draft's got to
23  go out three days before, do you know how many times I've done
24  that in 25 years?  One.  It's the only time.  I've never had
25  to do that.  I've never had to do that before.  I don't even

1    do it on the pretrial order, frankly, where I say, you know,

2    you've got to get your draft, because people work it out.

3    I've never had to do it before.  The this is the only time

4    in 25 years that I've ever had to tell somebody when they have

5    to get a draft of a status report to somebody else.

6              So do with that what you want.

7              What else do I have to decide today that I haven't

8    already decided?

9              MR. GAVRILOS:  Your Honor, I just have one quick

10   comment.  You asked Mr. Alexopoulos to produce a photograph of

11   the mileage of the Suburban I believe in a week.  You also

12   asked him to produce a photograph of the trailer by 5:00

13   tomorrow.

14             THE COURT:  Yeah, that can be -- that can be a week

15   too.

16             MR. GAVRILOS:  Okay.  Would you like an affidavit

17   still accompanying that photo --

18             THE COURT:  But here's the deal.

19             MS. HERRING:  I have them right here.

20             I have the photos, Judge.

21             THE COURT:  Yay.

22             MS. HERRING:  I sent him a quick text.  I've got

23   them.

24             THE COURT:  Okay.  Can you give her a number to text

25   them to?

1      MR. WATTERS:  Sure.

2      THE COURT:  Okay.  Like before you get to the back

3  door.

4      MR. WATTERS:  Understood, your Honor.

5      THE COURT:  It doesn't have to be right now.  Before

6  you get to the back door.

7      So that part's off the table.  The other thing is

8  just a week.  Okay?  So you don't have to worry about the

9  photos anymore.

10     So what else do I have to decide that I haven't

11  already decided?

12     MR. GAVRILOS:  Nothing from defendants, your Honor.

13     MR. WATTERS:  Your Honor, the only thing --

14     THE COURT:  I have to decide when I'm going to make

15  you people come back, but that's another issue.

16     MR. WATTERS:  I apologize, your Honor.  I didn't

17  mean --

18     THE COURT:  Yeah, go ahead.

19     MR. WATTERS:  The only other thing on our radar was,

20  as the Court's obviously well aware, we've had a number of

21  citations issued.

22     One of the third parties we've been working with on a

23  citation has completed its production, and they've asked and

24  we've agreed to withdraw the citation.

25     THE COURT:  Okay.  Which one?

1          MR. WATTERS:  Teller, Levit & Silvertrust.

2          THE COURT:  That's a law firm, right?

3          MR. WATTERS:  It is.

4          If the Court wants to put it in the minute order,

5    that'd be fine.  Otherwise, I'm happy to try to --

6          THE COURT:  Before you leave here, give the name of

7    the law firm to my courtroom deputy clerk.  We'll say that

8    that citation is withdrawn.

9          MR. WATTERS:  Understood, your Honor.

10          THE COURT:  Are there any others that are about to

11    expire that I need to deal with or anything like that, or --

12          MR. WATTERS:  We're working with everyone else, your

13    Honor.  Nothing else comes to mind immediately.

14          THE COURT:  All right.  Okay.  We're done.

15          MR. WATTERS:  Thank you, your Honor.

16          THE COURT:  Oh, the next status hearing is going to

17    be in four weeks.  That's September the 4th.

18          MR. GAVRILOS:  Your Honor, for some reason, I thought

19    there was a hearing on the 19th or the 29th.  I'm happy to

20    strike that --

21          THE COURT:  Of this month?

22          MR. GAVRILOS:  Of this month.

23          MR. WATTERS:  Yes, your Honor.

24          THE COURT:  What's it on?

25          MS. MARZIANI:  The 29th.

1     THE COURT:  What's it on?

2     MR. WATTERS:  As to the content of it, I think it's

3 just for status.

4     THE COURT:  It's just a status hearing?  We don't

5 need to do it that fast.  So that one's stricken.  I'm going

6 to make it -- actually, not the 4th.  Let's make it the 11th

7 of September at 9:15 in person, and the status report is due

8 on the 4th.  So figure out before you get back there who's

9 getting who a draft when.

10     All right.  See you.

11     MR. WATTERS:  Thank you, your Honor.

12  (Which were all the proceedings had in the above-entitled

13 cause on the day and date aforesaid.)

14  I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

15

/s/ *Carolyn R. Cox, RPR, F/CRR*   August 8, 2024
16 Official Court Reporter
United States District Court
17 Northern District of Illinois
Eastern Division

18

19

20

21

22

23

24

25