**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NHC LLC, a Florida limited liability company, | |
| Plaintiff, | |
| v. | No. 19-cv-06332 |
| CENTAUR CONSTRUCTION COMPANY INC., an Illinois corporation, SPIRO TSAPARAS, and PETER ALEXOPOULOS, | Honorable Matthew F. Kennelly |
| Defendants. | |

**<u>PLAINTIFF/JUDGMENT CREDITOR'S MOTION FOR RULE TO SHOW CAUSE AS TO WHY SPIRO TSAPARAS AND PETER ALEXOPOULOS SHOULD NOT BE HELD IN CONTEMPT BASED ON IMPERMISSIBLE TRANSFERS MADE THROUGH TRITON MARINE HOLDINGS, LLC</u>**

Daniel P. Jackson, Bar No. 6289813
Bryan K. Clark, Bar No. 6296090
Zachary J. Watters, Bar No. 6310675
Allison E. Czerniak, Bar No. 6319273
Keeley A. Sawyer, Bar No. 6336704
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T:  +1 312 609 7500
djackson@vedderprice.com
bclark@vedderprice.com
zwatters@vedderprice.com
aczerniak@vedderprice.com
ksawyer@vedderprice.com

Gini S. Marziani, Bar No. 3127421
Davis McGrath LLC
125 S. Wacker Drive
Chicago, Illinois 60606
T:  +1 312 332 3033
gsmarziani@davismcgrath.com

Plaintiff/judgment creditor, NHC LLC ("NHC"), by its undersigned counsel and pursuant to Fed. R. Civ. P. 69, 735 ILCS 5/2-1402, and the Court's inherent authority, respectfully moves this Court to issue a rule to show cause as to why defendants/judgment debtors Spiro Tsaparas ("Tsaparas") and Peter Alexopoulos ("Alexopoulos") (collectively, the "Judgment Debtors") should not be held in contempt of court for violating, *inter alia*, their respective citations to discover assets, the Court's April 23, 2024 oral ruling, and the Court's July 12, 2024 Order Regarding Certain Post-Judgment Matters (Dkt. No. 459) (the "July 2024 Contempt Order") with respect to transfers made through Triton Marine Holdings LLC ("Triton"). In support hereof, NHC states as follows:

## RELEVANT FACTS AND PROCEDURAL BACKGROUND

I. **The Judgment Debtors *Routinely* Violate the Debtors' Citations' Clear Restraining Provision(s)**

1. After a jury trial, judgment was entered against defendants Centaur Construction Co. ("Centaur"), Tsaparas, and Alexopoulos jointly and severally in the total amount of $22,272,124.34 for fraud and breach of contract plus punitive damages against the defendants individually and in particular Tsaparas in the amount of $1,500,000.00 ("Judgment"). (Dkt. No. 228.)

2. On or about May 5, 2023, NHC served a citation to discover assets on Tsaparas (the "Tsaparas Citation"). (Dkt. No. 243.) On or about May 19, 2023, NHC served a citation to discover assets on Alexopoulos (the "Alexopoulos Citation," and together with the Tsaparas Citation, the "Debtors' Citations"). (Dkt. No. 245.) The Debtors' Citations contained the following standard restraining language contained in citation forms:

> YOU ARE PROHIBITED from **making or allowing any transfer** or other disposition of, or interfering with, any property **not exempt** from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor and

1

from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further order of court or termination of the proceedings.  You are not required to withhold the payment of any money beyond double the amount of the judgment.

(*See* the Debtors' Citations (emphasis added).)

3.　　Since NHC served the Tsaparas Citation, Tsaparas has made partial productions of responsive documents on a disjointed and rolling basis.  Many of these documents were produced only after the Court granted NHC's various motions to compel.  (*See* Dkt. Nos. 295, 337.) Although Tsaparas's production was then incomplete, on March 5, 2024, NHC filed a motion for turnover order as to Spiro Tsaparas and US Bank Accounts (the "Tsaparas Turnover Motion"). (Dkt. No. 351.)  The Tsaparas Turnover Motion outlined a multitude of instances in which Tsaparas had violated the restraining provision of the Tsaparas Citation.  (*Id*. at ¶¶ 16, 18.)

