**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NHC LLC, a Florida limited liability company, | |
| Plaintiff, | |
| v. | No. 19-cv-06332 |
| CENTAUR CONSTRUCTION COMPANY INC., an Illinois corporation, SPIRO TSAPARAS, and PETER ALEXOPOULOS, | Honorable Matthew F. Kennelly |
| Defendants. | |

**PLAINTIFF/JUDGMENT CREDITOR'S MOTION TO HOLD
DEFENDANTS/JUDGMENT DEBTORS SPIRO TSAPARAS, PETER ALEXOPOULOS,
AND CENTAUR CONSTRUCTION COMPANY INC. IN CONTEMPT**

Plaintiff/Judgment Creditor, NHC LLC ("NHC"), by its undersigned counsel and pursuant to 18 U.S.C. § 401, 28 U.S.C. § 1927, Fed. R. Civ. P. 69, Illinois Supreme Court Rule 277(h), and the Court's inherent authority, respectfully moves this Court to hold Defendants/Judgment Debtors Spiro Tsaparas ("Mr. Tsaparas"), Peter Alexopoulos ("Mr. Alexopoulos"), and Centaur Construction Company Inc. ("Centaur") in contempt of court for violating the Court's Memorandum Opinion and Order entered on May 30, 2025 with respect to Mr. Tsaparas (Dkt. No. 682) and Memorandum Opinion and Order entered on May 30, 2025 with respect to Centaur (Dkt. No. 683) (collectively, the "Court's Orders"). In support hereof, NHC states as follows:

**RELEVANT FACTS AND PROCEDURAL BACKGROUND**

1.     After a jury trial, judgment was entered against defendants/judgment debtors Mr. Tsaparas, Mr. Alexopoulos, and Centaur (collectively, "Judgment Debtors") jointly and severally in the total amount of $22,272,124.34 for fraud and breach of contract plus punitive

damages against the defendants individually and in particular Mr. Tsaparas in the amount of $1,500,000.00. (Dkt. No. 228.)

2. Following entry of the judgment, NHC has made repeated efforts to collect the monies it is owed. Those efforts have been stymied by repeated misconduct from Judgment Debtors and various third-parties affiliated with Judgment Debtors.

3. A *portion* of Judgment Debtors' misconduct was addressed in two previous filings relevant to this Motion: (i) Plaintiff/Judgment Creditor's Motion for Rule to Show Cause as to Why Spiro Tsaparas Should Not be Held in Contempt (Dkt. No. 592); and (ii) Plaintiff/Judgment Creditor's Motion for Rule to Show Cause as to Why Centaur Construction Company Inc. Should Not be Held in Contempt (Dkt. No. 590). Following fulsome briefing, on May 30, 2025, the Court granted both motions and ordered the following relief:

(a) Mr. Tsaparas "must disclose and account for, by no later than 14 days from entry of this order, all cash transactions for himself and/or Centaur from January 1, 2019 to the present" (Dkt. No. 682);

(b) Mr. Tsaparas "must turn over all cash withdrawn in violation of the citation since he was served with it, by no later than 14 days from entry of this order" (*Id*.);

(c) Mr. Tsaparas "must pay the balance of the judgment in monthly installments in the amount of at least $25,000" (*Id*.);

(d) Centaur must transfer to NHC "servers that may contain documents relating to Centaur's business operations or, if Centaur no longer has control or access to these servers, the production of information regarding where the servers are located and who controls them, and a grant of authority to NHC to access these servers" (Dkt. No. 683);

(e)     Centaur must provide "an accounting of all of Centaur's incoming and outgoing payments (including loans and repayments of debt) from January 1, 2020 to present" (*Id*.); and

(f)     Centaur must pay "any amounts revealed in the newly produced documents and/or in the accounting to have been dissipated or improperly transferred" (*Id*.).

4.     To date, Mr. Tsaparas and Centaur have failed to comply with the Court's Orders.

5.     In an effort to avoid motion practice, on June 17, 2025, counsel for NHC sent Mr. Tsaparas and Mr. Alexopoulos an e-mail reminding them of Mr. Tsaparas' and Centaur's respective obligations pursuant to the Court's Orders.[1]  (Ex. 1.)  The e-mail requested that Mr. Tsaparas or Mr. Alexopoulos confirm whether or not Mr. Tsaparas and Centaur intended to comply with the Court's Orders.  (*Id*.)  Additionally, the e-mail provided Mr. Tsaparas with a consent for release of files directed to Box (one of the entities in control of servers containing documents relating to Centaur's business operations) and a request to confirm that Microsoft[2] was or is the host server for Centaur's e-mail accounts.  (*Id*.)

6.     On June 17, Mr. Alexopoulos responded to the e-mail from counsel for NHC stating that he had received the e-mail and will "reply in short order."[3]  (Ex. 2.)  To date, Mr. Alexopoulos has not provided a substantive response or further reply.[4]  (Ex. 3 ¶ 9.)

---

[1] Attached hereto as **Exhibit 1** is a true and correct copy of an e-mail dated June 17, 2025, sent by the undersigned to Mr. Tsaparas and Mr. Alexopoulos.

[2] Notably, and although required to provide this information *long* ago, Judgment Debtors never disclosed the existence and/or identity of Microsoft as the current/previous host of Centaur's e-mail servers.  NHC spent significant time and resources investigating the same and eventually obtained information confirming its suspicions from Deanna Van Senus, Mr. Tsaparas' assistant.

[3] Attached hereto as **Exhibit 2** is a true and correct copy of an e-mail dated June 17, 2025, sent by Mr. Alexopoulos to counsel for NHC.

[4] Attached hereto as **Exhibit 3** is a true and correct copy of the Declaration of Zachary J. Watters which complies with the obligations of L.R. 37.1(a).

3

7.     On June 22, 2025,[5] Mr. Tsaparas provided a substantive response to the June 17 e-mail.[6]  (Ex. 4.)  Mr. Tsaparas' response is lengthy, but not complex.  In short, Mr. Tsaparas continually asserts that he is unwilling or unable to comply with the Court's Orders.  (*Id.*)

## LEGAL STANDARD

8.     "Courts independently must be vested with power to impose . . . submission to their lawful mandates . . . ."  *Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 831 (1994) (internal quotations omitted).  One of the most important powers exercised by the Court is the power to punish contempt of a Court order.  *Autotech Tech. LP v. Integral Rsch. & Dev. Corp.*, 499 F.3d 737, 744 (7th Cir. 2007).  The Court is vested with broad discretion to enforce its decrees in a contempt proceeding and fashion contempt remedies, the purpose of which is to secure compliance with prior court orders.  *F.T.C. v. Trudeau*, 579 F.3d 754, 771 (7th Cir. 2009).  The Seventh Circuit Court of Appeals in *U.S. S.E.C. v. Hyatt* found that "the Federal Rules of Civil Procedure have simplified motion practice and largely eliminated the need to seek show-cause orders."  621 F.3d 687, 695 (7th Cir. 2010).  Instead, "[c]ivil contempt proceedings may be initiated by notice and motion."  *Id.*

9.     When a court finds that a party has not complied with an order, the court may employ both coercive and compensatory sanctions.  *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947).  A court has significant discretion to determine an appropriate sanction to coerce compliance with its order, though the court must "consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any

---

[5] Prior to providing a substantive response, Mr. Tsaparas contacted the undersigned and requested that he be provided until June 22, 2025 in order to fully address his and Centaur's compliance with the Court's Orders.  NHC agreed to this request.

[6] Attached hereto as **Exhibit 4** is a true and correct copy of an e-mail dated June 22, 2025, sent by Mr. Tsaparas to the undersigned.

suggested sanction in bringing about the result desired." *Id*. at 304. A court has the inherent power "to coerce obedience to its orders by summarily holding a recalcitrant person . . . in civil contempt and then imprisoning him until he complied." *In re Crededio*, 759 F.2d 589, 590 (7th Cir. 1985) (quotation omitted).

## **ARGUMENT**

10.     Mr. Tsaparas and Centaur (acting through Mr. Tsaparas and Mr. Alexopoulos)[7] have steadfastly and consistently refused to satisfy the judgment or comply with this Court's Orders. Unfortunately, it has become clear that Mr. Tsaparas and Mr. Alexopoulos (either individually or as principals of Centaur) have no regard for their obligations as imposed by this Court.

11.     Although the Court's Orders did not explicitly direct any single individual to take action on behalf of Centaur, as the corporate officers of Centaur Mr. Tsaparas and Mr. Alexopoulos were obligated to obey this Court's Orders and ensure Centaur was in compliance. *See Laborers' Pension Fund v. A&C Env't., Inc.*, 2005 U.S. Dist. LEXIS 7892, at *6 (N.D. Ill Apr. 19, 2005) ("Under Illinois law, corporate officers are obligated to obey judicial orders directed at their corporations, and are liable when they permit the corporation to make non-exempt payments in violation of the citation") (citations and quotations omitted); *Shales v. T. Manning Concrete, Inc.*, 847 F. Supp. 2d 1102, 1117 (N.D. Ill. 2012) (finding president of corporate debtor is "personally liable" for the conduct of the corporate debtor).

