**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

NHC LLC, a Florida limited liability company,

      Plaintiff,

v.

CENTAUR CONSTRUCTION COMPANY INC., an Illinois corporation, SPIRO TSAPARAS, and PETER ALEXOPOULOS,

      Defendants.

No. 19-cv-06332

Honorable Matthew F. Kennelly

**PLAINTIFF/JUDGMENT CREDITOR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY CITATION RESPONDENTS M DEVELOPMENT, LLC AND M SOURCING, LLC**

Daniel P. Jackson, Bar No. 6289813
Bryan K. Clark, Bar No. 6296090
Zachary J. Watters, Bar No. 6310675
Allison E. Czerniak, Bar No. 6319273
Keeley A. Sawyer, Bar No. 6336704
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T: +1 312 609 7500
djackson@vedderprice.com
bclark@vedderprice.com
zwatters@vedderprice.com
aczerniak@vedderprice.com
ksawyer@vedderprice.com

Gini S. Marziani, Bar No. 3127421
Davis McGrath LLC
125 S. Wacker Drive
Chicago, Illinois 60606
T: +1 312 332 3033
gsmarziani@davismcgrath.com

Plaintiff/judgment creditor, NHC LLC ("NHC"), by its undersigned counsel, hereby moves to compel production of documents in the possession, custody, or control of third-party citation respondents M Development, LLC ("M Development") and M Sourcing, LLC ("M Sourcing" and collectively with M Development, the "M Entities"). In support hereof, NHC states as follows:

## INTRODUCTION

1. The issues raised in this Motion follow a familiar and unfortunate pattern. In an effort to hold Judgment Debtors[1] accountable and collect the judgment it is owed, NHC issued third-party citations to the M Entities. The M Entities responded consistent with numerous other third-party citation respondents with a close connection to Judgment Debtors – they delayed, obfuscated, and ultimately made partial productions of cherry-picked documents which do not approach a fulsome production. NHC is mindful of the number of filings in this matter and, as a result, made numerous efforts to resolve this dispute before filing this Motion. Those efforts were unsuccessful. Now, in order to obtain documents and information which are exclusively within the possession of the M Entities, NHC is forced to file this Motion.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND

**I.  M Development's Role in the Nobu Hotel Project and Relationship with Centaur**

2. M Development has been operating since approximately 1997 and is a developer of both residential and commercial properties.[2] (Ex. 1 at 7:1-17.) In 2016, M Development become the owner of the Nobu Hotel project in Chicago. (*Id*. at 7:21-24.) M Development retained Centaur as the general contractor of the Nobu Hotel project in order to construct the hotel.[3] (Ex.

---

[1] Collectively, Centaur Construction Company Inc. ("Centaur"), Spiro Tsaparas ("Tsaparas"), and Peter Alexopoulos ("Alexopoulos") are referred to as the "Judgment Debtors."
[2] A true and correct copy of portions of the deposition transcript of Mark Hunt ("Hunt") is attached hereto as **Exhibit 1**.
[3] A true and correct copy of portions of the trial transcript, Volume 3-A, is attached hereto as **Exhibit 2**.

1

2 at 8:1-14.) During that time, Centaur was responsible for demolishing the existing building and performing certain subgrade work for the Nobu Hotel.[4] (Ex. 3 at 19:8-16.)

3. However, no "above-grade work" took place while M Development owned the project. (*Id*. at 19:14-16.) The reason for the stoppage in work was M Development's inability to obtain financing in order to continue construction on the Nobu Hotel project.[5] (Ex. 4 at 36:14-23.) In December 2017, M Development sold the Nobu Hotel project to NHC and recommended that Centaur remain as the general contractor of the project. (*Id*. at 35:10-24; Ex. 3 at 18:17-21.)

