> **NONPRECEDENTIAL DISPOSITION**
> To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals
### For the Seventh Circuit
### Chicago, Illinois 60604

Argued January 17, 2024
Decided September 24, 2025

**Before**

JOEL M. FLAUM, *Circuit Judge*[*]

FRANK H. EASTERBROOK, *Circuit Judge*

DORIS L. PRYOR, *Circuit Judge*

No. 23-1719

| | |
|---|---|
| NHC LLC, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 19-cv-06332 |
| CENTAUR CONSTRUCTION COMPANY INC., SPIRO TSAPARAS, and PETER ALEXOPOULOS, *Defendants-Appellants*. | Matthew F. Kennelly, *Judge*. |

**O R D E R**

In 2017, NHC LLC hired Centaur Construction Company, Inc. to design and build the Nobu Hotel in Chicago's West Loop neighborhood. NHC sued Centaur and two of its officers, Spiro Tsaparas and Peter Alexopoulos, for fraud and breach of contract. In particular, NHC alleged that Defendants falsely represented that they had

---

[*] Circuit Judge Flaum passed away on December 4, 2024, and did not participate in the decision of this case, which is being resolved under 28 U.S.C. § 46(d) by a quorum of the panel.

Case: 1:19-cv-06332 Document #: 837 Filed: 10/16/25 Page 2 of 8 PageID #:34201
Case: 23-1719     Document: 00714639584     Filed: 10/16/2025     Pages: 8

No. 23-1719          Page 2

completed work for which they requested payment from NHC, failed to pay project subcontractors, and failed to complete the project on time and within budget. The district court found Defendants liable for breach of contract on summary judgment, and a jury found Defendants liable for fraud and awarded NHC over $20 million in damages. The district court denied Defendants' motions for a new trial and judgment as a matter of law. We affirm.

## I. Background

### A. Factual Background

In 2017, NHC purchased the Chicago Nobu Hotel project, which was already underway but had stalled under previous ownership. NHC then promoted Centaur from its position as the project's general contractor to the project's lead designer and builder. Centaur's CEO, Spiro Tsaparas, and President, Peter Alexopoulos, were responsible for negotiating the contract with NHC, which the parties called a design-build agreement. Before signing the contract, one of NHC's owners, Rodrigo Chapur, told Tsaparas that NHC would not spend more than $49 million to build the hotel. Tsaparas drafted a payment schedule in line with Chapur's stipulation and told Chapur that payment requests would be "for work performed."

The parties signed the design-build agreement on April 16, 2018, which stated that the total cost of the project would not exceed $48,257,000. Among other things, the agreement required Centaur to substantially complete the project within 400 days after beginning construction; submit "[a]pplications for [p]ayment"—*i.e.*, invoices—for completed portions of work; provide accurate reports of completion progress; and pay subcontractors within seven days of receiving a payment from NHC for the work of the subcontractor. Alexopoulos was responsible for signing the invoices on a monthly basis, which were to align with the agreed-upon payment schedule between Tsaparas and Chapur.

As the project progressed, Tsaparas repeatedly represented to NHC that the project was under budget and on schedule. Yet, it was later revealed that the project was over budget by millions, in part because Centaur had used NHC funds to pay expenses unrelated to the project instead of paying subcontractors. For example, Centaur used NHC's progress payments to repay loans incurred prior to the construction of the Nobu Hotel. It also transferred nearly $2 million directly to Alexopoulos and Tsaparas. NHC spent roughly $20 million to cover subcontractor liens and to hire another firm to finish construction.

Tsaparas eventually admitted the project was over budget and attempted to repair the relationship with NHC. In July and August 2019, he told Chapur by text message that he took "full responsibility for the contract overruns," asked Chapur to "wire [him] the funds to pay the trades" so he could "keep [his] world at bay and keep the job going," and acknowledged that "credibility ha[d] been lost." And in a July 2019 email, he offered Chapur "a simple yet accurate update on the final cost to complete the project." He explained that Centaur's outstanding financial responsibility at that time exceeded $9 million.

Shortly thereafter, NHC sued Centaur, Tsaparas, and Alexopoulos. Among other things, NHC alleged that Tsaparas falsely represented that the project was just $750,000 over budget and behind schedule by "a month or two at the max"; that Alexopoulos made false representations when signing invoices, including an invoice that falsely stated Centaur had "earned" and "completed" construction work nearing $47 million; and that NHC relied on these misrepresentations by continuing to make progress payments to Centaur. It sought damages and attorneys' fees as a result.

### B. Procedural History

The parties cross-moved for summary judgment on the breach of contract claim. Defendants moved for partial summary judgment on the fraud claim as well. The district court granted in part NHC's motion for summary judgment on the breach of contract claim, concluding that Defendants breached several provisions of the design-build agreement relating to schedule, budget, and subcontractor payments. It denied Defendants summary judgment with respect to the fraud claim, which, along with the question of damages for breach of contract, proceeded to trial.