4.　　Likewise, and although Alexopoulos's production was also incomplete, on or about May 17, 2024 NHC filed a motion for turnover order as to Alexopoulos and Bank Accounts (the "Alexopoulos Turnover Motion").  (Dkt. No. 408.)  The Alexopoulos Turnover Motion also detailed a litany of instances in which Alexopoulos had violated the restraining provision of the Alexopoulos Citation.  (*Id*. at ¶ 16.)

5.　　On April 23, 2024, following briefing and a hearing on the Tsaparas Turnover Motion, the Court issued an oral ruling[1] on the Tsaparas Turnover Motion and found that "Tsaparas made numerous transfers in violation of the citation and the lien imposed by the citation.  The total of those is in the neighborhood of $400,000."  (Ex. 1, at 5:3-6.)  The Court further found that Tsaparas had "committed contempt of court about three dozen times" by systematically violating the Tsaparas Citation and the restraining provision imposed by the Tsaparas Citation.  (*Id*. at 8:1-

---

[1] A true and correct copy of the transcript of the April 23, 2024 hearing in this matter is attached hereto as **Exhibit 1**.

2.)  Despite this public finding on contempt, Tsaparas continued to dissipate his assets.  (*See* Dkt. No. 437 at ¶¶ 10-11.)

6.      On July 12, 2024, this Court entered it's the July 2024 Contempt Order.  (Dkt. No. 460.)  The July 2024 Contempt Order noted that the Court had "found Spiro Tsaparas in contempt due to his repeated and extensive violations of the restraining provisions of the citation to discover assets that was served upon him."  (July 2024 Contempt Order.)  Moreover, the Court ordered Tsaparas starting in August 2024 to "file with the Court on the 10th of each month. . . an accounting under penalty of perjury listing his monthly income and expenditures."  (*Id.* at 3.)  Since entry of the July 2024 Contempt Order, Tsaparas has continued to wrongfully transfer funds.

7.      The July 2024 Contempt Order also made explicit findings with respect to Alexopoulos.  The Court found that Alexopoulos "knowingly transferred funds in violation of the lien imposed by the [Alexopoulos Citation]." (*Id.* at 8.)  The Court noted that this conduct "constituted contempt of court" and went on to find Alexopoulos in contempt of court and entered various sanctions against him.  *Id.*  At that time, Alexopoulos had transferred no less than $138,449.75 in violation of the Alexopoulos Citation.  Since that time, and despite prohibitions against doing so, Alexopoulos has continued to violate the Alexopoulos Citation's restraining provision.  The sanctions imposed against the Judgment Debtors vis-à-vis the July 2024 Contempt Order have done little to curtail their contemptuous conduct, some of which is addressed in separate filings.  (Dkt. Nos. 437, 480, 481, 503, 504, 590 and 592.)

8.      Incredibly, and based on NHC's review of what may finally be a complete set of US Bank records pertaining to Triton, only recently received on or about February 28, 2025 (the "Triton US Bank Records," a partially redacted copy of which is attached hereto as **Group Exhibit**

3

**2**),[2] NHC has learned that *Tsaparas and Alexopoulos have committed dozens of additional instances of contempt and transferred no less than an additional $128,000 in violation of the Debtors' Citations' restraining provisions.* These transfers were made through Triton—an entity whose primary purpose appears to have been (or to be) to allow Judgment Debtors to covertly siphon money from Centaur and to continue to spend money freely post-Judgment (and in direct violation of the Debtors' Citations, various court orders and applicable law).

## II.     Brief Background on Triton

9.     NHC's ongoing investigation has revealed that Triton appears to be a central player in Judgment Debtors' efforts to avoid paying the Judgment and to circumvent Court Orders.

10.     Tsaparas and Alexopoulos have each confirmed that they were or are the sole owners of Triton. At Tsaparas' December 2023 citation examination (portions attached hereto as **Exhibit 3**), he confirmed he and Alexopoulos each had a 50% interest in Triton, yet falsely stated it stopped doing *anything* "some time ago" and that he had produced all bank records for Triton (he had not). (Ex. 3 at 43:7-45:2.) At Alexopoulos' December 2023 citation examination (portions attached hereto as **Exhibit 4**), he confirmed his ownership interest in Triton, yet curiously testified he was unable to procure and produce basic documents (including, but not limited to, bank records) related to Triton.[3] (Ex. 4 at 50:19-53:2.)