12.     NHC has met its burden of establishing a *prima facie* showing of contempt with respect to Mr. Tsaparas and Centaur's failure to comply with the Court's Orders.

---

[7] Mr. Tsaparas and Mr. Alexopoulos were the principals of Centaur. (Ex. 5 at 6:12-13.) Attached hereto as **Exhibit 5** is a true and correct copy of portions of the jury trial transcript from August 16, 2022 (Volume 3-B).

13.    In order to make such a showing NHC must demonstrate that: (i) the Court's Orders set forth an unambiguous command; (ii) Mr. Tsaparas and Centaur violated those commands; (iii) the violations were significant (meaning that neither Mr. Tsaparas or Centaur substantially complied with the Court's Orders); and (iv) Mr. Tsaparas and Centaur failed to take steps to reasonably and diligently comply with the Court's Orders. *See Teledyne Techs., Inc. v. Shekar*, 2015 U.S. Dist. LEXIS 78224, at *12–13 (N.D. Ill. June 17, 2015) (citing *F.T.C. v. Trudeau*, 579 F.3d 754, 763 (7th Cir. 2009)); *see also Country Mut. Ins. Co. v. Hilltop View, LLC*, 2014 IL App (4th) 140007, ¶ 26 (applying Illinois law and finding that a "party's failure to comply with a court order is *prima facie* evidence of contempt.") (citation omitted).

14.    *First*, the Court's Orders clearly set forth Mr. Tsaparas' and Centaur's obligations with regard to certain disclosures, payments, and providing access to various documents and information.  (Dkt. Nos. 682–83.)  Mr. Tsaparas' June 22 e-mail confirms this.  At no point in his multi-page e-mail does Mr. Tsaparas claim that the Court's Orders are unclear or that he does not understand his or Centaur's obligations.  (Ex. 4.)  Similarly, Mr. Alexopoulos' e-mail contains no assertion that the Court's Orders are unclear or that he does not understand his obligations as a principal of Centaur.  (Ex. 2.)

15.    *Second*, Mr. Tsaparas and Centaur violated the Court's Orders by failing to make the required disclosures, payments, or providing access to various documents and information. (Ex. 3 at ¶¶ 6–7.)  Again, Mr. Tsaparas' June 22 e-mail confirms this.  (Ex. 4.)  Similarly, Mr. Alexopuolos' e-mail does not assert that Centaur has complied with the Court's Orders.  (Ex. 2.)

16.    *Third*, Mr. Tsaparas and Centaur's violations of the Court's Orders are significant. Neither Mr. Tsaparas or Centaur have complied with *any* of their obligations.  Put simply, NHC has not received: (i) an accounting of any of the cash withdrawals made by Mr. Tsaparas or the

incoming and outgoing payments of Centaur; (ii) any payments from Mr. Tsaparas or Centaur; or (iii) access to the documents and communications of Centaur which are currently housed on the private servers of third-parties. (Ex. 3 at ¶ 7.)

17.     *Finally*, there is no evidence that Mr. Tsaparas or Centaur made a serious (let alone any) attempt to comply with the Court's Orders. For efficiency, NHC has grouped the portions of the Court's Orders which Mr. Tsaparas and Centaur have failed to comply with and provided an analysis of the rationale contained in Mr. Tsaparas' June 22 e-mail regarding his and Mr. Alexopoulos' non-compliance with those portions of the Court's Orders.

> *Mr. Tsaparas "must disclose and account for, by no later than 14 days from entry of this order, all cash transactions for himself and/or Centaur from January 1, 2019 to the present" (Dkt. No. 682)*

> *Centaur must provide "an accounting of all of Centaur's incoming and outgoing payments (including loans and repayments of debt) from January 1, 2020 to present" (Dkt. No. 683)*

18.     In response to these portions of the Court's Orders requiring Mr. Tsaparas (both personally and on behalf of Centaur) to account for the voluminous number of improper cash withdrawals, Mr. Tsaparas asserts that "full and complete compliance" is not "practically possible." (Ex. 4.)[8] Specifically, Mr. Tsaparas states that he does not have access to the necessary bank statements and that he may no longer recall the purpose of his various improper cash withdrawals. (*Id.*) Neither excuse is credible.

19.     As an initial matter, the bank statements at issue are for accounts in Mr. Tsaparas' name or under his control (as a co-owner of Centaur, along with Mr. Alexopoulos). There is no basis to believe that Mr. Tsaparas or Mr. Alexopoulos do not have in their possession, or could not

---

[8] For his part, Mr. Alexopoulos provides no purported explanation for Centaur's failure to comply with the Court's Orders. (Ex. 2.)

easily obtain, the necessary bank statements.[9]  *See Nalco Co. v. Chen*, 2018 U.S. Dist. LEXIS 17243, at *6–7 (N.D. Ill. Feb. 2, 2018) (judgment debtor ordered to turn over assets in foreign bank accounts after judgment debtor failed to comply with order compelling production of bank statements and contempt order failed to coerce compliance).  Moreover, many of the relevant bank statements have been filed with the Court and thus provided to Mr. Tsaparas and Mr. Alexopoulos. (*See* Dkt. Nos. 592-2, 592-3, 592-4, 592-11, and 592-12.)[10]

20.    With regard to the obligation to account for the cash transactions, it is not credible that neither Mr. Tsaparas nor Mr. Alexopoulos can provide information regarding the significant number of withdrawals that took place.  For example, on June 1, 2022, either Mr. Tsaparas or Mr. Alexopoulos withdrew $299,668.40 from Centaur's bank account.  (Dkt. No. 590-19 at 64.) As an initial matter, the amount of this withdrawal is of such significance that it is beyond reasonable contention Judgment Debtors would have no recollection of the withdrawal or its purpose.  Moreover, the amount of the withdrawal is not a round figure and the specificity of the figure provides all the more reason to believe that Mr. Tsaparas or Mr. Alexopoulos knew exactly what this was for and to whom the funds were provided.  By way of an additional example, in June

---

[9] In his June 22 e-mail, Mr. Tsaparas states that he will travel to "the bank" and request printed statements on Monday, June 23.  (Ex. 4.)  Mr. Tsaparas also promised that he would "report back" with the "results of that request" by noon on June 23.  (*Id.*)  To date, Mr. Tsaparas has not provided any report of his efforts to obtain the bank statements.  (Ex. 3 at ¶ 11.)  Nor has Mr. Tsaparas provided any explanation as to any other steps he has taken to comply.  For example, he could easily assess and review e-mails, text messages, and other communications that detail withdrawals from his personal and Centaur bank accounts.  NHC has learned from various third-parties that Mr. Tsaparas frequently communicated about his cash withdrawals and the purpose for those withdrawals.  For example, in a text message exchange on July 28, 2023, with his assistant, Ms. Van Senus, Mr. Tsaparas stated: "Took $4,500 cash 2,400 to Vivi for this and next week $1,200 to Corri for last week Vivi  $900 cash to have with me for next week."  (Ex. 6.)  Attached hereto as **Exhibit 6** is a true and correct copy of portions of a text message conversation between Mr. Tsaparas and Ms. Van Senus.

[10] Exhibits 11 and 12 to Plaintiff/Judgment Creditor's Motion for Rule to Show Cause as to Why Spiro Tsaparas Should Not be Held in Contempt (Dkt. Nos. 592-11 and 592-12) are not bank statements. However, they contain summary information derived from bank statements and identify dates and amounts of cash withdrawals made from Mr. Tsaparas' and Centaur's accounts.

2024, in just two transactions Mr. Tsaparas withdrew $9,800 *in cash* from his *personal bank account*. (Dkt. No. 592 at 6.) Similarly, in July 2024, in just five transactions Mr. Tsaparas withdrew $13,700 *in cash* from his *personal bank account*. (*Id*.) Withdrawing $23,500 in cash over a two month period is not merely "walking around" money used to pay everyday expenses. These significant cash withdrawals, and the other similar cash withdrawals, were made for a specific purpose. Mr. Tsaparas and Centaur were ordered to account for these payments and have failed to do so.

> Mr. Tsaparas "must turn over all cash withdrawn in violation of the citation since he was served with it, by no later than 14 days from entry of this order" (Dkt. No. 682)

> Mr. Tsaparas "must pay the balance of the judgment in monthly installments in the amount of at least $25,000" (Id.)