4. The Nobu Hotel project was not the first time M Development and Centaur worked together. Indeed, the relationship between M Development and Centaur was "longstanding" and the two entities had collaborated on more than a dozen projects, in addition to the Nobu Hotel project. (Ex. 1 at 18:21-24; Ex. 2 at 9:5-7.) The relationship between M Development and Centaur extends beyond the entities to their respective principals, Hunt and Tsaparas. Hunt and Tsaparas describe themselves as "dear friends" and call each other "brothers."[6] (Ex. 5 at 70:20-24.) Hunt previously testified that he has "gotten into kind of the bad habit of making a bunch of loans to [Tsaparas] over the years[.]"[7] (Ex. 6 at 13:10-25; 14:1-25; 15:1-16.) Hunt testified that the cumulative values of those loans was approximately $4.1 million. (*Id*. at 13:18-25; 14:1-10.)

5. While unknown to NHC at the time, the significance of this seven figure debt cannot be overstated. It was in the context of allegedly being unable to obtain financing and being

---

[4] A true and correct copy of portions of the deposition transcript of Alexopoulos is attached hereto as **Exhibit 3**.
[5] A true and correct copy of portions of the deposition transcript of Rodrigo Chapur Duarte is attached hereto as **Exhibit 4**.
[6] A true and correct copy of portions of the January 8, 2025, hearing transcript is attached hereto as **Exhibit 5**.
[7] A true and correct copy of portions of the citation examination transcript of Hunt is attached hereto as **Exhibit 6**.

owed millions of dollars by Centaur and/or Tsaparas that M Development ultimately sold the Nobu Hotel project to NHC. The events that occurred after M Development sold the Nobu Hotel project are well known to this Court. Centaur, and its principals Tsaparas and Alexopoulos, breached their contractual obligations and committed fraud. After a jury trial, judgment was entered against Centaur, Tsaparas, and Alexopoulos jointly and severally in the total amount of $22,272,124.34 for fraud and breach of contract, plus punitive damages against the defendants individually and in particular Tsaparas in the amount of $1,500,000.00 (the "Judgment"). (Dkt. No. 228.)

**II.     M Development's Continued Relationship with the Judgment Debtors**

6.     Contrary to information provided by M Development, NHC now knows that M Development's relationship with the Judgment Debtors, specifically Centaur, continued after the sale of the Nobu Hotel project. At trial, Hunt, the owner of M Development, testified that although he and his company were currently working with Tsaparas on "upwards of 20 projects," he and his company were *not* currently working on any projects with Centaur.[8] (Ex. 7 at 25:6-24.) NHC and this Court now know this testimony was false. As outlined in greater detail in other submissions to this Court (*see, e.g.*, Dkt. No. 590), the relationship between Centaur and M Development continued long after the Nobu Hotel project.

7.     For example, in early October 2022 (approximately two months after Hunt's trial testimony), Tsaparas, in his role as CEO of Centaur, communicated with the City of Aspen and multiple M Development employees regarding a joint project referred to as the "201 E Main Street" project.[9] (Ex. 8.) Based on information currently available, NHC believes that Centaur was involved in multiple similar projects in the greater Aspen area with M Development,

---

[8] A true and correct copy of portions of the trial transcript, Volume 4-A, is attached hereto as **Exhibit 7**.
[9] A true and correct copy of an email exchange between Tsaparas, the City of Aspen, and M Development employees regarding the 201 E Main Street project is attached hereto as **Exhibit 8**.

3

including, but not limited to, projects referred to as "312 Hyman," "434 Cooper," and "834 Hallam."[10] (Ex. 9 (referring to the "Centaur team" working on various projects).) Eventually, Centaur's name was removed from these projects, including the "201 E Main Street" project, and replaced with another entity.[11] (Ex. 10 (Ms. Van Senus: "The proposal for 201 is directed to centaur. Should I cross that out and put 201 Main LLC?" Tsaparas: "Yes").) With the exception of the name change, however, there is no indication of any other change. Put simply, the personnel, tasks, and all other aspects of the projects remained the same; a new corporate name was inserted as part of an overnight transition from Centaur to other entities.[12] (Ex. 11 (Tsaparas: "Please tell Martha OK field Greg Woods not to use my Centaur Construction email anymore and only use the M source and you'll see. Thanks." Tsaparas: "Please make sure mail forwarding g [sic] is still active and change the address on as many accounts as possible.").)