NHC submitted its proposed witness list in anticipation of trial, which included a project accountant, Manuel Nuñez, who had worked in Mexico for NHC's parent company, Corporación Inmobiliaria KTRC—also known as RCD. At a previously held remote deposition, Nuñez testified that his role on the Nobu project was to obtain proof that subcontractors had been paid. He recounted that in December 2018, he and Chapur met with Tsaparas to obtain documentation showing the money Centaur had paid to subcontractors. According to Nuñez, Tsaparas did not provide the supporting documents Nuñez sought and could not explain why invoices were inaccurate.

NHC's witness list indicated that Nuñez's address was "[u]nknown," and that NHC expected to use the transcript of his deposition at trial. NHC reported that Nuñez had resigned from RCD and clarified that Nuñez was never employed by NHC itself.

Defendants moved to compel Nuñez's live testimony or for a missing witness instruction. They asserted that the proposed jury instructions reflected new allegations against Alexopoulos that they did not have the chance to question Nuñez about, including that Alexopoulos "made false statements of material fact regarding the project being on budget or … on schedule." In Defendants' view, that allegation originally was imputed to Tsaparas. When asked to clarify their position, however, Defendants admitted that the jury instructions did not list any newly-alleged misrepresentations allegedly made by either Tsaparas or Alexopoulos; instead, they noted differences in the "wording" that they viewed as "significant[]." The district court denied the motion, observing that there was not "anything material that ha[d] … changed since the [Nuñez] deposition that would make the deposition[] inadequate."

Defendants also submitted several motions *in limine*. Relevant here, they sought to exclude the July 2019 correspondence between Tsaparas and Chapur because it took place before the lawsuit was filed and constituted "preemptory settlement discussions" aimed at avoiding litigation. The district judge denied the motion because although Tsaparas and Chapur discussed outstanding construction costs, the email did not show a compromise offer within the meaning of Federal Rule of Evidence 408.

The case proceeded to trial. The jury found in favor of NHC on the fraud claim. It also awarded NHC compensatory and punitive damages. Defendants moved for a new trial or judgment as a matter of law on the breach of contract and fraud claims. The district court denied the motions.

## II. Discussion

We considered all ten of Defendants' questions presented and find that only two merit discussion. First, whether the district court abused its discretion by admitting evidence of settlement discussions. *See* FED. R. EVID. 408(a). Second, whether the district court abused its discretion by denying Defendants' request to issue a missing witness instruction.

### A. Admission of the July 2019 Email

We review the denial of motions *in limine* for an abuse of discretion. *Stegall v. Saul*, 943 F.3d 1124, 1127 (7th Cir. 2019). "We will reverse only if no reasonable person would agree with the trial court's ruling and the error likely affected the outcome of the trial." *Hernandez v. City of Peoria*, 135 F.4th 517, 527 (7th Cir. 2025) (quoting *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013)).

No. 23-1719 Page 5

Defendants argue the July 24, 2019, email from Tsaparas to Chapur constitutes evidence of settlement negotiations, which are inadmissible under Federal Rule of Evidence 408. In their view, Tsaparas's email reflected an effort to avoid litigation, which he knew was imminent. NHC responds that Rule 408 does not apply because the email contains no offer to settle or proposed terms of settlement, mention of litigation, or mention of any attorneys involved.

Federal Rule of Evidence 408 prohibits the admission of evidence of compromise offers and statements made during compromise negotiations to prove "the validity or amount of a disputed claim." FED. R. EVID. 408(a); *see also Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 688–89 (7th Cir. 2005). The party opposing admission must "make a 'substantial showing'" that the evidence was part of a settlement attempt. *Raybestos Prods. Co. v. Younger*, 54 F.3d 1234, 1241 (7th Cir. 1995) (quoting *New Burnham Homes, Inc. v. Village of Burnham*, 910 F.2d 1474, 1482 (7th Cir. 1990)). In reviewing the evidence, we consider "the totality of the circumstances," which include "the contents of the [communication] and the timing of its delivery." *Id.*

In *Raybestos*, a manufacturer of car parts sued a mechanic servicer and its president for making defamatory statements about the manufacturer's products. *Id.* at 1236–37. The plaintiff alleged the defendants launched a "deliberate campaign" by publishing statements that the plaintiff's products were defective. *Id.* at 1238. Eight months before the litigation began, the defendants wrote a letter to the plaintiff with a plan that would require the plaintiff to pay for research to identify problems with its products and avoid litigation. *Id.* at 1240. The plaintiff sought to offer this letter as evidence of intimidation tactics by the defendants, but the defendants argued the letter was inadmissible evidence of settlement discussions. *Id.* at 1241. We affirmed the district court's decision to admit the letter, reasoning that "the record and the atmosphere in which this letter was sent" reflected that settlement discussions had not begun. *Id.* For instance, we observed that no such discussions had yet been initiated by the plaintiff, and even assuming the defendant intended the letter to "avoid *potential* litigation," the timing and contents of the letter did not show that settlement discussions had begun. *Id.* (emphasis in original).