---

[2] NHC was forced to obtain these documents directly from US Bank in spite of the fact that Tsaparas and Alexopoulos unquestionably had these records within their possession, custody and/or control. This and other refusals to provide documents and/or information have accounted for delay(s) herein.

[3] *See also* the Signature Card from Triton's account with US Bank listing Tsaparas and Alexopoulos as joint account holders, a copy of which is attached hereto as **Exhibit 5**. *See also* the Resolution of Limited Liability Company from Triton's account with US Bank listing only Tsaparas and Alexopoulos as agents to act on behalf of Triton, a copy of which is attached hereto as **Exhibit 6**.

11.     NHC has never gotten a straight answer as to Triton's true purpose. During his citation examination (portions attached hereto as **Exhibit 7**), Mark Hunt (owner of M Development and/or M Sourcing, and Judgment Debtors' longtime business partner) ("Hunt") testified that Triton was an entity owned by Tsaparas and through which Tsaparas allegedly provided consulting services to M Development or M Sourcing, prior to Tsaparas executing his employment agreement with M Sourcing in December 2022. (Ex. 7 at 12:17-13:9.) Specifically, Hunt testified that Triton[4] was hired for consulting services "with a handful of – of construction projects." (*Id*. at 13:9.) Hunt testified that in connection with those consulting services Triton issued 11 invoices (attached hereto as **Group Exhibit 10**) to M Development and M Sourcing for a cumulative total of $211,538.47.[5] (*Id*. at 19:17-20:1.)

12.     However, following Hunt's citation examination, Tsaparas gave drastically different testimony regarding the alleged purpose of Triton during his citation examination. According to Tsaparas, the "only purpose" of Triton was to own "a vessel that [Mr. Tsaparas and Mr. Alexopoulos] purchased in Greece." (Ex. 3 at 47:23-48:4.) Tsaparas clarified that Triton "was not in the construction business." (*Id*. at 48:16-18.) Likewise, at Alexopoulos' citation examination, he testified that Triton "did not have anything to do with construction." (Ex. 4 at 51:6-8.)

---

[4] M Sourcing was formed in November 2022 per publicly available records obtained from the Colorado Secretary of State, a copy of which is attached hereto as **Exhibit 8**. According to Tsaparas, Hunt and M Sourcing's attorneys came up with the idea to pay Tsaparas for work he was performing for M Development through Triton because of the fraud case pending against him. *See* excerpt from January 8, 2025 evidentiary hearing, attached hereto as **Exhibit 9**. (Ex. 9 at 64:23-65:11.) However, Hunt's September 2023 citation examination testimony appears to suggest it was Tsaparas' idea to use Triton for Tsaparas' consulting work for M Development. (Ex. 7 at 12:20-13:2.)

[5] Curiously, when questioned about these at the January 8, 2025 evidentiary hearing Tsaparas was initially perplexed by these statements and acted as if he had never seen them. (Ex. 9 at 44:7-46:18.) Tsaparas also claimed to lack knowledge of when Triton stopped existing. (*Id*. at 34:10.)

13.     When asked about Triton's eventual sale of this "vessel," Alexopoulos asserted his Fifth Amendment right against self-incrimination and refused to answer basic questions.[6]  In a civil case, unlike a criminal case, an assertion of the Fifth Amendment can give rise to an adverse inference.[7]  Alexopoulos gave further contradictory testimony as to Triton's alleged business purpose:  "So Triton Marine was, again, an entity that was set up with the expectation of trying to explore opportunities in the hospitality sector in Greece."  (Ex. 4 at 51:21-24.)  Although a fifty percent owner and signatory on Triton bank accounts, he then stated, "I don't know a ton about Triton Marine."  (*Id*. at 51:24.)

14.     According to Veronica Velez ("Velez"), the former Controller for judgment debtor Centaur, Triton was a "lender" of Centaur.  Portions of Velez's deposition transcript are attached hereto as **Exhibit 11**. (Ex. 11 at 133:17-23.)  Velez was purportedly in charge of the day-to-day of Centaur's finances and/or the recordkeeping related to Centaur's financial records.  (*Id*. at 13:15-18:19.)