> Centaur must pay "any amounts revealed in the newly produced documents and/or in the accounting to have been dissipated or improperly transferred" (Dkt. No. 683)

21.     In response to these portions of the Court's Orders requiring Mr. Tsaparas and Centaur to make various payments to NHC, Mr. Tsaparas asserts, without any support, that he has no funds to turn over. (Ex. 4.) However, as the Court has already recognized, Mr. Tsaparas "has made, and failed to disclose, more than $142,000 in personal cash withdrawals" and "more than $1.2 million" in cash withdrawals from Centaur's bank accounts. (Dkt. No. 682 at 5.) Moreover, as noted above, Mr. Tsaparas has failed to account for these cash withdrawals despite being under Court order to do so. At this point, the Court cannot take Mr. Tsaparas' word that he no longer has access to the more than $1.3 million in cash which was improperly withdrawn.

22.     On May 30, 2025, Mr. Tsaparas was ordered to make "monthly" installment payments of at least $25,000. (*Id*.) However, Mr. Tsaparas made no payment at all during the month of June, 2025. (Ex. 3 at ¶ 7.) Mr. Tsaparas failed to make even a partial payment despite

receiving, upon information and belief, $28,333.35 in *gross* monthly income based on his employment with M Sourcing, LLC. (Dkt. No. 699 at ¶ 2.) Mr. Tsaparas provides no explanation for why he has failed to utilize his monthly income to at least partially comply with the Court's Orders. Instead, Mr. Tsaparas continues to prioritize the payment of other purported debts (specifically to various taxing authorities) over his obligations to NHC and compliance with the Court's Orders.

> *Centaur must transfer to NHC "servers that may contain documents relating to Centaur's business operations or, if Centaur no longer has control or access to these servers, the production of information regarding where the servers are located and who controls them, and a grant of authority to NHC to access these servers" (Dkt. No. 683)*

23.  In response to this portion of the Court's Orders, Mr. Tsaparas has taken two different, but equally non-compliant approaches.

24.  First, after NHC spent significant time and resources to identify Box as a server of documents relating to Centaur's business operations and provided Mr. Tsaparas and Mr. Alexopoulos with a release to allow them to comply with the Court's Order, Mr. Tsaparas *refused to execute the release*. (Ex. 4.) The shifting positions of Mr. Tsaparas and Centaur is nothing short of remarkable. For months, Centaur has taken the knowingly false position that it ceased operations in 2019 and thus no documents regarding its operations could exist. (Dkt. No. 683 at 5.) Recently, however, Centaur has conceded that it did continue to operate for several years after 2019, but continued to claim that no responsive documents existed. (*Id.*) Now, however, Mr. Tsaparas has conceded that documents do exist on a server controlled by Box. (Ex. 4.) According to Mr. Tsaparas, although he "does not recall the contents" of the Box server he believes that many of the documents on the server are irrelevant, privileged, or confidential. (*Id.*) The time for

Centaur to raise concerns regarding relevance, privilege, or confidentiality has long since passed. This new position is simply the latest in a series of delays designed to obfuscate and obstruct.

25.    Second, with respect to Centaur's e-mail servers, after the applicable deadline set by the Court (and only after NHC confronted him with information based on its own independent investigation) Mr. Tsaparas confirmed NHC's belief that Centaur's e-mail severs were hosted by Microsoft.  (Ex. 4.)  However, Centaur has not provided NHC with access to the Microsoft Server or a grant of authority to permit NHC to access the Microsoft Server.  (Ex. 3 at ¶ 7.)  Instead, Mr. Tsaparas assets, again without any support, that the contents of the e-mail server were deleted "due to prolonged inactivity and nonpayment."[11]  (Ex. 4.)  In other words, Centaur has again taken the position that no documents are available.  Centaur has no support, and no credibility.  As a result, NHC cannot be forced to merely take Centaur at its word.

26.    Ultimately, Mr. Tsaparas and Mr. Alexopoulos have ignored Mr. Tsaparas' personal obligations and Centaur's obligations under the Court's Orders by failing to provide: (i) an accounting of any of the cash withdrawals made by Mr. Tsaparas or the incoming and outgoing payments of Centaur; (ii) any payments from Mr. Tsaparas or Centaur; or (iii) access to the documents and communications of Centaur which are currently housed on the private servers of third-parties.  (Ex. 3 at ¶ 7.)  As the Court is well aware, this is not the first instance where Mr. Tsaparas and Mr. Alexopoulos have failed to abide by this Court's Orders.  Recognizing this reality, the Court ordered that Centaur will incur a financial penalty of $1,000 for each day Centaur continues to fail to produce responsive documents.  (Dkt. No. 683 at 7.)  As the Court stated, such a financial penalty has "a significant potential to coerce compliance with this Court's orders."  (*Id.*)

---

[11] NHC reasonably believes this statement to be knowingly false.  By way of example, a third-party has provided NHC with October 2023, e-mail communications with Mr. Tsaparas at his @centaur.com e-mail address.  (Ex. 7.)  Attached hereto as **Exhibit 7** is an October 28, 2023, e-mail including Mr. Tsaparas at his @centaur.com e-mail address.

Unfortunately, that potential appears unrealized. The financial penalty has been in effect since June 16, 2025. (*Id.*) Despite this, no records have been produced. Put simply, financial penalties appear to have no impact on Mr. Tsaparas, Mr. Alexopoulos, or Centaur.

27.     As a result, and based on Mr. Tsaparas' and Mr. Alexopoulos' refusal to obey the Court's Orders, NHC requests that the Court issue a bench warrant for the arrest of Mr. Tsaparas and Mr. Alexopoulos and jail both for a sufficient time in order to ensure compliance with this Court's Orders. NHC is aware it has made this request in the past and that the Court has declined to grant it. NHC does not renew this request lightly. In short, NHC sees no other means by which to compel Mr. Tsaparas or Mr. Alexopoulos to comply with this Court's Orders directed at Mr. Tsaparas (personally) or Centaur. *See First Chi. Bank & Tr. v. Zausa*, 2012 IL APP (3d) 110651-UB, ¶¶ 26–28 (finding trial court's imposition of a jail sentence not to exceed 30 days for judgment debtor was properly categorized as "indirect civil contempt" and concluding that the trial court must amend the order "to reflect a continuing and indeterminate sentence, which provides that defendant can purge himself of the contempt").

28.     Additionally, NHC requests that the Court order Mr. Tsaparas and Centaur to pay NHC's reasonable attorneys' fees in preparing and arguing this Motion.

WHEREFORE, for the above and foregoing reasons, NHC LLC respectfully requests that this Court enter an Order:

(i)     permitting NHC to file a reply in support of its Motion in the event Mr. Tsaparas, Mr. Alexopoulos, or Centaur oppose this Motion;

(ii)     issuing a bench warrant for the arrest of Mr. Tsaparas and Mr. Alexopoulos and jailing Mr. Tsaparas and Mr. Alexopoulos for a sufficient time in order to ensure compliance with the Court's Orders;

(iii)     requiring Mr. Tsaparas and Centaur to pay NHC's reasonable attorneys' fees in preparing and arguing this Motion; and

(iv)     granting NHC such other, further or additional relief in its favor and against Mr. Tsaparas, Mr. Alexopoulos, or Centaur as this Court deems fair, just and equitable.

Dated:  June 30, 2025

Respectfully submitted,

NHC LLC

By:  /s/ *Zachary J. Watters*
One of Its Attorneys

Daniel P. Jackson, Bar No. 6289813
Bryan K. Clark, Bar No. 6296090
Zachary J. Watters, Bar No. 6310675
Allison E. Czerniak, Bar No. 6319273
Keeley A. Sawyer, Bar No. 6336704
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T:  +1 312 609 7500
djackson@vedderprice.com
bclark@vedderprice.com
zwatters@vedderprice.com
aczerniak@vedderprice.com
ksawyer@vedderprice.com

Gini S. Marziani, Bar No. 3127421
Davis McGrath LLC
125 S. Wacker Drive
Chicago, Illinois 60606
T:  +1 312 332 3033
gsmarziani@davismcgrath.com

*Counsel for NHC LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 30, 2025, a true and correct copy of the foregoing **PLAINTIFF/JUDGMENT CREDITOR'S MOTION TO HOLD DEFENDANTS/JUDGMENT DEBTORS SPIRO TSAPARAS, PETER ALEXOPOULOS, AND CENTAUR CONSTRUCTION COMPANY INC. IN CONTEMPT** was electronically filed with the Clerk of the Court using the Court's CM/ECF system and thereby served electronically by the CM/ECF system on all counsel of record.