8.     In January 2023, Tsaparas (still using his Centaur email address that listed him as the CEO) continued to brag to his landlord, Ms. Bateman-Hershey, about new projects, stating that "We purchased the Aman Hotel in Jackson Hole WY that we are preparing for a major rehabilitation" and "We purchased the last palace on Villanueva and meeting with architects. It will be a magnificent project."[13] (Ex. 12.)

9.     From the email alone it is unclear exactly who Tsaparas means by "we" in these emails, but news articles provide additional context and reflect that the Aman Hotel was actually purchased by M Development. *See* "M Development marches to its own beat," *Hotels Magazine*,

---

[10] A true and correct copy of a July 29, 2021 email from Linda Manning of M Development regarding the projects referred to as "312 Hyman," "434 Cooper," and "834 Hallam" is attached hereto as **Exhibit 9**.
[11] A true and correct copy of excerpts of text message communications between Tsaparas and Deanna Van Senus ("Ms. Van Senus"), Tsaparas' assistant, is attached hereto as **Exhibit 10**.
[12] A true and correct copy of excerpts of text message communications between Tsaparas and Ms. Van Senus is attached hereto as **Exhibit 11**.
[13] A true and correct copy of an email exchange between Tsaparas and Ms. Bateman-Hershey is attached hereto as **Exhibit 12**.

4

available at https://hotelsmag.com/news/m-development-marches-to-its-own-beat/ (last visited July 13, 2025). It is clear that a professional relationship between M Development and Centaur continued long after both entities were no longer involved in the Nobu Hotel project.

### III. Judgment Debtors' Use of Triton Marine Holdings LLC to Further Partner with M Development

10. NHC's ongoing investigation has revealed that Judgment Debtors utilized Triton Marine Holdings LLC ("Triton") in, *inter alia*, an attempt to obfuscate their continued relationship with M Development. Tsaparas and Alexopoulos have each confirmed that they were or are the sole owners of Triton.[14] (Ex. 13 at 43:7-45:2; Ex. 14 50:19-53:2.) NHC, however, has never gotten a straight answer as to Triton's purpose.

11. During his citation examination, Hunt testified that Triton was an entity owned by Tsaparas and through which Tsaparas allegedly provided consulting services to M Development or M Sourcing, prior to Tsaparas executing his employment agreement with M Sourcing in December 2022. (Ex. 6 at 12:17-13:9.) Specifically, Hunt testified that Triton was hired for consulting services "with a handful of – of construction projects." (*Id*. at 13:9.) Hunt testified that in connection with those consulting services Triton issued 11 invoices[15] (Group Ex. 15) to M Development and M Sourcing for a cumulative total of $211,538.47. (Ex. 6 at 19:17-20:1.) Curiously, all of these invoices were issued *after* the jury's verdict. However, NHC's analysis of bank records indicates that between December 2020 and November 2022, M Development paid Triton a total of $1,747,356.47.[16] (Ex. 16.)

---

[14] A true and correct copy of portions of Tsaparas' citation examination transcript is attached hereto as **Exhibit 13**. A true and correct copy of portions of Alexopoulos' citation examination transcript is attached hereto as **Exhibit 14**.
[15] True and correct copies of invoices issued by Triton to M Development or M Sourcing are attached hereto as **Group Exhibit 15**.
[16] A summary of bank records indicating payments from M Development to Triton is attached hereto as **Exhibit 16**.

5

12. However, following Hunt's citation examination, Tsaparas gave drastically different testimony regarding the alleged purpose of Triton during his citation examination. According to Tsaparas, the "only purpose" of Triton was to own "a vessel that [Tsaparas and Alexopoulos] purchased in Greece." (Ex. 13 at 47:23-48:4.) Tsaparas clarified that Triton "was not in the construction business." (*Id*. at 48:16-18.) Likewise, at Alexopoulos' citation examination, he testified that Triton "did not have anything to do with construction." (Ex. 14 at 51:6-8.) Alexopoulos also testified that Triton was "an entity that was set up with the expectation of trying to explore opportunities in the hospitality sector in Greece." (*Id*. at 51:21-24.)