So too, here. Tsaparas sent the July 24, 2019, email prior to this litigation. Even if Tsaparas correctly predicted that litigation was forthcoming, that belief, without more, is not proof that settlement discussions had begun. The email's content similarly does not help Defendants, as it made no mention of lawyers, compromise, or settlement; and it did not reflect a dispute about whether any funds were owed or to whom. That

Tsaparas later sent Chapur text messages in August 2019 asking NHC not to file suit does not change the result, as these messages post-date the July 24 email and, in any event, do not reflect an effort by NHC to initiate or participate in settlement discussions. "[T]he record and the atmosphere" surrounding the email was that of a worried businessman attempting to placate his customer and avoid a lawsuit, not an attempt to settle a dispute about funds he still owed. *Id*.

It is true that Tsaparas's representation in his email that Centaur had outstanding financial responsibilities as of July 24, 2019, could be used to help establish the validity or amount of NHC's claims. But Rule 408 does not prohibit using evidence for this purpose where the evidence does not show the parties engaging in settlement negotiations. *See* FED. R. EVID. 408. Because Defendants did not make a substantial showing that the email was part of a settlement attempt, the district court did not abuse its discretion in admitting the evidence at trial.

### B. Missing Witness Instruction

Defendants also argue the district court erred by failing to issue a missing witness instruction about Manuel Nuñez. District courts have broad discretion in deciding whether to issue a missing witness instruction, and we review that decision for abuse of discretion. *United States v. Foster*, 701 F.3d 1142, 1154 (7th Cir. 2012).

A missing witness instruction allows the jury to infer the missing witness's testimony would have been unfavorable to the party that arguably should have, but failed to, make the witness available for trial. *United States v. DiSantis*, 565 F.3d 354, 364 (7th Cir. 2009). The instruction is "generally disfavored" and warranted only when the proponent of the instruction shows that (1) the witness was "peculiarly" within the opponent's "power to produce" and (2) the witness's "testimony would have elucidated issues in the case and would not merely have been cumulative." *Id*. (quoting *United States v. Gant*, 396 F.3d 906, 910 (7th Cir. 2005)). We find neither prong satisfied here.

#### 1. *Power to Produce*

"A witness is peculiarly within the [opponent's] power to produce when the witness is physically available only to the [opponent], or where the witness's relationship with the [opponent] makes his testimony, in pragmatic terms, available only to the [opponent]." *United States v. Christ*, 513 F.3d 762, 773 (7th Cir. 2008). Defendants contend that Nuñez was within only NHC's power to produce because he lived in Mexico and worked for NHC. We disagree.

First, Defendants have not shown that Nuñez was physically available to NHC. A missing witness instruction is not warranted when, "through neither party's fault[,] the witness was physically *un*available to both parties." *United States v. Pizarro*, 717 F.2d 336, 346 (7th Cir. 1983) (emphasis in original). Under Federal Rule of Civil Procedure 32(a)(4)(B), a witness is unavailable when "the witness is … outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition." Here, Nuñez lived in Mexico, and Defendants' speculation as to "gamesmanship" by NHC does not reflect that NHC procured his absence intentionally.

Second, Nuñez was not pragmatically available to NHC. While pragmatic availability can be based on the opponent's employment of a witness, *Christ*, 513 F.3d at 773, the record does not reflect that NHC employed Nuñez. Nuñez testified at his deposition that he worked for RCD and did not report to NHC. NHC's lawyers likewise represented that Nuñez was never an NHC employee. And although Nuñez had a limited role on the Nobu project as part of his employment with RCD, he quit his job before trial and there is no evidence that he ever had a personal interest in the success of NHC at trial. *See id.* at 772–74 (affirming denial of a missing witness instruction when, despite the absent witness's employment by a party, he did not have a personal stake in the outcome of the case). Moreover, Nuñez's willingness to provide deposition testimony when called by Defendants further undermines Defendants' position, as a missing witness instruction requires the evidence to "reflect the [proponent's] inability to present that same testimony." *Pizarro*, 717 F.2d at 346.

### 2. *Cumulativeness*

Defendants also do not show that Nuñez's testimony would have elucidated issues in the case as opposed to merely being cumulative. *Foster*, 701 F.3d at 1154. Recall the proposed jury instructions, submitted after Nuñez was deposed, alleged that both Tsaparas and Alexopoulos misrepresented the project's budget and schedule. Defendants argued to the district court that the operative complaint did not contain such allegations with respect to Alexopoulos and that Nuñez's live testimony was therefore critical to exploring the new allegations. Yet, Defendants then admitted to the district court that nothing "brand new" had been added to the jury instructions that was absent from the complaint. And Defendants do not otherwise show that Nuñez's live testimony would have elucidated issues involving Alexopoulos, particularly given that Defendants represented to the district court that they had already asked Nuñez about his meetings with Centaur representatives.

No. 23-1719 Page 8

In sum, Nuñez was not peculiarly within NHC's power to produce, and his live testimony would not have elucidated the issues in the case. Therefore, the district court did not abuse its discretion in declining to provide the missing witness instruction.

### III. CONCLUSION

The district court did not abuse its discretion in admitting an email that did not contain evidence of settlement discussions, nor in declining to issue a missing witness instruction. Defendants' remaining arguments are also unavailing and do not merit discussion. Accordingly, we AFFIRM the judgment of the district court.