15.     The disparate testimony of Hunt, Tsaparas, Alexopoulos, and Velez leaves many open questions as to the actual purpose of Triton, the rationale for the more than $200,000 worth of invoices issued by Triton to M Development and M Sourcing (Group Ex. 10), and the origin of the $4,164,759.90 Amended and Restated Promissory Note issued by Triton in favor of M

---

[6] In all, Alexopoulos asserted his Fifth Amendment right(s) more than a dozen times.  From what NHC has been able to piece together (efforts are ongoing), right before or during the underlying litigation in this case, Centaur started funneling money to Triton, which then purchased the vessel.  Then, at some point closer to entry of Judgment, the vessel was sold and portions of the sale were transferred back to Centaur, then immediately paid out to various third parties, including, but not limited to, Hunt's ex-wife Lesley Hunt.

[7] *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *see also LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995) ("The rule that adverse inferences may be drawn from Fifth Amendment silence in civil proceedings has been widely recognized by the circuit courts of appeals, including our own."); *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153-54 (1923) ("Silence is often evidence of the most persuasive character.") (Brandeis, J.).

Sourcing (a copy of which is attached hereto as **Exhibit 12**).  NHC is actively exploring the nature of Triton and seeking to fully understand the financial interactions between M Development, M Sourcing, Triton, and the Judgment Debtors.[8]

### III. New Evidence of Tsaparas and Alexopoulos Violating the Debtors' Citations' Restraining Provision(s)

16.     On or about June 5, 2024, and in furtherance of its efforts to enforce the Judgment, NHC served Triton with a Citation to Discover Assets in connection with the above-captioned action (the "Triton Citation").  (Dkt. No. 422.)  As detailed in NHC's pending Motion for Rule to Show Cause as to Why Third-Party Citation Respondent Triton Marine Holdings, LLC Should Not Be Held in Contempt of Court and for Entry of Conditional Judgment Against Triton Marine Holdings, LLC (Dkt. No. 606), Triton has never responded to the Triton Citation.  Therefore, NHC has been forced to gather, *inter alia*, certain Triton records from other sources, including, but not limited to, US Bank.  As noted above, the Triton US Bank Records reveal that the Judgment Debtors have committed dozens of additional instances of contempt.

17.     While each and every one of those transfers identified in the Triton US Bank Records is evidence of separate violations of the restraining provisions of the Debtors' Citations (and related court orders), some of the more notable transfers include the following:

---

[8] Just one example of the way(s) in which Centaur and Judgment Debtors have used Triton to shuffle around money during the pendency of this litigation can be found in Triton's banking records from Feb. 2022 (a partially redacted copy of which is attached hereto as **Exhibit 13**).  In just a few short weeks during that month, Centaur transferred $24,500 into Triton's account and then $30,425 was sent *back* to Tsaparas' account ending in -8753.  Another example can be found in March 2022 (see partially-redacted bank statement, attached hereto as **Exhibit 14**).  In that month, large incoming transfers can be seen from M Development (nearly $70,000). Just as soon as the cash comes in—it goes back out—to Centaur and Tsaparas.  This goes on *month after month*. In June 2022 (partially redacted bank statement attached as **Exhibit 15**), M Development transfers in over $550,000 to Triton (and again those amounts are immediately transferred out to Centaur and/or Tsaparas).