Additionally, I hereby certify that, on June 30, 2025, a true and correct copy the foregoing **PLAINTIFF/JUDGMENT CREDITOR'S MOTION TO HOLD DEFENDANTS/JUDGMENT DEBTORS SPIRO TSAPARAS, PETER ALEXOPOULOS, AND CENTAUR CONSTRUCTION COMPANY INC. IN CONTEMPT** was served on the following *pro se* parties in the manner indicated below:

Spiro Tsaparas
Via e-mail to spiro@msourcingllc.com

Peter Alexopoulos
Via e-mail to peter@srtrainingllc.com

Centaur Construction Company
Via U.S. First Class Mail
Illinois Secretary of State
501 S. Second St., Suite 328
Springfield, IL 62756

/s/  Zachary J. Watters
An Attorney for NHC LLC

# EXHIBIT 1

| From: | Watters, Zachary J. |
|---|---|
| To: | spiro@msourcingllc.com; peter@srtrainingllc.com |
| Cc: | Jackson, Daniel P. |
| Bcc: | {F535382}.VP@vp-mx.imanage.work |
| Subject: | NHC LLC v. Centaur Construction Co., et al. - Case No. 19 C 6332 - Court Ordered Deadlines [VED-VP.FID535382] |
| Date: | Tuesday, June 17, 2025 7:54:30 AM |
| Attachments: | 2025-05-30 [dckt 683_0] Memorandum Opinion And Order(71636465.1).pdf |
| | 2025-05-30 [dckt 682_0] Memorandum Opinion And Order(71636441.1).pdf |
| | Box Release(71851011.1).doc |

Messrs. Tsaparas and Alexopoulos:

We are writing with respect to multiple deadlines in the above-referenced litigation. If you or Centaur Construction Co. ("Centaur") have counsel, please forward this email to that attorney.

On May 30, 2025, the Court issued two Memorandum Opinions and Orders. (Dkt. Nos. 682-83.) We have attached copies of both Orders for your reference. Included in those Orders are several deadlines applicable to Mr. Tsaparas and Centaur for the completion of specific tasks, including:

- Mr. Tsaparas "must disclose and account for, by no later than 14 days from entry of this order, all cash transactions for himself and/or Centaur from January 1, 2019 to the present" (Dkt. No. 682);

- Mr. Tsaparas "must turn over all cash withdrawn in violation of the citation since he was served with it, by no later than 14 days from entry of this order" (Dkt. No. 682);

- Centaur must transfer to NHC "servers that may contain documents relating to Centaur's business operations or, if Centaur no longer has control or access to these servers, the production of information regarding where the servers are located and who controls them, and a grant of authority to NHC to access these servers" (Dkt. No. 683);

- Centaur must provide "an accounting of all of Centaur's incoming and outgoing payments (including loans and repayments of debt) from January 1, 2020 to present" (Dkt. No. 683); and

- Centaur must pay "any amounts revealed in the newly produced documents and/or in the accounting to have been dissipated or improperly transferred" (Dkt. No. 683).

None of these tasks have been completed and the deadline to complete these tasks has lapsed. Because these deadlines were set by the Court, NHC is not empowered to extend or modify the deadlines. On or before Friday, June 20, 2025, please advise if Mr. Tsaparas or Centaur intend to comply with these Orders from the Court and if so, when compliance will occur.

With respect to Centaur's obligation to provide NHC with access to the servers, NHC has spoken with representatives of Box and has confirmed that Box is in possession of a significant number of documents relating to Centaur's business operations. Box has requested that Mr. Tsaparas execute the attached consent to release files, contents, and other records so that Box may release the records to NHC. Please return an executed copy of the attached release on or before Friday, June

20, 2025.

In addition to the documents in the possession of Box, it is NHC's understanding that Microsoft was or is the host server for Centaur's email account(s).  Please confirm if this understanding is accurate on or before Friday, June 20, 2025.  If Microsoft was not or is not the host server for Centaur's email account(s), please provide the name(s) of the entities that hosted and are currently hosting the server for Centaur's email account(s).  Please provide this information on or before Friday, June 20, 2025.

As always, NHC reserves all rights and remedies.

Thank you.

Zach Watters
*Counsel for NHC*


**Zachary J. Watters,** Shareholder

## VedderPrice
222 North LaSalle Street, Chicago, Illinois 60601
T +1 312 609 7594

web | email | offices | biography

# EXHIBIT 2

| | |
|---|---|
| **From:** | Peter Alexopoulos |
| **To:** | Watters, Zachary J. |
| **Cc:** | spiro@msourcingllc.com; Jackson, Daniel P. |
| **Subject:** | [EXT] Re: NHC LLC v. Centaur Construction Co., et al. - Case No. 19 C 6332 - Court Ordered Deadlines [VED-VP.FID535382] |
| **Date:** | Tuesday, June 17, 2025 7:57:19 AM |

Mr Watters. I am in receipt of your email and will review and reply in short order.

Peter Alexopoulos
Founder / Instructor
847.282.2728
peter@srtrainingllc.com
www.srtrainingllc.com

On Jun 17, 2025, at 7:54 AM, Watters, Zachary J. <zwatters@vedderprice.com> wrote:

Messrs. Tsaparas and Alexopoulos:

We are writing with respect to multiple deadlines in the above-referenced litigation. If you or Centaur Construction Co. ("Centaur") have counsel, please forward this email to that attorney.

On May 30, 2025, the Court issued two Memorandum Opinions and Orders. (Dkt. Nos. 682-83.) We have attached copies of both Orders for your reference. Included in those Orders are several deadlines applicable to Mr. Tsaparas and Centaur for the completion of specific tasks, including:

- Mr. Tsaparas "must disclose and account for, by no later than 14 days from entry of this order, all cash transactions for himself and/or Centaur from January 1, 2019 to the present" (Dkt. No. 682);

- Mr. Tsaparas "must turn over all cash withdrawn in violation of the citation since he was served with it, by no later than 14 days from entry of this order" (Dkt. No. 682);

- Centaur must transfer to NHC "servers that may contain documents relating to Centaur's business operations or, if Centaur no longer has control or access to these servers, the production of information regarding where the servers are located and who controls them, and a grant of authority to NHC to access these servers" (Dkt. No. 683);

- Centaur must provide "an accounting of all of Centaur's incoming and outgoing

payments (including loans and repayments of debt) from January 1, 2020 to present" (Dkt. No. 683); and

- Centaur must pay "any amounts revealed in the newly produced documents and/or in the accounting to have been dissipated or improperly transferred" (Dkt. No. 683).

None of these tasks have been completed and the deadline to complete these tasks has lapsed. Because these deadlines were set by the Court, NHC is not empowered to extend or modify the deadlines. On or before Friday, June 20, 2025, please advise if Mr. Tsaparas or Centaur intend to comply with these Orders from the Court and if so, when compliance will occur.

With respect to Centaur's obligation to provide NHC with access to the servers, NHC has spoken with representatives of Box and has confirmed that Box is in possession of a significant number of documents relating to Centaur's business operations. Box has requested that Mr. Tsaparas execute the attached consent to release files, contents, and other records so that Box may release the records to NHC. Please return an executed copy of the attached release on or before Friday, June 20, 2025.

In addition to the documents in the possession of Box, it is NHC's understanding that Microsoft was or is the host server for Centaur's email account(s). Please confirm if this understanding is accurate on or before Friday, June 20, 2025. If Microsoft was not or is not the host server for Centaur's email account(s), please provide the name(s) of the entities that hosted and are currently hosting the server for Centaur's email account(s). Please provide this information on or before Friday, June 20, 2025.

As always, NHC reserves all rights and remedies.

Thank you.

Zach Watters
*Counsel for NHC*


**Zachary J. Watters,** Shareholder

## VedderPrice

222 North LaSalle Street, Chicago, Illinois 60601
T +1 312 609 7594
web | email | offices | biography

---

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, Vedder Price (FL) LLP, which operates in Florida, and Vedder Price Pte. Ltd., which operates in Singapore.

CONFIDENTIALITY NOTE: This e-mail is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this e-mail message is not the intended recipient, or the employee or agent responsible for delivery of the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this e-mail in error, please notify us immediately by telephone at (312) 609-5038 and also indicate the sender's name. Thank you.

d250106us

<2025-05-30 [dckt 683_0] Memorandum Opinion And Order(71636465.1).pdf>
<2025-05-30 [dckt 682_0] Memorandum Opinion And Order(71636441.1).pdf>
<Box Release(71851011.1).doc>

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NHC LLC, a Florida limited liability company, | |
| Plaintiff, | |
| v. | No. 19-cv-06332 |
| CENTAUR CONSTRUCTION COMPANY INC., an Illinois corporation, SPIRO TSAPARAS, and PETER ALEXOPOULOS, | Honorable Matthew F. Kennelly |
| Defendants. | |

**<u>DECLARATION OF ZACHARY J. WATTERS</u>**

1.      I am over the age of majority; of sound mind and memory; and make this Declaration of my own free will.

2.      I have personal knowledge of the facts set forth in this Declaration.  If I was called as a witness, I could competently testify about these facts.

3.      I am counsel of record for Plaintiff/Judgment Creditor NHC LLC ("<u>NHC</u>").

4.      On May 30, 2025, the Court issued a Memorandum Opinion and Order with respect to Spiro Tsaparas ("<u>Mr. Tsaparas</u>") (Dkt. No. 682) and a Memorandum Opinion and Order with respect to Centaur Construction Company Inc. ("<u>Centaur</u>") (Dkt. No. 683) (collectively, the "<u>Court's Orders</u>").