13. According to Tsaparas, Hunt and M Sourcing's attorneys came up with the idea to pay Tsaparas for work he was performing for M Development through Triton because of the fraud case against him. (Ex. 5 at 64:23-65:11.) However, Hunt's testimony suggests it was Tsaparas' idea to use Triton for Tsaparas' consulting work for M Development. (Ex. 6 at 12:20-13:2.)

14. In addition to the divergent stories regarding the role of Triton, M Development and Judgment Debtors have never explained why Triton, whether involved in the construction industry or not, was purportedly provided a more than $4.1 million dollar loan from M Sourcing.[17] (Ex. 17.) NHC continues to explore the role of Triton in the professional and monetary relationship between M Development and/or M Sourcing, on the one hand, and the Judgment Debtors on the other hand.

## IV. The Formation of M Sourcing

15. M Sourcing was formed in November 2022, shortly *after* the Judgment was originally entered in this case.[18] (Ex. 18.) NHC now knows that Amundsen Davis, former counsel

---

[17] A true and correct copy of an Amended and Restated Promissory Note between Triton and M Sourcing is attached hereto as **Exhibit 17**.

[18] A true and correct copy of publicly available records of the Colorado Secretary of State is attached hereto as **Exhibit 18**.

for Judgment Debtors, Hunt, M Development, and M Sourcing, coordinated both the creation of M Sourcing and the documentation of the purported loan between Triton and M Sourcing.[19] (Ex. 19.)

## V. Prior Efforts to Obtain Information and Documents from the M Entities

16. On August 4 and 24, 2023, NHC served a third-party citation to discover assets on M Development and M Sourcing, respectively. (Dkt. Nos. 257, 262.)

17. In total, M Development and M Sourcing produced less than 300 pages of documents in response to those third-party citations, including Tsaparas' employment agreement with M Sourcing, partial payroll records, and various invoices pertaining to purported "construction services."

18. On September 22, 2023, NHC conducted the citation examination of Hunt based on the incomplete document production from M Development and M Sourcing.

19. Based on newly discovered information, on December 16, 2024, NHC filed an *ex parte* motion seeking the Court's permission to issue certain citations. (Dkt. No. 548.) On December 17, 2024, the Court granted NHC's *ex parte* motion. (Dkt. No. 550.)

20. Thereafter and pursuant to an agreement with counsel for M Development and M Sourcing, NHC served citations on M Development and M Sourcing.[20] (Exs. 20-21.)

21. Since the service of those citations in January 2025, on April 8, 2025 the M Entities produced a cumulative total of 319 pages of documents. This limited production is the result of numerous meet-and-confer discussions with counsel for the M Entities. In short, counsel for NHC has made repeated efforts to reach a compromise with the M Entities and eliminate the need for

---

[19] A true and correct copy of an email between M Development personnel and Amundsen Davis is attached hereto as **Exhibit 19**.
[20] True and correct copies of the third-party citation to discover assets served on M Development and M Sourcing are attached hereto as **Exhibits 20** and **21**, respectively.

Court intervention. Those efforts have included permitting the M Entities to make initial partial document productions responsive to select requests and attempting to gather documents and information from Judgment Debtors or other third parties.[21] Unfortunately, those efforts have been unsuccessful given the collusion and entanglement the M Entities have had with Judgment Debtors and the wholesale failure of Judgment Debtors to produce responsive information.