| Date | Description | Amount |
|---|---|---|
| May 9, 2023 | Zelle Instant to DEEVS | $6,346.00 |
| May 19, 2023 | Internet Banking Transfer to Tsaparas Account Ending in -8753 | $1,246.00 |
| May 19, 2023 | Zelle Instant to DEEVS | $7,000.00 |
| June 14, 2023 | Internet Banking Transfer to Centaur Account Ending in -8746 | $790.00 |
| June 14, 2023 | Internet Banking Transfer to Centaur Account Ending in -8746 | $900.00 |
| June 20, 2023 | Internet Banking Transfer to Tsaparas Account Ending in -8753 | $200.00 |
| June 20, 2023 | Internet Banking Transfer to Tsaparas Account Ending in -8753 | $500.00 |
| June 23, 2023 | Internet Banking Transfer to Tsaparas Account Ending in -8753 | $200.00 |
| June 30, 2023 | Zelle Instant to DEEVS | $6,346.00 |
| July 14, 2023 | Zelle Instant to DEEVS | $6,346.00 |
| July 28, 2023 | Zelle Instant to DEEVS | $6,346.00 |
| August 11, 2023 | Internet Banking Transfer to Tsaparas Account Ending in -8753 | $2,500.00 |
| August 11, 2023 | Zelle Instant to DEEVS | $3,800.00 |
| August 25, 2023 | Zelle Instant to DEEVS | $6,346.00 |
| September 8, 2023 | Zelle Instant to DEEVS | $6,346.00 |
| September 22, 2023 | Zelle Instant to DEEVS | $6,346.00 |
| October 3, 2023 | Zelle Instant to PETER ALEXOPOULOS | $1,500.00 |
| October 3, 2023 | CASH WITHDRAWAL | $2,000.00 |
| October 17, 2023 | Telephone Transfer to Tsaparas Account Ending in -1745 | $100.00 |

| | | |
|---|---|---|
| October 27, 2023 | Zelle Standard to All Seasons Auto | $900.00 |
| October 27, 2023 | Zelle Standard to SETH MCFADDDEN (Corri's brother) | $2,839.00 |
| October 27, 2023 | CASH WITHDRAWAL | $5,000.00 |
| October 27, 2023 | Zelle Instant to DEEVS | $6,346.00 |
| October 30, 2023 | Transfer to VENMO | $950.00 |
| October 30, 2023 | CASH WITHDRAWAL | $2,500.00 |
| November 3, 2023 | Zelle Instant to DEEVS | $6,346.00 |
| November 6, 2023 | CASH WITHDRAWAL | $8,000.00 |
| November 7, 2023 | Zelle Instant to All Seasons Auto | $350.00 |
| November 10, 2023 | Wire to Aetna Life Insurance | $2,367.00 |
| November 10, 2023 | CASH WITHDRAWAL | $17,000.00 |
| November 13, 2023 | Zelle Instant to PETER ALEXOPOULOS | $100.00 |
| November 13, 2023 | Transfer to GEICO | $148.06 |
| November 13, 2023 | Transfer to GEICO | $158.70 |
| November 13, 2023 | CASH WITHDRAWAL | $3,000.00 |
| November 20, 2023 | Transfer to VENMO | $260.00 |
| November 22, 2023 | Zelle Instant to DEEVS | $6,346.00 |
| November 24, 2023 | Transfer to VENMO | $260.00 |
| November 27, 2023 | Transfer to Centaur Account Ending in -8746 | $11.50 |
| **TOTAL**[9] | | **$128,177.26** |

[9] The total outgoing transfers from Triton account ending in -3011, after service of the Debtors' Citations, is shown in the account statements from US Bank attached hereto as **Group Exhibit 16**.

(Group Ex. 2.) Once again, and while under court order(s) to not dissipate assets, Tsaparas and/or Alexopoulos transferred no less than **$128,177.26** (including $37,500 in cash) from the Triton account ending in -3011.

## IV. NHC Believes that Tsaparas and/or Alexopoulos Are in Possession of Large Sums of Cash and/or Are Spending Cash in Violation of The Debtors' Citations' Restraining Provision(s) and Numerous Court Orders

18. At the September 30, 2024 show cause hearing, the Court indicated that if NHC thought there was "something in the knipple[10] out there . . . then tell [the Court] to tell them [the Debtors] to disclose it, and we'll figure it out." (Ex. 17 at 21:20, 25; 22:1.)

19. As set forth in greater detail in NHC's separately filed motions with respect to Tsaparas and counsel's misstatements concerning Centaur's cessation of operations and purported lack of records after 2019, between February 16, 2021 and February 24, 2023, Centaur/Tsaparas/Alexopoulos withdrew no less than $1,271,157.38 **in cash** from Centaur's various bank accounts (that NHC is aware of). (Dkt. No. 592 at ¶ 25.) Since May 5, 2023, Spiro has individually withdrawn no less than $142,320.15 *in cash*. (*Id*.) Now, we have additional information as to additional cash withdrawals taken via the Triton account. No records have been provided regarding what, if anything, was done with that cash.