5.      The Court's Orders provided for the following relief:

(a)      Mr. Tsaparas "must disclose and account for, by no later than 14 days from entry of this order, all cash transactions for himself and/or Centaur from January 1, 2019 to the present" (Dkt. No. 682);

(b)     Mr. Tsaparas "must turn over all cash withdrawn in violation of the citation since he was served with it, by no later than 14 days from entry of this order" (*Id.*);

(c)     Mr. Tsaparas "must pay the balance of the judgment in monthly installments in the amount of at least $25,000" (*Id.*);

(d)     Centaur must transfer to NHC "servers that may contain documents relating to Centaur's business operations or, if Centaur no longer has control or access to these servers, the production of information regarding where the servers are located and who controls them, and a grant of authority to NHC to access these servers" (Dkt. No. 683);

(e)     Centaur must provide "an accounting of all of Centaur's incoming and outgoing payments (including loans and repayments of debt) from January 1, 2020 to present" (*Id.*); and

(f)     Centaur must pay "any amounts revealed in the newly produced documents and/or in the accounting to have been dissipated or improperly transferred" (*Id.*).

6.     To date, Mr. Tsaparas and Centaur have failed to comply with the Court's Orders.

7.     NHC has not received: (i) an accounting of any of the cash withdrawals made by Mr. Tsaparas or the incoming and outgoing payments of Centaur; (ii) any payments from Mr. Tsaparas or Centaur; or (iii) access to the documents and communications of Centaur which are currently housed on the private servers of third-parties.

8.     In an effort to avoid motion practice, on June 17, 2025, counsel for NHC sent Mr. Tsaparas and Peter Alexopoulos ("Mr. Alexopoulos") an e-mail reminding them of Mr. Tsaparas' and Centaur's respective obligations pursuant to the Court's Orders.[1] (Ex. 1.)  The e-

---

[1] Attached as **Exhibit 1** to Plaintiff/Judgment Creditor's Motion to Hold Defendants/Judgment Debtors Spiro Tsaparas, Peter Alexopoulos, and Centaur Construction Company Inc. in Contempt is a true and correct copy of an e-mail dated June 17, 2025, sent by the undersigned to Mr. Tsaparas and Mr. Alexopoulos.

mail requested that Mr. Tsaparas or Mr. Alexopoulos confirm whether or not Mr. Tsaparas and Centaur intended to comply with the Court's Orders. (*Id*.) Additionally, the e-mail provided Mr. Tsaparas with a consent for release of files directed to Box (one of the entities in control of servers containing documents relating to Centaur's business operations) and a request to confirm that Microsoft was or is the host server for Centaur's e-mail accounts. (*Id*.)

9. On June 17, Mr. Alexopoulos responded to the e-mail from counsel for NHC stating that he had received the email and will "reply in short order."[2] (Ex. 2.) To date, Mr. Alexopoulos has not provided a substantive response or further reply.

10. On June 22, 2025,[3] Mr. Tsaparas provided a substantive response to the June 17 e-mail.[4] (Ex. 4.) Mr. Tsaparas' response is lengthy, but not complex. In short, Mr. Tsaparas continually asserts that he is unwilling or unable to comply with the Court's Orders. (*Id*.)

11. In his June 22 e-mail, Mr. Tsaparas states that he will travel to "the bank" and request printed statements on Monday, June 23. (Ex. 4.) Mr. Tsaparas also promised that he would "report back" with the "results of that request" by noon on June 23. (*Id*.) To date, Mr. Tsaparas has not provided any report of his efforts to obtain the bank statements.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

---

[2] Attached as **Exhibit 2** to Plaintiff/Judgment Creditor's Motion to Hold Defendants/Judgment Debtors Spiro Tsaparas, Peter Alexopoulos, and Centaur Construction Company Inc. in Contempt is a true and correct copy of an e-mail dated June 17, 2025, sent by Mr. Alexopoulos to counsel for NHC.

[3] Prior to providing a substantive response, Mr. Tsaparas contacted the undersigned and request that he be provided until June 22, 2025 in order to fully address his and Centaur's compliance with the Court's Orders. NHC agreed to this request.

[4] Attached as **Exhibit 4** to Plaintiff/Judgment Creditor's Motion to Hold Defendants/Judgment Debtors Spiro Tsaparas, Peter Alexopoulos, and Centaur Construction Company Inc. in Contempt is a true and correct copy of an e-mail dated June 22, 2025, sent by Mr. Tsaparas to the undersigned.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Date:    June 30, 2025                              /s/ Zachary J. Watters
                                                    Zachary J. Watters

4

# EXHIBIT 4

| | |
|---|---|
| **From:** | Spiro Tsaparas |
| **To:** | Watters, Zachary J.; peter@srtrainingllc.com; Jackson, Daniel P. |
| **Subject:** | Re: [EXT] Re: NHC LLC v. Centaur Construction Co, et al. - Case No. 19 C 6332 - Court Ordered Deadlines [VED-VP.FID535382] |
| **Date:** | Sunday, June 22, 2025 11:36:11 PM |
| **Attachments:** | Updated_Box_Consent_Expanded_Exclusions.docx |

Mr. Watters,

I am writing to provide a detailed, good-faith response to the outstanding matters you raised, along with supporting context regarding my current position and past limitations in representation.

In my responses below, I often refer to email communications with my former attorneys. I am not waiving attorney–client privilege and expressly reserve all applicable protections in that regard. However, on the condition that you agree not to pursue a waiver of privilege or seek to compel production of protected communications, I am willing to voluntarily share select emails that support the factual representations I make below and demonstrate that the handling of this case and the use of funds occurred as I describe.

**Item #1: Disclosure of All Cash Transactions (2019–Present)**

With respect to the Court's directive that I disclose and account for all cash transactions for myself and/or Centaur from January 1, 2019 to the present, I must respectfully state that full and complete compliance is not practically possible.

I do not maintain detailed records of cash transactions, particularly from earlier periods, and I do not have complete access to all the necessary bank statements or supporting documentation needed to generate a comprehensive record spanning more than six years. Life and business operations during this time have been conducted in a reactive, survival-oriented manner. Many records were lost or became inaccessible due to account closures or the suspension of operations.

That said, I am making a good-faith effort to begin with the most recent and more manageable timeframe. I have already located the following account records:

- Centaur Account ending in 5923 – Appears to have been used exclusively for payroll. I have statements for this account from February 2021 through March 2022, after which the account was closed.
- Centaur Account ending in 8746 – Used for both payroll and everyday business expenses. I currently have statements from January 2021 through January 2024.

I am planning to visit the bank in person tomorrow, Monday, June 23, to request printed statements for any earlier periods that may still be available from any and all business and personal accounts associated with me, Centaur, and any businesses that either I or Peter were part of. I will report back with the results of that request by noon Mountain Time. It is my understanding that the branch should be able to provide additional archived records.

I want to emphasize that I am willing to begin with 2025 and 2024, where the volume of transactions is significantly lower, and build from there. However, I must be transparent that I am not in a position to commit to providing a full accounting for 2019–2023 with precision, particularly as to individual cash withdrawals whose purpose or recipient I may no longer recall.

I also want to make a critical clarification: the prior statement that Centaur "ceased operations in 2019" has been taken out of context. What I meant was that once the fraud lawsuit was filed against Centaur in or about September 2019, our ability to operate as a traditional general contractor rapidly diminished. Key employees began resigning, and the financiers of our largest projects withdrew support and clients terminated our contracts.

General contracting has a long sales and procurement cycle, and we attempted to continue operations as best we could. However, after losing developer financing support and being terminated from major projects, we were left with only a few small engagements. In that sense, Centaur's operations were functionally winding down over a prolonged period.

Importantly, the characterization of Centaur as having ceased all activity in 2019 is inconsistent with the actual facts and was never meant to suggest that the company stopped transacting altogether. I would also direct you to the 7.5-hour examination I had with Ms. Mazziani, during which we discussed transactions from this period in detail and during which all relevant account records were provided.

Lastly, I would note that I was advised by prior legal counsel, in writing, that exempt income, including certain forms of personal income and benefits, is not subject to turnover under Illinois collection law. That advice influenced my recordkeeping practices, and I ask that this context be considered in evaluating my past and present disclosures.

**Item #2: Turnover of Cash Withdrawn in Violation of the Citation**

With respect to the Court's directive that I turn over all cash withdrawn in violation of the citation since it was served, I must state plainly that I am not in possession of any such cash at this time. I do not have any funds available to surrender, nor am I holding cash that was previously withdrawn.

I also want to clarify that, during the relevant period, I acted based on legal advice from my former counsel at Amundsen Davis LLC, including attorneys Kimberly Herring, Constantine Gavrilos, Matthew Horn, and Ryan Jacobson. My understanding, based on their guidance, was that only a certain portion of my income was subject to creditor turnover under applicable law, and that the remaining income was exempt and could be used for personal living expenses.

I fully intend to comply with the Court's orders to the best of my ability and am making a good-faith effort to do so. However, I do not currently have any cash to remit and cannot turn over funds that I do not possess.