22. Once it became clear that a fulsome document production with respect to the M Entities would be necessary, on July 16, 2025, the undersigned sent an email to counsel for the M Entities requesting that counsel confirm the positions the M Entities had previously staked out with respect to the pending requests.[22] (Ex. 23.) In that email, the undersigned requested confirmation of the M Entities' position within five days. (*Id.*) On July 21, 2025, at the request of counsel for the M Entities, the parties engaged in yet another telephonic meet-and-confer. (*Id.*) That same day, counsel for the M Entities stated she would provide a response to NHC "by the end of this week or, at the latest, early next week." (*Id.*)

23. On July 30, 2025, counsel for the M Entities sent a lengthy written response to NHC. (*Id.*) While the response is long, it is not complex. The M Entities confirm that unless NHC agrees to narrow its existing requests, the M Entities "are not prepared to produce documents beyond those [previously] described[.]" (*Id.*) The response is relevant in two respects. *First*, it demonstrates NHC and the M Entities are at an impasse. *Second*, the timing of the response, provided the day of NHC's filing, is not a coincidence. The M Entities appear to be operating from the same playbook as several other third parties with close ties to Judgment Debtors – the

---

[21] A true and correct copy of correspondence from counsel for the M Entities setting forth the M Entities' general objections and positions with respect to the pending requests is attached hereto as **Exhibit 22**.
[22] A true and correct copy of an email chain between counsel for NHC and counsel for the M Entities is attached hereto as **Exhibit 23**. There are numerous other email communications regarding earlier meet-and-confer efforts, which are not included herein.

8

strategy is to delay and obfuscate through protracted meet-and-confer discussions and never-ending requests for clarification, with the end goal of running out the clock. This improper strategy should not be rewarded. The M Entities cannot avoid their obligation to provide a fulsome document production under the guise of engaging in endless consideration of more narrow and limited productions, if NHC will identify specific documents. NHC is entitled to a fulsome production of documents responsive to the requests and is not limited to documents it is aware of.

## ARGUMENT

### I. Legal Standard

24. Fed. R. Civ. P. 69 ("Rule 69") incorporates into federal law state post-judgment enforcement procedures. The incorporated state procedures in this district are Section 2-1402 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1402) and Illinois Supreme Court Rule 277, the state statutes and rules governing supplementary procedures. Thus, included within Rule 69 is the Court's authority to compel the production of documents in these citation proceedings to discover assets to apply to the judgment. *See GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 628 (7th Cir. 2013). The scope of permissible discovery by the judgment creditor is extremely broad: "more than one appellate court has held that extensive searching for assets — even described as 'a "fishing expedition"' — is permissible." *Id.*

### II. The M Entities Must Make a Fulsome Production of Documents Responsive to the Citations

25. Applying the broad scope of relevancy under Rule 69, the M Entities should be compelled to produce documents responsive to the citations. (Exs. 20-21.) The citations call for the production of documents related to: (i) the income or assets of Judgment Debtors (*see, e.g.*, Ex. 20 at Request Nos. 1-4, 8-16, 18, 25-26, 30-34, 36, 40-41, 43-47); (ii) the relationship between the M Entities and Judgment Debtors (*id.* at Request Nos. 7, 23-24, 35, 37-38); (iii) the relationship

9

between the M Entities and Triton (*id.* at Request Nos. 5-6); and (iv) corporate records of the M Entities and their relationship to one another (*id.* at Request Nos. 19-22, 27-29, 39, 42). To date, the M Entities have either not made a fulsome production of documents responsive to certain categories, or have refused to make a production at all.

*The Income or Assets of Judgment Debtors*

26. Identifying and locating the assets of Judgment Debtors is of paramount importance to NHC. As a result, NHC propounded numerous requests aimed at discovering Judgment Debtors' assets. It is NHC's understanding that the M Entities have taken the position that they have produced all documents responsive to these requests. Not so. Discovery provided by other third parties has identified at least *three* categories of documents which are responsive to these requests and have not been produced.