## LEGAL STANDARD

20. "Courts independently must be vested with power to impose . . . submission to their lawful mandates . . . ." *Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 831 (1994) (internal quotations omitted). One of the most important powers exercised by a court is the power to punish contempt of a court order. *Autotech Tech. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 744 (7th Cir. 2007). A court is vested with broad discretion to enforce its decrees in a

---

[10] The Court went on to define a "knipple" as a Yiddish term denoting a "little box that you hid under the floor that has the cash in it." (Ex. 17 at 21:22-24.)

contempt proceeding and fashion contempt remedies, the purpose of which is to secure compliance with prior court orders. *F.T.C. v. Trudeau*, 579 F.3d 754, 771 (7th Cir. 2009).

21.     Fed. R. Civ. P. 69 incorporates into federal law state post-judgment enforcement procedures. The incorporated state procedures in this district are Section 2-1402 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1402) and Illinois Supreme Court Rule 277, the state statutes and rules governing supplementary procedures. Thus, included within Fed. R. Civ. P. 69 is the court's authority to enter orders in these supplemental citation proceedings to discover assets to apply to the judgment. *See GE Betz, Inc. v. Zee Co.*, 718 F.3d 615 (7th Cir. 2013). As set forth in 735 ILCS 5/2-1402(f)(1), a "court may punish any party who violates the restraining provision of a citation as and for a contempt." Similarly, Illinois Supreme Court Rule 277(h) provides as follows: "**Sanctions**. Any person who fails to obey a citation, subpoena, or order or other direction of the court issued pursuant to any provision of this rule may be punished for contempt."

## ARGUMENT

## I.     THIS COURT SHOULD ISSUE RULES TO SHOW CAUSE AGAINST TSAPARAS AND ALEXOPOULOS

If not already clear based on the lengthy history of this case, it is now beyond reasonable dispute that neither Tsaparas nor Alexopoulos has any regard for their obligations as imposed by the Debtors' Citations and no respect for this Court's orders. This Court has already made multiple attempts to ensure compliance with its orders, only a small sampling of which are detailed herein.

*First*, on April 23, 2024, the Court found that Tsaparas "made numerous transfers in violation of the citation and the lien imposed by the citation. The total of those is in the neighborhood of $400,000." (Ex. 1, at 5:3-6.) The Court further found that Tsaparas had "committed contempt of court about three dozen times" by systematically violating the lien imposed by the Citation to Discover Assets served on Tsaparas. (*Id*. at 8:1-2).) Despite this public

finding of contempt, Tsaparas continued to dissipate his assets. (*See* Dkt. No. 437, ¶¶ 10-11.) Incredibly, the *very next day* Tsaparas initiated a $4,000 transfer to his attorneys at Amundsen Davis.

*Second*, on July 12, 2024, the Court ordered Tsaparas to pay $25,000 monthly installments starting on July 30, 2024, as a sanction for his earlier contempt. (Dkt. No. 459, at 3.) That *very same day*, Tsaparas withdrew $7,000 in cash that has never been accounted for or turned over to NHC. Tsaparas failed to make his first monthly installment payment. In fact, Tsaparas has never paid a single penny toward the court-ordered monthly installments—despite living in a multimillion-dollar mansion and routinely jet-setting around the globe.

In that same July 2024 Contempt Order, the Court ordered Alexopoulos to pay $10,000 monthly installments starting on July 30, 2024, as a sanction for his earlier contempt. (Dkt. No. 459, at 8.) Alexopoulos failed to make his first monthly installment payment. Like Tsaparas, Alexopoulos has never paid a single penny toward the court-ordered monthly installments. Alexopoulos' monthly filings demonstrate he continues to pay other creditors and/or make payments for his living expenses as if this Judgment, the Alexopoulos Citation's restraining provision, and/or the July 2024 Contempt Order did not exist. By way of example, see Alexopoulos' most recent monthly submission regarding his income and expenditures. (Dkt. No. 610.) Alexopoulos concedes he is (and has been) routinely spending money in violation of the prohibition against doing so. There is no exception and/or rule that allows him to do so. *See, e.g., Chi. Reg'l Council of Carpenters Pension Fund v. Van Der Laan (In re Van Der Laan)*, 556 B.R. 366, 379 (Bankr. N.D. Ill. 2016) (debtor cannot simply choose to pay one creditor over a judgment creditor when citation in place).