**Item #3: Accounting of Centaur's Incoming and Outgoing Payments (2020–Present)**

With respect to the Court's directive that Centaur provide an accounting of all incoming and outgoing payments — including loans and loan repayments — from January 1, 2020 to the present, I am currently gathering the necessary records.

I will be able to provide complete bank statements for all Centaur accounts that I currently have access to tomorrow. In addition, as I mentioned above, I plan to visit my local bank branch tomorrow to request printed statements for any remaining accounts or time periods that are not already in my possession. I will report back to you tomorrow morning with an update on what the bank is able to produce and the estimated timeline for receiving those records. It is not yet clear whether the branch will be able to provide them immediately or whether a processing period will be required.

I will provide all bank statements currently in my possession tomorrow, and I will promptly share any additional statements as soon as they are made available to me by the bank.

**Item #4: Payment of Dissipated or Improperly Transferred Amounts**

With respect to the Court's directive that I pay any amounts found to have been improperly transferred or dissipated; I must reiterate that I do not currently have any funds with which to make such payments.

That said, I believe it is important to address the underlying context surrounding certain transactions that were flagged as improper. I was never given an opportunity to personally explain these transactions before they were presented in your filings, and I recognize how, in the absence of explanation, they may understandably appear evasive or noncompliant.

As soon as I became aware of the citation, and as soon as I was able to review your filings, I contacted my then-attorneys at Amundsen Davis and requested a meeting to begin addressing the issues raised. I specifically provided them with explanations regarding several of the transactions now cited in your motion. I also requested that they relay those explanations to you directly. Unfortunately, my requests were either ignored or dismissed. I was told, for example, that they intended to "just file a motion to quash," rather than respond directly.

To illustrate, I raised the following two transactions with my attorneys:
- August 21, 2024 – $10,281
- December 3, 2024 – $1,390

These were foreign currency exchange transactions involving a colleague visiting from Europe, who was temporarily staying at the M Development company condo in Aspen. As he was not staying in a hotel and did not have a local banking relationship, I accompanied him to the bank to help facilitate a EUR to USD exchange. The transactions were handled through my account purely as a matter of logistical convenience, I did not personally gain or retain any funds. My attorneys at the time advised me not to include these items in my disclosures because they were neither income nor personal expenditures.

However, when you later subpoenaed the bank records, the nature of these transactions was not reflected in the statements, and I understand how they would raise concerns. I want to clarify that I was acting on legal advice when I omitted those items, and I did not intend to conceal or misrepresent anything.

Further, I want to emphasize that I made multiple urgent efforts to reach my attorneys leading up to the Court deadline in April 2025, including numerous emails and calls requesting that we respond properly to your citation. My outreach went unanswered until I threatened to report them to the ARDC. Only after that did I receive a copy of the response they had filed, which I had neither seen, reviewed, nor approved before it was submitted. I did not even know it had been filed until several days later.

Accordingly, the response you received was prepared and filed entirely without my review or approval, and I did not receive it until days after it was filed.

**Item #5: Transfer or Disclosure of Server Access and Control**
With respect to the Court's directive that Centaur either transfer servers that may contain documents relating to its business operations, or disclose their location, control, and provide NHC access, I want to respond with transparency while also emphasizing the complexity and sensitivity of the situation.

To the best of my current knowledge, Centaur no longer has active access or administrative control over any physical or cloud-based server infrastructure that contains operational records. During the early period of this litigation, particularly after the fraud claims were filed in 2019, Centaur's IT systems began to deteriorate as the company's operations diminished. Staff turnover and loss of vendor relationships compounded the situation, and eventually access to hosted platforms was lost due to unpaid accounts and deactivation by providers.

That said, I am aware that Box still has records related to the domain @centaurco.com. I will address that matter separately in response to the Box-specific consent form, but I want to be clear that if Box or any other service provider is in possession of relevant records and if I can legally and technically assist in releasing those, I will cooperate in good faith to do so, provided that I am not exposing myself to broader legal risk, violating client confidentiality, or waiving any legal privileges or constitutional protections.

On the specific question of Centaur's historical email hosting, it is my understanding that Microsoft 365 was the platform used to manage Centaur's email accounts. However, according to my recent inquiry, the entire domain and its contents were deleted due to prolonged inactivity. I do not have access to any email server, nor do I know who currently holds technical or administrative rights to any backups that may have once existed. I don't believe anyone does.

I respectfully ask that this context be considered before drawing any adverse inference regarding noncompliance. I have not withheld access intentionally, nor am I concealing the location of servers. To the extent any party believes access can be restored through specific third parties, I am willing to cooperate, again, with appropriate assurances that such cooperation does not expose me to further legal exposure or waive fundamental protections.

**Item #6: Box Consent and Request for Modified Procedure**
With respect to your request that I execute the blanket "Consent to Release" form authorizing Box to disclose all records associated with the @centaurco.com domain, I must respectfully object in its current form.

The language proposed grants unrestricted access to a large repository of documents, many of which are not only irrelevant to asset discovery but are also protected by legal privilege, subject to third-party confidentiality obligations, proprietary trade secrets or strategies, or governed by fiduciary, statutory, or contractual limitations. These include, but are not limited to:
- Employee HR and payroll records
- Contractor tax forms and identification numbers
- Client NDAs, scopes of work, and confidential pricing models
- Attorney–client communications
- Business strategy documents unrelated to asset recovery
- Contracts with public companies not implicated in this litigation
- Drawings of private residences and shop drawings of unique projects involving companies such as Barneys New York, W Hotel, Hellenic Museum, Apple, and Restoration Hardware

I have not had access to the Box account for some time due to nonpayment and I do not recall the contents, but I am fully willing to cooperate. I respectfully request the opportunity to regain access and personally extract all documents responsive to the Court's May 30, 2025 Order (Dkt. 683), consistent with the standards outlined in Illinois Supreme Court Rule 277.

Additionally, I ask to take careful notice that this case is currently pending before the appellate court, and the judgment remains subject to review. In that light, it is imperative that I not be forced to surrender unfiltered, privileged communications, internal litigation strategy, or materials protected under work product doctrine, particularly as doing so may compromise my right to a full defense should the matter be remanded due to procedural error or a mistrial.

Permitting unrestricted access to the Box account without opportunity for review would not only prejudice my defense but also circumvent the safeguards designed to protect due process during the appellate phase. I therefore request, respectfully and in the interest of both ethics and judicial efficiency, that I be permitted to conduct a comprehensive review and disclosure. I note that it has been my intention to do this.

If that proposal is not acceptable to you, I ask that you instead accept the modified release attached here, which limits Box's production to relevant, non-privileged materials tied solely to Centaur's business operations, and explicitly excludes protected or irrelevant categories.

**Item #7: Confirmation of Microsoft as the Host Server**
With respect to your request regarding the host server for Centaur's email accounts, I can confirm that Centaur Construction Co. used Microsoft 365 (formerly Office 365) as its email hosting platform for the @centaurco.com domain.

However, I no longer have administrative access to that email environment. Based on my recent efforts to investigate the account status, I was informed by Microsoft that the domain and its contents were automatically deleted due to prolonged inactivity and nonpayment. They indicated that no backup or recovery option is available for the emails, files, or user accounts once the deletion process has completed.

To the best of my knowledge, Microsoft was the only email host used by Centaur during the relevant period. If another provider was ever involved (e.g., prior to migration to Microsoft 365), I have no access to those records and no recollection of any alternative host being used.

**Item #8: Alternative or Current Host for Centaur Email Server(s)**
To the best of my knowledge, there is no alternative or current email host for Centaur's email accounts beyond what I previously disclosed.

Centaur used Microsoft 365 as its sole email hosting provider for the @centaurco.com domain. I do not have any personal knowledge of another provider ever being used, either before or during the Microsoft 365 period. I am speaking truthfully based on what I understand to be accurate.

If you would find it helpful, I am willing to identify and reach out to individuals who may have been responsible for IT or email system administration at Centaur during the relevant periods, and ask whether they recall the use of any other email service provider. However, I want to be clear that I have no independent recollection or direct knowledge of another host being involved.

If subsequent facts come to light showing that a different provider was used at some point without my knowledge, I respectfully request that no adverse inference be drawn, as I am providing this response in good faith and to the best of my current understanding.

**Item #9: Offer to Meet via Zoom or In Person**
As previously stated, I remain fully open and willing to meet with you to discuss these matters in detail — whether via Zoom, telephone, or in person at your office or another mutually agreeable location.

My intention is to foster transparency, reduce unnecessary litigation effort, and avoid misunderstandings that may arise from limited, document-only exchanges. If you believe it would be productive, I am available to walk through your questions, clarify transaction history, and address any concerns — whether informally or in a structured setting.

Please feel free to propose a date and format that works for your team. I will make every effort to accommodate promptly.