27. *First*, as the Court is well aware, the M Entities are responsible for the payment of a significant portion of Judgment Debtors' legal fees. As disclosed by Tsaparas in his "Disclosure of Legal Fees Pursuant to May 24, 2024 Court Directive" (Dkt. No. 563-1 at 5-6) and in his "Revised Disclosure of Legal Fee Payments" (Dkt. No. 561), M Development has paid approximately $803,653.73 to Amundsen Davis on behalf of Judgment Debtors. The M Entities have produced a *de minimis* amount of communications pertaining to these payments. Specifically, while the M Entities have produced ministerial communications related to some of these payments (*e.g.,* wire transfer confirmations, communications with Amundsen Davis to confirm receipt), the M Entities have not produced a single communication (*e.g.,* email or text message) between Tsaparas and any representative of the M Entities in which Tsaparas requests that these payments be made or the terms under which the payments are made. The implied

10

representation that no such communications exist regarding payment of more than $800,000 spread across nearly three years strains credulity.[23]

28. Moreover, the M Entities have not produced any communications or documents related to more recent payments made to Amundsen Davis on behalf of Judgment Debtors. Through third party discovery, NHC has learned that on or about September 13, 2024, M Sourcing sent a payment to Amundsen Davis in the amount of $63,400.60.[24] (Ex. 24.) The existence of this payment was not revealed by Tsaparas, the M Entities, or Amundsen Davis and no documents or communications related to this payment have been produced by the M Entities. Moreover, recent communications produced by Tsaparas reveal that on May 19, 2025, Nancy Turken, of M Development, sent Tsaparas a "draft of a new promissory note regarding legal fees." (Dkt. No. 729 at 10.) No draft promissory note or related correspondence has been produced.

29. *Second*, third-party discovery strongly indicates that Tsaparas possesses an ownership interest in at least one corporate entity which also involves the M Entities. Specifically, in a September 1, 2021, email Tsaparas told Ms. Van Senus that her "position is to act as the integrator of the *entire new company*."[25] (Ex. 25 (emphasis added).) While Tsaparas does not explain what "new company" he is referring to, later correspondence indicates that he likely is referring to a new entity in which he possesses an ownership interest.

---

[23] The absence of any text message correspondence on this subject is particularly vexing. To say that Tsaparas is a prolific communicator via text message is an understatement. By way of example, Ms. Van Senus produced over *three hundred pages* of text message communications between her and Tsaparas. The failure of the M Entities to produce a single text message between Tsaparas and Hunt (or any other representative of the M Entities) is a strong indication that the M Entities' document production is not complete.
[24] A true and correct copy of a text message communication with Corri McFadden is attached hereto as **Exhibit 24**.
[25] A true and correct copy of an email chain between Tsaparas and Ms. Van Senus is attached hereto as **Exhibit 25**.

30. Several months later, in a December 29, 2021 email from Tsaparas to Ms. Bateman-Hershey, he writes, "[o]n a personal note, I finalized my deal and executed the documents. Excited to begin a new chapter while I continue to do what I love."[26] (Ex. 26.) In response, Ms. Bateman-Hershey writes, "Congratulations on the deal. Is this for RH,[27] Crystal Palace, or both or something new? Nonetheless, I am sure you worked hard to do the deal and it will keep you very busy! Always good to be busy." (*Id.*) While somewhat unclear, this email correspondence does *not* appear to be related to Tsaparas' move to M Sourcing; his employment agreement with M. Sourcing is dated a full year later, in December 2022.

31. In multiple later emails, Ms. Bateman-Hershey congratulates Tsaparas "on the merger/acquisition by RH" and in a later email states that Tsaparas is closing down Centaur "but working for another newly-formed company that is RH and another investor" and "will eventually do a REIT."[28] (Group Ex. 27.) Ms. Bateman-Hershey testified that based, in part, on these emails and other communications she had with Tsaparas, it was her understanding that Tsaparas was involved in a joint venture with RH and had an ownership interest in multiple pieces of real estate as a result.[29] (Ex. 28 at 96:5-25, 97:1-14, 101:4-25, 102:1-25, 103:1-11.)