In short, the Judgment Debtors have made it clear that public findings of contempt and monetary sanctions are not effective. They consistently ignore them or circumvent them through use of other entities and/or persons acting at their direction. More is needed to compel compliance.

## II.    THIS COURT SHOULD ORDER TRITON AND JUDGMENT DEBTORS TO PROVIDE A DETAILED ACCOUNTING OF TRITON CASH TRANSACTIONS DURING THE PENDENCY OF THIS LITIGATION

Besides the impermissible transfers from the Triton account noted above, NHC is also presently aware (NHC is *still* working to obtain complete bank records given Judgment Debtors' refusal to produce documents as required) that Judgment Debtors have used Triton to funnel well over $2 million during the pendency of this litigation. (**Ex. 18**.) This includes, but is not limited to, near-daily cash withdrawals from an *ATM located in Greece* during the period of June to December 2020. (**Group Ex. 19**.) This, coupled with other information regarding Judgment Debtors' transfer of property and/or cash oversees (and/or M. Sourcing alleged business in Greece) is troubling to say the least.

A court can order a judgment debtor to provide an accounting of "all cash he has received or . . . possessed," and may also make the judgment debtor liable for the costs the judgment creditor incurred in bringing a motion for an accounting. *W. Bend Mut. Ins. Co. v. Belmont State Corp.*, 2010 WL 5419061, at *13 (N.D. Ill. Dec. 23, 2010), *aff'd*, 712 F.3d 1030 (7th Cir. 2013); *cf. Resol. Tr. Corp. v. Ruggiero,* 994 F.2d 1221, 1224 (7th Cir. 1993) (discussing district court's granting of an accounting in connection with 1402 citation proceedings)*; cf. Shales v. Lanas Const., Inc.*, 2010 WL 3842362, at *2 (N.D. Ill. Sept. 24, 2010) (Kennelly, J.). In its July 2024 Contempt Order, this Court already ordered Judgment Debtors to submit "an accounting under penalty of perjury listing monthly income and expenditures," yet NHC has never seen details of how certain cash that was pilfered was spent. NHC has no idea how the Triton cash detailed herein was spent. Either the cash has NOT been spent, or it has been spent subject to NHC's lien on the same.

13

As detailed in the record of this case, Judgment Debtors (whether individually or in connection with their roles with Centaur and/or Triton) have taken out massive sums of cash during the period leading up the Judgment—and in the period after entry of Judgment when strictly forbidden from doing so. Judgment Debtors are either sitting on a very large "knipple," or they have covertly transferred this cash in an attempt to circumvent payment obligations to NHC. Either way, NHC is entitled to know what happened so that it might pursue any and all remedies.

III. **THIS COURT SHOULD ORDER JUDGMENT DEBTORS TO IMMEDIATELY TURN OVER ALL CASH WITHDRAWN SINCE SERVICE OF THE JUDGMENT DEBTORS' CITATIONS OR SHOW CAUSE WHY SUCH IS NOT POSSIBLE**

Once a judgment creditor discovers assets in the hands of the judgment debtor and/or a third party, a court may order the judgment debtor or third party to deliver those assets to the judgment creditor to satisfy the judgment. 735 ILCS 5/2-1402(a); *Ericksen v. Rush Presbyterian St. Luke's Med. Ctr.*, 682 N.E.2d 79, 84 (1st Dist. 1999). 735 ILCS 5/2–1402 is "construed liberally" and vests courts with "broad powers to compel the application of discovered assets or income to satisfy a judgment." *Broaddus v. Shields*, 2012 WL 1144664, at *2 (N.D. Ill. Apr. 5, 2012) (internal quotations omitted). It follows that a court may "'summarily compel the application of discovered assets to satisfy a judgment.'" *Joseph Stephens & Co. v. Cikanek*, 588 F. Supp. 2d 870, 872 (N.D. Ill. 2008) (quoting *Society of Lloyd's v. Est. of McMurray*, 274 F.3d 1133, 1135 (7th Cir. 2001)). Judgment Debtors have withdrawn large sums of cash through Triton and not provided evidence that those funds have been spent. This Court should order Judgment Debtors to immediately turn over those funds to NHC in partial satisfaction of the Judgment or explain (in detail) why that is not possible.