More importantly, I hope this can be a turning point. Now that I am representing myself and fully engaged, I am asking for the opportunity to respond clearly, directly, and cooperatively — something I was not able to do while being filtered through counsel who often failed to act on my behalf.

I understand that past delays and omissions may have created a perception of evasiveness or concealment. But I want to be absolutely clear: I am not hiding anything. I do not have hidden funds. The reality is far more mundane as I am financially depleted.

**Item #10: Court-Granted Timeframe Through July 26 (Confirm date)**
I would like to respectfully remind you that during the most recent hearing, I explicitly asked the Court for additional time to receive access and familiarize myself with PACER, review all open matters, and get up to speed now that I am representing myself pro se.

While Judge Kennelly did not assign a specific deadline, he did acknowledge on the record that I have no immediate obligations due before June 26, 2025. (If this date is incorrect, I respectfully request that we clarify the exact language from the hearing transcript or your notes.) I have taken this directive seriously and am using this window to organize records, correct past gaps in representation, and respond to your inquiries in a timely, thorough, and good-faith manner.

Importantly, I only received access to PACER on Friday, June 20th. After a preliminary review, I realized that I had never seen, nor been made aware of, many of the filings, citations, and communications that are now central to your concerns. I have discovered dozens of docket entries and accompanying exhibits that were never shared with me by my prior attorneys, including responses filed on my behalf that I had neither seen, commented on, nor approved prior to their submission. This also includes multiple emails from your office that went unanswered. I want to be very clear: I did not receive those requests and was not made aware that they had even been sent.

Everything I am doing now, including this correspondence, is a sincere effort to use whatever grace I am afforded constructively, and to comply fully and transparently with the Court's expectations.

I will conclude with a direct and respectfully motivated request: Please allow me the opportunity to respond properly. I am not offering tactics or positioning; I am offering open, clear, and direct communication. I will continue to provide you with updates and information in a spirit of cooperation, not confrontation.

Sincerely,
Spiro Tsaparas
Pro Se Litigant
(c): 312.735.4960
96 Mountain Laurel Ct.
Aspen, CO 81611

---

**From:** "Watters, Zachary J." <zwatters@vedderprice.com>
**Date:** Thursday, June 19, 2025 at 1:45 PM
**To:** Spiro Tsaparas <SpiroTsaparas.ProSe@outlook.com>, "peter@srtrainingllc.com" <peter@srtrainingllc.com>, "Jackson, Daniel P." <djackson@vedderprice.com>
**Subject:** RE: [EXT] Re: NHC LLC v. Centaur Construction Co., et al. - Case No. 19 C 6332 - Court Ordered Deadlines [VED-VP.FID535382]

Mr. Tsaparas,

Thank you for your email.

As we mentioned in our email of June 17th, the deadlines contained in the two attached Memorandum Opinions and Orders (Dkt. Nos. 682-83) were set by the Court. As a result, NHC does not have the authority to modify or extend the deadlines.

Having said that, NHC will agree not to file any motion with the Court until after Sunday, June 22nd in order to give you time to respond to the issues raised in our email of June 17th.

With respect to the request from Box for an executed copy of the attached release, provide the executed copy on or before Sunday, June 22   . Additionally, please confirm whether or not Microsoft was or is the host server for Centaur's email account(s).  If Microsoft was not or is not the host server for Centaur's email account(s), please provide the name(s) of the entities that hosted and are currently hosting the server for Centaur's email account(s).  Please also provide this information on or before Sunday, June 22nd.

As always, NHC reserves all rights and remedies.

Thank you.

Zach Watters
*Counsel for NHC*

**Zachary J. Watters,** Shareholder

Vedder**Price**

222 North LaSalle Street, Chicago, Illinois 60601

T +1 312 609 7594

web | email | offices | biography

**From:** Spiro Tsaparas <SpiroTsaparas.ProSe@outlook.com>
**Sent:** Thursday, June 19, 2025 12:52 PM
**To:** peter@srtraininingllc.com; Jackson, Daniel P. <djackson@vedderprice.com>; Watters, Zachary J. <zwatters@vedderprice.com>
**Subject:** [EXT] Re: NHC LLC v. Centaur Construction Co., et al. - Case No. 19 C 6332 - Court Ordered Deadlines [VED-VP.FID535382]

Dear Mr. Watters,

I'm following up to confirm receipt of the email I sent Tuesday, as well as the voicemail I left later that day providing additional context for my request. As mentioned, I'm currently traveling for work and won't be back in Aspen until tomorrow afternoon.

I would appreciate it if you could allow me until Sunday evening to provide a full and appropriate response, as the weekend would give me the necessary time to address the matter properly.

Thank you for your consideration.

Sincerely,
Spiro

**From:** Spiro Tsaparas <SpiroTsaparas.ProSe@outlook.com>
**Sent:** Tuesday, June 17, 2025 2:52 PM
**To:** peter@srtraininingllc.com <peter@srtraininingllc.com>; djackson@vedderprice.com <djackson@vedderprice.com>; zwatters@vedderprice.com <zwatters@vedderprice.com>
**Subject:** Re: NHC LLC v. Centaur Construction Co., et al. - Case No. 19 C 6332 - Court Ordered Deadlines [VED-VP.FID535382]

Dear Mr. Watters,

Thank you for outlining the outstanding matters in connection with the recent court orders.

As you may recall, during the most recent hearing, I explicitly requested that the Court allow me time to familiarize myself with PACER and to review all open matters now that I am representing myself pro se. In response, Judge Kennelly noted that I do not have any immediate obligations due until July 26, thereby granting me the space to get up to speed with the case and the court's expectations.

In the spirit of cooperation and transparency, I want to emphasize that I am not looking to delay or evade any responsibilities. My objective is to respond fully and in good faith, within the limits of the law and my current capacity. I respectfully request until Sunday evening, June 23, to provide you with a substantive response addressing all the points raised in your June 17 email.

While I am not in a position at this time to commit to providing the specific materials or data you referenced, I will provide a response to each of the questions and requests you've outlined.

Furthermore, to help facilitate progress and open communication, I am also willing to make myself available for a Zoom meeting, or even an in-person meeting at your offices, during which you can ask me any questions you wish. I believe this could be a constructive step, given that I have not been able to participate meaningfully in the case's recent activity, motions, and filings.

Please confirm that you are amenable to receiving my response by Sunday night so I may respond appropriately.

Best regards,

Spiro Tsaparas

**From:** Watters, Zachary J. <zwatters@vedderprice.com>
**Sent:** Tuesday, June 17, 2025 7:54 AM
**To:** Spiro Tsaparas <spiro@msourcingllc.com>; peter@srtraininingllc.com <peter@srtraininingllc.com>
**Cc:** Jackson, Daniel P. <djackson@vedderprice.com>
**Subject:** NHC LLC v. Centaur Construction Co., et al. - Case No. 19 C 6332 - Court Ordered Deadlines [VED-VP.FID535382]

Messrs. Tsaparas and Alexopoulos:

We are writing with respect to multiple deadlines in the above-referenced litigation.  If you or Centaur Construction Co. ("Centaur") have counsel, please forward this email to that attorney.

On May 30, 2025, the Court issued two Memorandum Opinions and Orders.  (Dkt. Nos. 682-83.)  We have attached copies of both Orders for your reference.  Included in those Orders are several deadlines applicable to Mr. Tsaparas and Centaur for the completion of specific tasks, including:

- Mr. Tsaparas "must disclose and account for, by no later than 14 days from entry of this order, all cash transactions for himself and/or Centaur from January 1, 2019 to the present" (Dkt. No. 682);

- Mr. Tsaparas "must turn over all cash withdrawn in violation of the citation since he was served with it, by no later than 14 days from entry of this order" (Dkt. No. 682);

- Centaur must transfer to NHC "servers that may contain documents relating to Centaur's business operations or, if Centaur no longer has control or access to these servers, the production of information regarding where the servers are located and who controls them, and a grant of authority to NHC to access these servers" (Dkt. No. 683);

- Centaur must provide "an accounting of all of Centaur's incoming and outgoing payments (including loans and repayments of debt) from January 1, 2020 to present" (Dkt. No. 683); and

- Centaur must pay "any amounts revealed in the newly produced documents and/or in the accounting to have been dissipated or improperly transferred" (Dkt. No. 683).

None of these tasks have been completed and the deadline to complete these tasks has lapsed. Because these deadlines were set by the Court, NHC is not empowered to extend or modify the deadlines. On or before Friday, June 20, 2025, please advise if Mr. Tsaparas or Centaur intend to comply with these Orders from the Court and if so, when compliance will occur.

With respect to Centaur's obligation to provide NHC with access to the servers, NHC has spoken with representatives of Box and has confirmed that Box is in possession of a significant number of documents relating to Centaur's business operations. Box has requested that Mr. Tsaparas execute the attached consent to release files, contents, and other records so that Box may release the records to NHC. Please return an executed copy of the attached release on or before Friday, June 20, 2025.