32. Additional third-party discovery indicates that Tsaparas' relationship with RH also included the M Entities. By way of example, Tsaparas' text messages with Ms. Van Senus contain multiple references to RH and the M Entities.[30] (Ex. 29 at 1 (Tsaparas: "Can you send me a pdf

---

[26] A true and correct copy of an email chain between Tsaparas and Ms. Bateman-Hershey is attached hereto as **Exhibit 26**.
[27] RH (formerly Restoration Hardware) appears to feature prominently in the Centaur to Triton to M Sourcing/M Development succession.
[28] A true and correct copy of emails between Tsaparas and Ms. Bateman-Hershey is attached hereto as **Group Exhibit 27**.
[29] A true and correct copy of portions of Ms. Bateman-Hershey's citation examination transcript is attached hereto as **Exhibit 28**.
[30] A true and correct copy of excerpts of text message communications between Tsaparas and Ms. Van Senus is attached hereto as **Exhibit 29**.

12

of the accountability chart for M/Rh global expansion?"); at 2 (Ms. Van Senus: "Nancy's response: [. . .] As an FYI, you are asking mark to put in $ for this and for payroll. Again, RH not paying not only makes us look bad but puts a huge burden on M. It's a vicious cycle[.]").)

33. *Finally*, the M Entities have not produced any communications with Tsaparas regarding the amount of his tax withholding. As outlined in greater detail in NHC's pending motion to compel production of tax documents (Dkt. No. 671), the production of documents and communications pertaining to Tsaparas' purported outstanding tax liabilities owed to the U.S. Internal Revenue Service and the additional withholding from his paycheck related to those purported liabilities is relevant to adjudicating lien priority of Tsaparas' assets. To date, the M Entities have produced partial payroll records related to Tsaparas, but no records pertaining to changes in his withholding or his outstanding tax obligations.

34. To be clear, NHC identifies the three above-referenced categories of documents relating to Judgment Debtors' assets, as *examples* of documents which have not been produced. These examples are not intended to be an exhaustive list of outstanding documents. Instead, they are provided to illustrate the failure of the M Entities to make a fulsome document production.

*The Relationship Between the M Entities and Judgment Debtors*

35. NHC is entitled to explore the relationship between the M Entities and Judgment Debtors and how those relationships have changed and evolved over time. M Development and Centaur allegedly began their relationship as separate entities often working together on various projects. (Ex. 1 at 18:21-24; Ex. 2 at 9:5-7.) However, NHC believes that during the pendency of the underlying litigation the relationship between M Development and Judgment Debtors changed dramatically and culminated in the transfer of personnel and assets from Centaur to the M Entities. NHC is seeking information related to possible alter ego and/or successor liability theory(ies) of

13

recovery. This Court has already ruled NHC is entitled to pursue this information. (Dkt. No. 674 (permitting "NHC to seek documents relating to its successor liability theory."); *see also Sullivan v. Alpine Irrigation Co.*, 2011 U.S. Dist. LEXIS 44571, at *14 (N.D. Ill. Apr. 25, 2011) ("not only has the Seventh Circuit allowed judgment creditors to pursue successor liability claims in supplemental proceedings, but other Illinois courts have as well.") (citations omitted).)

36. Moreover, NHC is entitled to explore other aspects of the relationship between the M Entities and Judgment Debtors, including any additional contracts or agreements between them and any references in the corporate records of the M Entities with respect to Judgment Debtors.

*The Relationship Between the M Entities and Triton*

37. Between August 26, 2022, and January 10, 2023, Triton issued a total of 11 invoices to the M Entities for a total amount due of $211,538.47. (Group Ex. 15.) The invoices are substantively identical and all seek payment for undefined "Construction Services." (*Id.*) Moreover, a total of $1,747,356.47 in payments were made to Triton by M Development. (Ex. 16.) However, as outlined in greater detail above (*see* ¶¶ 10-14 *supra*), NHC has received wildly different versions of events regarding the purpose of Triton and whether or not it performed any construction related work. To date, the M Entities have not produced *any* documents and communications pertaining to their relationship with Triton or with respect to any work Triton purportedly performed on their behalf (whether related to the Triton invoices or otherwise).