WHEREFORE, and given Judgment Debtors' recalcitrance and for the above and foregoing reasons, NHC LLC respectfully requests that this Court (i) find Judgment Debtors in civil contempt of court, (ii) issue a bench warrant for the arrest of Judgment Debtors and jail

Judgment Debtors for a sufficient time in order to ensure compliance with this Court's orders and the Debtors' Citations,[11] (iii) order Judgment Debtors to pay to NHC the additional amounts detailed herein that they dissipated in violation of the Debtors' Citations, (iv) forbid Judgment Debtors from using cash moving forward, unless they obtain and produce legitimate receipts for each *permitted* transaction, (v) order Judgment Debtors to pay the balance of the Judgment in monthly installments in the amount of at least $25,000.00 (without prejudice to NHC's right to continue to locate and/or recover any assets available to satisfy the judgment), (vi) award NHC its reasonable attorneys' fees in preparing and arguing this motion, (vii) order Judgment Debtors to provide a full and accurate accounting of all cash transactions for themselves and/or Triton, (viii) order Judgment Debtors to turn over all cash withdrawn from Triton in violation of the Debtors' Citation since service of the Debtors' Citation, and (ix) grant NHC such other, further, or additional relief in its favor and against Judgment Debtors as this Court deems fair, just and equitable.

---

[11] When a court finds that a party has not complied with an order, the court may employ both coercive and compensatory sanctions. *See United States v. United Mine Workers of America*, 330 U.S. 258, 303-04 (1947). A court has significant discretion to determine an appropriate sanction to coerce compliance with its order, though the court must "consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Id*. at 304. A court has the inherent power "to coerce obedience to its orders by summarily holding a recalcitrant person . . . in civil contempt and then imprisoning him until he complies." *In re Crededio*, 759 F.2d 589, 590 (7th Cir. 1985) (quotation omitted).

Dated:  April 24, 2025                Respectfully submitted,

NHC LLC

By:  /s/ *Zachary J. Watters*
                      One of Its Attorneys

Daniel P. Jackson, Bar No. 6289813
Bryan K. Clark, Bar No. 6296090
Zachary J. Watters, Bar No. 6310675
Allison E. Czerniak, Bar No. 6319273
Keeley A. Sawyer, Bar No. 6336704
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T:  +1 312 609 7500
djackson@vedderprice.com
bclark@vedderprice.com
zwatters@vedderprice.com
aczerniak@vedderprice.com
ksawyer@vedderprice.com

Gini S. Marziani, Bar No. 3127421
Davis McGrath LLC
125 S. Wacker Drive
Chicago, Illinois 60606
T:  +1 312 332 3033
gsmarziani@davismcgrath.com

## DECLARATION OF ZACHARY J. WATTERS

Zachary J. Watters, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury under the laws of the United States of America that: (i) he is one of the attorneys for Plaintiff/Judgment Creditor in the pending lawsuit styled as *NHC LLC v. Centaur Constr. Co., et al.* (N.D. Ill. Case No. 19 C 6332) (the "Lawsuit"); (ii) he has read the foregoing motion being filed in the Lawsuit simultaneously with this Declaration and knows the contents thereof; (iii) the statements set forth therein are true and correct to the best of his knowledge, information, and belief; and (iv) the sources of his information and the grounds of his knowledge, information, and belief are his personal involvement in the Lawsuit and his review of relevant documents and files concerning the Lawsuit, including those documents attached as exhibits to the motion.

Executed on April 24, 2025

*/s/  Zachary J. Watters*
    Zachary J. Watters

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 24, 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system and thereby served electronically by the CM/ECF system on all counsel of record.

*/s/  Zachary J. Watters*
An Attorney for NHC LLC