In addition to the documents in the possession of Box, it is NHC's understanding that Microsoft was or is the host server for Centaur's email account(s). Please confirm if this understanding is accurate on or before Friday, June 20, 2025. If Microsoft was not or is not the host server for Centaur's email account(s), please provide the name(s) of the entities that hosted and are currently hosting the server for Centaur's email account(s). Please provide this information on or before Friday, June 20, 2025.

As always, NHC reserves all rights and remedies.

Thank you.


Zach Watters
*Counsel for NHC*


**Zachary J. Watters**, Shareholder

Vedder**Price**
222 North LaSalle Street, Chicago, Illinois 60601

T +1 312 609 7594

web | email | offices | biography

---

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, Vedder Price (FL) LLP, which operates in Florida, and Vedder Price Pte. Ltd., which operates in Singapore.

CONFIDENTIALITY NOTE: This e-mail is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this e-mail message is not the intended recipient, or the employee or agent responsible for delivery of the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this e-mail in error, please notify us immediately by telephone at (312) 609-5038 and also indicate the sender's name. Thank you.

d250106us

# EXHIBIT 5

***REALTIME UNEDITED TRANSCRIPT ONLY***

1

01:29:27   1   August 16, 2022, Judge Kennelly, 1:30 p.m., volume 3-B, NHC v.
01:29:38   2   Centaur trial.
01:32:03   3     (The jury enters the courtroom.)
01:32:04   4       THE COURT:  Okay.  Everybody can have a seat.  We're
01:32:07   5   ready for the Redirect Examination of Mr. Alexopoulos and
01:32:10   6   Ms. Herring, you can go ahead.
01:32:14   7                              - - -
01:32:14   8       PETER ALEXOPOULOS, REDIRECT EXAMINATION
01:32:14   9   BY MS. HERRING:
01:32:16  10   Q.  Mr. Cocciemiglio, can you pull up Plaintiff's Exhibit 52,
01:32:19  11   please.
01:32:26  12       Mr. Alexopoulos, what was your role in compiling this
01:32:29  13   document?
01:32:29  14   A.  I simply took documents similar to this that had been
01:32:39  15   compiled in my office and put it in a little bit more of a
01:32:42  16   legible organized fashion and formatted the document itself.
01:32:52  17   Q.  Would say it your understanding that this was a final
01:32:56  18   accounting for the Nobu Hotel project on behalf of Centaur?
01:33:00  19   A.  No, ma'am.
01:33:01  20   Q.  Why not?
01:33:01  21   A.  I think it was -- I hate to use the word moving target,
01:33:06  22   but I think that there was still information that needed to be
01:33:12  23   finalized as well as maybe even some conversations between
01:33:19  24   ownership and Spiro.
01:33:20  25   Q.  What kind of information needed to be finalized?


***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

5

01:37:32　1　　　　THE COURT:  All right.  The witness is excused.

01:37:34　2　　　　THE WITNESS:  Thank you, sir.

01:37:35　3　　　　THE COURT:  You can call the next one.

01:37:43　4　　　　MS. HERRING:  The defendants call Spiro Tsaparas.

01:38:07　5　　(Witness sworn.)

01:38:10　6　　　　THE COURT:  Have a seat.  Take your face mask off and

01:38:13　7　put one of those little things on the microphone.

01:38:26　8　　　　All right.  Ms. Herring, you can go ahead.  It's

01:38:28　9　actually better to move the mic to you rather than to move you

01:38:32　10　to the mic.  Go ahead.

01:38:33　11　　　　　　　　　　　　　- - -

01:38:33　12　　　　　　SPIRO TSAPARAS, DIRECT EXAMINATION

01:38:33　13　BY MS. HERRING:

01:38:35　14　Q.  Could you please introduce yourself to the members of the

01:38:36　15　jury.

01:38:36　16　A.  My name is Spiro Tsaparas.

01:38:39　17　Q.  Where do you live?

01:38:39　18　A.  In Colorado.

01:38:41　19　Q.  What is your highest level of education?

01:38:43　20　A.  High school.

01:38:45　21　　　　THE COURT:  I know how to spell your last name, but

01:38:47　22　the jury may not.  Can you spell your last name, please.

01:38:51　23　　　　THE WITNESS:  Sure, it is Tsaparas.

01:38:53　24　　　　THE COURT:  Thank you.

01:38:55　25　BY MS. HERRING:


***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

6

01:38:55  1   Q.  Where do you work?

01:38:56  2   A.  I just got a job, so I work at M Development and at

01:39:05  3   Centaur as I'm winding it down to close it.

01:39:08  4   Q.  What is your title at Centaur?

01:39:09  5   A.  Chief executive.

01:39:11  6   Q.  How long have you held that title?

01:39:13  7   A.  Since 199 -- not 98, 9 will is when we started the

01:39:20  8   company.  The title came about when we structured the company

01:39:24  9   in 2004 I would say.

01:39:24  10  Q.  What was your title before 2004?

01:39:26  11  A.  We didn't have titles.

01:39:27  12  Q.  Were you an owner of Centaur Construction?

01:39:30  13  A.  I was a principal, me and Peter.

01:39:32  14  Q.  Tell us a little bit about what your job duties have

01:39:35  15  entailed during the entire time that you worked at Centaur.

01:39:37  16  A.  Okay.  In '98, I was a carpenter, working in the feed and

01:39:46  17  Peter was an electrician.  And slowly getting more work,

01:39:50  18  expanding the business, the business becoming better, with a

01:39:56  19  pinnacle being 2007, 2008, the company had about 55 employees

01:40:00  20  in the office running about 30 to 40 projects simultaneously

01:40:05  21  in the field and reaching about $90 million in one year in

01:40:10  22  work performed on the ground.

01:40:13  23       The roles and responsibilities changed as the company

01:40:17  24  grew.

01:40:19  25  Q.  In your time at Centaur, approximately how many

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

7

01:40:23   1   construction projects has Centaur been a part of?

01:40:25   2   A.  Several hundred.

01:40:31   3   Q.  What was Centaur's typical role on those projects?

01:40:34   4   A.  General contractor and develop and management.

01:40:40   5   Q.  Tell us a little bit about what types of projects Centaur

01:40:45   6   worked on from the beginning up until the Nobu Hotel Chicago

01:40:50   7   project?

01:40:50   8   A.  We started as a residential contractor, the residential

01:40:54   9   relationships yielded commercial work.  From the same people

01:40:58  10   that build homes and have some commercial property that they

01:41:01  11   would want us to work on.  It was becoming bigger and bigger

01:41:09  12   and bigger in terms of the size of the projects, and we got

01:41:14  13   into retail pretty deep.  We did the construction management

01:41:19  14   of the barns New York, down here, we built a two story

01:41:24  15   Starbucks in the gold coast, in the gold coast, we built 50

01:41:30  16   percent.  The /PWRAO*EPB, the next to Walgreens, lieu lieu

01:41:35  17   lemon, club Monaco, the Starbucks building, then on observing

01:41:45  18   street, we were doing the /PHERSer hotel where the theater is

01:41:49  19   and then 2008 happened and then we reverted back.

01:41:53  20   Q.  When did Centaur?

01:41:55  21   A.  Nash.

01:41:57  22   Q.  Keep going.  I didn't mean to interrupt you?

01:42:01  23   A.  I'm good.

01:42:02  24   Q.  When did Centaur become involved in the Nobu Hotel

01:42:07  25   project?


***REALTIME UNEDITED TRANSCRIPT ONLY***

# EXHIBIT 6

| Chat Session | Message Date | Delivered Date | Read Date | Edited Date | Service | Type |
|---|---|---|---|---|---|---|
| Spiro Tsaparas | 2023-07-28 14:50:54 | | 2023-07-28 14:51:16 | | iMessage | Incoming |

| Sender ID | Sender Name | Status | Replying to | Subject | Text | Attachment | Attachment type |
|---|---|---|---|---|---|---|---|
| +1312735 4960 | Spiro Tsaparas | Read | | | Note: Took $4,500 cash 2,400 to Vivi for this and next week $1,200 to Corri for last week Vivi $900 cash to have with me for next week | | |

# EXHIBIT 7

**Subject:** Re: Filter change- both units A and B
**From:** ▮▮▮▮▮▮ Bateman ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Date:** 10/28/2023, 2:42 PM
**To:** Corri McFadden <cm@glitterandbubbles.com>
**CC:** Spiro Tsaparas <spiro@centaurco.com>

Thank you very much.

I think I used Pacific Sheet Metal last time. It is strange that they did not remind me. I'll email the person who is in charge of filters.



On Tue, Oct 24, 2023 at 6:57 AM Corri McFadden <cm@glitterandbubbles.com> wrote:

> ▮▮▮▮-
> Hope you and ▮▮▮ are doing great.  I have down that the filters need to be changed in the house, would you like to arrange or you can give me the company and I can coordinate as well. Just let me know what you prefer.
>
> Xx
> Corri
>
> Sent from my iPhone