38. NHC is entitled to documents and communications related to Triton, an entity which is/was owed by Tsaparas and Alexopoulos. (Ex. 13 at 43:7-45:2; Ex. 14 50:19-53:2.) Specifically, NHC is entitled to documents and communications related to the work performed by Triton on behalf of the M Entities, payment for that work, loan agreements with Triton (Ex. 17), and the associated indemnification agreement with Triton.

14

*Corporate Records of the M Entities and Their Relationship to One Another*

39. While M Development has operated since approximately 1997, M Sourcing was created in November 2022, shortly after the Judgment was originally entered in this case. Despite a shifting story, Tsaparas' employment agreement indicates that he is an employee of M Sourcing, and not M Development.[31] (Ex. 30.) NHC is entitled to explore the relationship between the M Entities and the ownership of each entity.[32] Moreover, NHC is entitled to explore the rationale behind creating a "new" entity, M Sourcing, to "employ" Tsaparas after M Development had existed and been operating for approximately 25 years. As with the other categories of requests, this information may assist NHC in identifying and locating assets of the Judgment Debtors, including any purported ownership interest possessed by Judgment Debtors in relation to the M Entities, the transfer of Centaur's operations under the guise of the M Entities and the terms of any compensation, loans, or other monies or interests provided to Judgment Debtors by the M Entities.

WHEREFORE, for the above and foregoing reasons, NHC LLC respectfully requests that this Court enter an Order:

(i) compelling M Development, LLC and M Sourcing, LLC to make a fulsome production of documents in response to the third party citations to discover assets served on each entity within 14 days; and

(ii) granting NHC such other, further, or additional relief in its favor and against M Development, LLC and M Sourcing, LLC as this Court deems fair, just, and equitable.

---

[31] A true and correct copy of Tsaparas' employment agreement is attached hereto as **Exhibit 30**.

[32] As the Court may recall, Tsaparas and third party Sachse Construction have publicly held out Tsaparas as a "principal" of M Development. (Dkt. No. 526 at ¶¶ 30-31.) While those statements were initially believed to be based solely on representations from Tsaparas in preparation for a "Retail Summit," documents subsequently obtained by NHC from Sachse Construction and various FOIA requests have confirmed that the M Entities, Tsaparas, and Sachse Construction worked collaboratively on numerous construction projects. As a result, these representations appear to be based, in part, on Sachse Construction's longstanding professional relationship with Tsaparas.

15

Dated: July 30, 2025                                    Respectfully submitted,

                                                                               NHC LLC


                                                           By: /s/ *Zachary J. Watters*
                                                                         One of Its Attorneys

Daniel P. Jackson, Bar No. 6289813
Bryan K. Clark, Bar No. 6296090
Zachary J. Watters, Bar No. 6310675
Allison E. Czerniak, Bar No. 6319273
Keeley A. Sawyer, Bar No. 6336704
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T: +1 312 609 7500
djackson@vedderprice.com
bclark@vedderprice.com
zwatters@vedderprice.com
aczerniak@vedderprice.com
ksawyer@vedderprice.com

Gini S. Marziani, Bar No. 3127421
Davis McGrath LLC
125 S. Wacker Drive
Chicago, Illinois 60606
T: +1 312 332 3033
gsmarziani@davismcgrath.com

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 30, 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system and thereby served electronically by the CM/ECF system on all counsel of record.

Additionally, I hereby certify that, on July 30, 2025, a true and correct copy the foregoing was served on the following individuals and entities in the manner indicated below:

Spiro Tsaparas
Via email to spiro@msourcingllc.com

Peter Alexopoulos
Via email to peter@srtrainingllc.com

Centaur Construction Company
Via U.S. First Class Mail
Illinois Secretary of State
501 S. Second St., Suite 328
Springfield, IL 62756

M Development, LLC and M Sourcing, LLC
Jessica Arett
Venable LLP
Jarett@venable.com
*Counsel for M Development, LLC and M Sourcing, LLC*

/s/ Zachary J. Watters
An Attorney for NHC LLC